1 | J. Craig Crawford (Bar No. 238466)
ccrawford@carr-mcclellan.com
2 | Christian P. Foote (Bar No. 240919)
cfoote@carr-mcclellan.com
3 | CARR McCLELLAN P.C.
216 Park Road
4 | Burlingame, California 94010
Telephone:   (650) 342-9600
5 | Facsimile:   (650) 342-7685

6 | Attorneys for Plaintiffs
Christopher Cardinal, Kitchen Experts of California, Inc. and
7 | American Appliance Outlet, LLC

8

9 | UNITED STATES DISTRICT COURT

10 | NORTHERN DISTRICT OF CALIFORNIA

11

12 | CHRISTOPHER CARDINAL, KITCHEN
EXPERTS OF CALIFORNIA, INC., and
13 | AMERICAN APPLIANCE OUTLET,
LLC,

Case No.

**COMPLAINT FOR:**

14
Plaintiffs,
15
v.
16
17 | JOHN LUPO, ANDREANA MICHAEL,
KITCHEN FANTASTIC, INC.,
APPLIANCE FANTASTIC, INC.,
18 | BRYCE PHELTON, MOHEBA D'ANNA,
and DOES 1 though 20, inclusive,
19
Defendants.
20

(1)   Fraudulent Misrepresentation
(2)   Negligent Misrepresentation
(3)   Aiding and Abetting Fraud
(4)   Breach of Contract (by Kitchen Experts)
(5)   Breach of Contract (by Cardinal)
(6)   Breach of Duty of Good Faith and Fair
        Dealing
(7)   Trade Libel
(8)   Intentional Interference with Contractual
        Relations
(9)   Intentional Interference with Prospective
        Economic Relations
(10)  Breach of Duty of Loyalty
(11)  Inducing Breach of Duty of Loyalty
(12)  Conversion
(13)  Violation of Computer Fraud and Abuse
        Act
(14)  Violation of the Stored Communications
        Act
(15)  Unfair Business Practice in Violation of
        Business & Professions Code § 17200

**JURY TRIAL DEMAND**

Complaint

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### NATURE OF THE ACTION

1.     Plaintiffs bring this action to put a stop to a fraudulent scheme orchestrated by John Lupo, his company Kitchen Fantastic, and the individual co-conspirators who participated in a plan to defame, defraud, and unfairly compete with Lupo's prior company, Kitchen Experts, and the individual who purchased it, Christopher Cardinal.  Lupo's fraud was an elaborate one involving pre-sale misrepresentations and omissions followed by post-sale unfair competition singularly aimed at putting his prior company out of business, positioning himself and his new company to inherit the business, customers, and employees he sold to Cardinal only months earlier.

2.     The first part of Lupo's scheme involved the sale of his residential kitchen remodeling company for a grossly inflated value.  To achieve this first step, Lupo presented half-baked books and records and concealed hundreds of thousands of dollars of trade debt and outstanding liabilities, rendering it impossible for Cardinal to accurately assess the true value of Kitchen Experts during the due diligence period leading up to the sale.  As a result of Lupo's misstated valuation and concealed debt, he was able to extract a sales price of $2 million—an amount grossly in excess of Kitchen Experts' actual value.

3.     But this fraudulent sale was only the first step in Lupo's two-step scheme.  The next step contemplated Lupo setting up a competing kitchen remodeling business for the singular purpose of devaluing Kitchen Experts after the close of the sale.  Lupo set out to achieve this second step through an elaborate series of transactions.  Lupo first issued a series of checks from Kitchen Experts' account that were timed to post shortly after close, drawing down on Kitchen Experts' operating cash at this critical transitional period.  Lupo next formed a competing business with an intentionally confusing name, based upon the same business model, offering the same services as Kitchen Experts, and appearing to consumers and vendors to be affiliated with Kitchen Experts.  Lupo did so despite his repeated and documented statements during negotiations that he did not need to—and would not—sign a non-competition provision because he intended to retire to Tennessee so that he could purchase a large house, raise his family, and start a new occupation in the cabinet industry.  Next, Lupo embarked on a strategy of actively

1   undermining Kitchen Experts by diverting customers away from Kitchen Experts and its affiliates

2   towards Kitchen Fantastic, by poaching Kitchen Experts' most valued and profitable employees,

3   and by defaming and disparaging Kitchen Experts to its employees, customers, and vendors to

4   ensure that Kitchen Experts could no longer get the customers, vendor relationships, and

5   construction crews it needed to compete and stay in business. Finally, Lupo sought to disrupt and

6   interfere with Kitchen Experts' valuable and critical vendor and finance relations.

7        4.     Lupo almost succeeded. His initial efforts were largely successful and caused

8   Kitchen Experts to suffer significant losses in employees and associated revenue, as well as

9   several potential customers. Perhaps more importantly, Lupo's scheme required Kitchen Experts'

10   key personnel to devote untold hours and effort to fighting Lupo's false, defamatory, and

11   unlawful actions just to stay in business during a critical period of transition where their time and

12   effort would be much better spent elsewhere. These long hours and periods of uncertainty caused

13   Kitchen Experts' principals to suffer unnecessary stress and anxiety for many months. Having

14   now weathered this unexpected storm, Kitchen Experts is in a position to hold those responsible

15   for its injuries accountable for their conduct.

16                           **PARTIES**

17        5.     Plaintiff Christopher Cardinal is an individual and resident of California.

18        6.     Plaintiff Kitchen Experts of California, Inc. ("Kitchen Experts") is a duly-

19   organized corporation with its headquarters and principal place of business in Pleasanton,

20   California.

21        7.     American Appliance Outlet, LLC ("AAO") is a California limited liability

22   company headquartered in Pleasanton, California.

23        8.     Defendant John Lupo is an individual and resident of California.

24        9.     Defendant Andreana Michael is an individual and resident of California. Ms.

25   Michael is also known as Andreana Lupo and is the wife of John Lupo.

26        10.    Defendant Bryce Phelton is an individual and resident of Contra Costa County,

27   California.

28        11.    Defendant Kitchen Fantastic, Inc. ("Kitchen Fantastic") is a duly-organized

1    corporation headquartered in Livermore, Alameda County, California.

2         12.    Defendant Appliance Fantastic, Inc. is a duly-organized corporation headquartered

3    in Livermore, Alameda County, California.

4         13.    Various others, presently unknown to Plaintiffs, participated as co-conspirators

5    with defendants in the violations of law alleged in this Complaint and have engaged in conduct

6    and made statements in furtherance thereof.  DOES 1-10 are individuals who were employed by

7    Plaintiffs and participated in the activity which is the subject of this action. DOES 11-20 are

8    outside individuals and business entities of unknown form that participated in the activity which

9    is the subject of this action.  Plaintiffs do not know the true names and capacities of the

10    defendants named in this action as DOES 1-20, and therefore sue them under fictitious names.

11    Plaintiffs will request permission to amend this Complaint to state the true names and capacities

12    of these fictitiously named defendants when they ascertain them. Plaintiffs are informed and

13    believe, and allege on this ground, that these fictitiously named defendants are legally responsible

14    in some manner for the acts and omissions set forth below, and therefore are liable to them for the

15    relief requested.

16         14.    Plaintiffs are informed and believe, and on that basis allege, that at all times herein

17    mentioned each of the defendants was the agent, servant, employee, and/or co-conspirator of each

18    of the other defendants, and, in doing the acts hereinafter alleged, was acting within the course

19    and scope of their authority as such agent, servant, employee, and/or co-conspirator with the

20    permission and consent of their co-defendants and, further, that the defendants, and each of them,

21    have authorized, ratified, and approved the acts of each of the other defendants with full

22    knowledge of those acts.

23                  **JURISDICTION AND VENUE**

24         15.    This Court has original subject matter jurisdiction of this action under 28 U.S.C.

25    §§ 1331, 1338, and 1367.

26         16.    This court has supplemental jurisdiction over the state law claims for fraud,

27    negligent misrepresentation, breach of contract, tortious interference, conversion, trade libel, and

28    unfair competition.

17.     This Court has personal jurisdiction over Defendants and their principals because their residences and principal places of business are located in California and within the jurisdiction of this Court.  Defendants also conducted business in California and purposefully committed the acts from which these claims arise within California while knowing and intending that such acts would cause injury within the state to Plaintiffs, all of whom are residents of California.

## STATEMENT OF FACTS

**A.      The False Bill of Goods: Cardinal Buys Kitchen Experts Based on Lupo's Fraud.**

18.     Chris Cardinal is a successful marketing and technology professional who has branched out into charity and philanthropy. Cardinal also invested in cash-flow positive businesses with the end goal of supporting his favored charitable programs. In 2017, Cardinal was approached with the opportunity to purchase a successful kitchen remodel construction company, Kitchen Experts, whose owner was John Lupo.

19.     Non-compete agreements are the norm in sales of closely held businesses, and naturally Cardinal demanded such a clause during the contract negotiations. Lupo refused to sign one.  He said that such a clause was totally unnecessary because he was moving to Tennessee. Lupo told a story of how he regretted raising kids from a prior marriage in California, and that he wanted his younger kids to grow up in a more tranquil environment. Lupo went so far as to demand a clause in the Stock Purchase Agreement that required Kitchen Experts to purchase certain cabinets from the company that he would be starting in Tennessee. (The Stock Purchase Agreement is attached to the Complaint as Exhibit A.)

20.     Cardinal ultimately agreed to purchase Kitchen Experts from Lupo for approximately $2 million. In addition to the story spun by Lupo, Cardinal's consent was obtained, inter alia, by virtue of numerous material representations and warranties in the Stock Purchase Agreement.

21.     Under section 3.6, "Books of the Corporation," Lupo represented that:

> to the best of [his] knowledge, there are no liabilities in excess of
> $5,000 which are presently known to John Lupo that are required to
> be reflected on the books of the Company in accordance with the

1  historic accounting practices of the Company. The Corporation has
   not guaranteed and is not a current guarantor of the liabilities or
2  obligations of any other Person or entity.

3      22.   Lupo represented that the company "has good and valid title to all of its assets,

4  free and clear of all Liens." ¶ 3.7, "Assets". Lupo represented that he had allowed Cardinal

5  access to "true, correct and complete copies" of the company's financial records for 2014 and

6  2015, and that those "books and records are complete and correct in all material respects and have

7  been accurately prepared from the Corporation's books and records in accordance with the

8  Corporation's customary practices and policies, applied on a consistent basis." ¶ 3.13

9      23.   Further, section 3.16, "Disclosure" stated:

10     No representation or warranty or other statement made by Seller in
       this Agreement or the Schedules or certificates to be delivered by
11     Seller pursuant to this Agreement contained, contains or will
       contain any untrue statement or omitted, omits or will omit to state
12     a material fact necessary to make any of them, in light of the
       circumstances in which they were made, not misleading.
13

14     24.   In the kitchen remodel business, by far a company's most important assets are its

15  workers. Companies with the most skilled, efficient and experienced crews win out over those

16  with less talented employees. The work product of the crew, more than anything else, is the

17  distinguishing feature of a winning business in this field. In his discussions regarding the

18  purchase of Kitchen Experts, John Lupo explained that Kitchen Experts had the best crews in the

19  business.

20     25.   The Stock Purchase Agreement contained a strong non-solicitation provision:

21     For a period of five (5) years after the Closing Date, Seller shall not
       at any time directly or indirectly, by or for himself, or as the agent
22     of another, or through others as his agent, in any way solicit or take
       away, or attempt to solicit or take away, any employee, officer,
23     director, representative, consultant, or other agent of the
       Corporation (with the exception of Bryce Phelton) whether such
24     person is presently employed by Buyer or the Corporation or may
       hereafter be so employed.
25

26  See ¶ 4. 7, Non-Solicitation Covenant.

27

28

Complaint

**B.     Cardinal Discovers the True State of Kitchen Experts and Uncovers Lupo's Significant Misstatements and Omissions.**

26.     Shortly after the close of the sale, Cardinal and Kitchen Experts' executive team discovered that Kitchen Experts had significantly more debt than Lupo had previously represented.  Lupo represented that the debts were limited to several small trade accounts and that no debt exceeded $5,000.  In the days, weeks, and months following the close of the sale, a nightmarish parade of creditors appeared seemingly every day with new claims of significant debt.  Much of this debt appeared to be trade accounts, though others were clearly personal in nature and were for the personal benefit of Lupo, Michael, and their family.  None of this debt was disclosed during the negations and the due diligence period, and Lupo actively concealed these debts from Cardinal.

27.     These debts were so substantial and numerous that Lupo must have known about them, and included without limitation the following items, none of which were included in Lupo's disclosures and were not recorded in Kitchen Experts' books and records presented to Cardinal during the due diligence period:

        a.   $38,440.40 to Home Depot

        b.   $21,144.00 to GreenSky

        c.   $5,570.00 to DeSando Insurance

        d.   $5,855.04 to Decorative Specialties

        e.   $20,150.00 to Pristine Environmental LLC

        f.   $6,459.79 to Franchise Tax Board

        g.   $1,948.96 to Castlewood Country Club (Lupo personal expense)

        h.   $11,478.07 to J & K Cabinetry

        i.   $11,000.05 to Elkay / Medallion

28.     Cardinal's investigation into these misrepresentations and omission is ongoing.  However, these undisclosed debts exceed $192,000—or approximately 10% of the entire purchase price.

**C.**   **Cardinal and Kitchen Experts Discover that Lupo Started a Competing Kitchen Remodel Business in the Same Market, Using the Same Employees, and Using a Confusingly Similar Name and Image as Kitchen Experts.**

29.   After the deal closed, Lupo violated the SPA by failing to support Kitchen Experts' transition by not providing the promised consulting services per Section 4.6.  That section required:

> 4.6 Consulting by John Lupo. John Lupo agrees to make himself available by phone or in person, after reasonable notice, during normal business hours, for up to 15 hours per week from the time of the Closing until December 15, 2017, for the purpose of consulting with the Buyer about the operations of the Business. Lupo shall receive $5,000 per month payable in accordance with the Corporation's standard payroll practices after the Closing.

30.   It became clear after the deal closed, however, that Lupo was incapable of providing the promised consulting services. As it turns out, Lupo was too busy setting up Kitchen Fantastic to be able to provide consulting to Kitchen Experts.  John Lupo incorporated Kitchen Fantastic, Inc. on August 3, 2017—just *two months* after he closed the sale of his shares in Kitchen Experts to Cardinal.

31.   At the core of Lupo's new business, Kitchen Fantastic, was stealing Kitchen Experts' valuable, experienced, and highly profitable construction crews in direct violation of the non-solicitation provision of the SPA. Despite promising not to solicit a single Kitchen Expert employee, Lupo directly and indirectly solicited nearly each and every one of Kitchen Experts' foremen and its operations manager.  These employees included:

a.   Luis Daza;

b.   Eliseo Salazar;

c.   Inosencio Perez;

d.   Ricardo Vargas;

e.   Fernando Vargas;

f.   Miguel Cisneros;

g.   Christian Mendoza;

h.   Saul Aguilar;

i.   Isaias Aguilar;

j.   Aaron Nunez;

k.   Travis Roth;

l.   Dean Geary; and

m.  Anne Barlow.

32.    To induce these employees to leave Kitchen Experts for Kitchen Fantastic, Lupo promised these employees more money and offered to pay them in cash with the intention of avoiding payroll taxes on these wages. Lupo also greased the rails from Kitchen Experts to Kitchen Fantastic by spreading false and derogatory rumors of Kitchen Experts' impending demise—a prophecy Lupo was intent on fulfilling.  Fearful of the prospects of Kitchen Experts' failures, as told to them by their former boss and employer, several employees understandably left Kitchen Experts for the seemingly safer employ and higher wages offered by Lupo at Kitchen Fantastic.  Other Kitchen Experts' employees were—and remain—tempted by Lupo's misstatements and unlawful and false inducements.

33.    Unfortunately for Kitchen Experts, Lupo's efforts were successful both in soliciting employees as well as causing distrust, anxiety and distraction within Kitchen Experts. One crew that Lupo and Kitchen Fantastic were able to successfully lure away from Kitchen Experts was the crew run by Luis Daza.  Kitchen Experts discovered Lupo's successful solicitation of Daza away from Kitchen Experts when Kitchen Experts' President James Franchini and Operations Manager Anne Barlow visited Kitchen Fantastic's showroom to investigate their growing suspicions of Lupo's unfair and unlawful conduct.  On October 24, 2017, Franchini and Barlow entered Kitchen Fantastic's showroom and immediately observed Daza, along with crew members Perez, Vargas, and Ponce, along with two unidentified Kitchen Experts' employees, working for Lupo to assemble and install merchandise.  At this time, all of these individuals were still employees of Kitchen Experts and were on Kitchen Experts' payroll and were supposed to be working on the site of Kitchen Experts' projects.

34.    The loss of Daza's crew placed an enormous stress on Kitchen Experts.  This crew was Kitchen Experts' highest grossing and most profitable crew.  At the time the crew was

1 | solicited away, it was individually responsible for regularly generating between $400,000-

2 | $500,000 of revenue per month for Kitchen Experts.  The loss was immediate and drastic, as

3 | Kitchen Experts has not been able to replace this crew despite significant efforts, placing its

4 | ability to meet construction deadlines and fulfill customer orders in jeopardy.

5 | **D.    Lupo and Kitchen Fantastic's Ongoing Efforts to Interfere with Kitchen Experts'**
6 | **Business Operations and Economic Relations.**

7 | 35.    After the sale of Kitchen Experts to Cardinal, Lupo engaged in further efforts to

8 | interfere with Kitchen Experts' business operations.  In particular, Lupo has withheld and refused

9 | to turn over critical business equipment and information.  Specifically, Lupo withheld and

10 | continues to hold Kitchen Experts' computer equipment, including a company cellular phone and

11 | a tablet. This equipment contains confidential and sensitive business information, and Kitchen

12 | Experts believes that Lupo is accessing and using this information to unfairly compete with

13 | Kitchen Experts.  Without authorization, Lupo has accessed this sensitive information and used it

14 | to start Kitchen Fantastic.

15 | 36.    Lupo has also withheld and refused to turn over Kitchen Experts' business records

16 | and financial statements, many of which would corroborate the depth and seriousness of his

17 | misstatements regarding Kitchen Experts' financial affairs.

18 | 37.    In addition to his withholding of critical company documents and records, Lupo

19 | also endeavored to interrupt Kitchen Experts' long standing relationship with consumer finance

20 | company GreenSky, LLC.  GreenSky provides consumer finance to home improvement

21 | customers who, among other things, want to remodel their kitchens.  GreenSky lives up to its

22 | motto of "Closing Deals Has Never Been Easier."  Through its relationship with GreenSky,

23 | Kitchen Experts' consumers were able to finance remodel projects through Kitchen Experts that

24 | they otherwise could not afford without a time-consuming loan application process for which they

25 | ultimately may not qualify.  To qualify to work with GreenSky, a construction firm needed to

26 | meet exacting criteria over a prolonged period of time.

27 | 38.    This relationship with GreenSky was a critical aspect of Kitchen Experts' ability to

28 | generate cash flow, as it allowed Kitchen Experts' customers to finance and build the exact

kitchen they wanted while ensuring that Kitchen Experts would be timely paid in full. For this reason, Kitchen Experts' relationship with GreenSky was a valuable asset and a material inducement to Cardinal's decision to purchase Kitchen Experts. Indeed, Lupo had stated during negotiations that the GreenSky financing was a key to the company's success.

39.    With this knowledge, after the sale Lupo then set out to destroy Kitchen Experts' relationship with GreenSky. Kitchen Experts discovered that, after the close of the sale, Lupo on behalf of Kitchen Fantastic used his prior affiliation with Kitchen Experts to apply for project financing through GreenSky.  Knowing that it could not obtain financing through GreenSky on its own because it was a newly formed entity without the requisite experience and reputation, Kitchen Fantastic applied for an account using a false affiliation with Kitchen Experts.

40.    As a result of Kitchen Fantastic's false and fraudulent conduct, GreenSky became suspicious of the activity associated with Kitchen Experts and decided to suspend and lock Kitchen Experts' financing availability for its projects until it could sort out the confusion. Upon learning of this lock and the time that it would take to resolve this issue, Kitchen Experts was forced to terminate its prior account to disassociate itself from Kitchen Fantastic and Lupo.  As a result of this change in account status at GreenSky, Kitchen Experts no longer qualifies for unrestricted financing on its projects, which as a practical matter puts a huge strain on cash flow. Operating under this restricted financing arrangement has impacted the types of customers and the amount of business Kitchen Experts is able to service through its relationship with GreenSky.

41.    To further interfere with Kitchen Experts' business, Kitchen Fantastic and Lupo instructed their friends and employees to submit false Yelp reviews – false negative reviews for Kitchen Experts and false positive reviews for Kitchen Fantastic.  These reviews were false in that the reviewers who purported to work with Kitchen Experts and Kitchen Fantastic in fact were not customers of either entity.  These false reviewers also used Yelp's "upvote" features to influence and take advantage of Yelp's search optimization and hierarchy features to drive the desired positive and negative reviews to the top of the companies' Yelp pages.  In other instances, Lupo directed these false reviewers to take prior reviews for Kitchen Experts and paste them to Kitchen Fantastic's Yelp page.

42.     Under Kitchen Fantastic's website there is a "gallery" section.  Kitchen Fantastic uses this section to advertise and promote its services.  Several of the photographs in the Kitchen Fantastic gallery, however, are photos of the work product of other vendors, including Kitchen Experts.  By posting pictures of Kitchen Experts' work product, and passing it off as that of Kitchen Fantastic, Kitchen Fantastic is making false and misleading statements to consumers in this market.

**E.     Cardinal buys AAO, and Lupo Solicits a Former AAO Employee to Start Appliance Fantastic to Unfairly Compete.**

43.     After purchasing Kitchen Experts from Lupo in May 2017, Cardinal then sought to acquire an appliance company in the same geographic area of the purpose of consolidating the remodel function with internal appliance sales for a single vertical offering different than what other competitors in the market were offering.

44.     In the summer of 2017, Kitchen Experts' executive team identified company called American Appliance Outlet, LLC ("AAO") as a potential acquisition target.  While the negations were well underway, Lupo learned of Cardinal's strategy and Kitchen Experts' business advantage with respect to AAO.  Having a pre-existing professional and personal relationship with AAO's owners, Tristan Odell and Marian Helmandy, Lupo immediately set out to interfere with these negotiations.  Lupo informed Odell and Helmandy that Cardinal did not have the money needed to buy AAO and that he would pay more with the proceeds of the overpriced sale of Kitchen Experts to Cardinal to purchase AAO.  Truthfully, Lupo had no intention of purchasing AAO but only intended to drive up the costs of AAO for the purpose of further draining the funds available to support Kitchen Experts (and later AAO) while Lupo launched his competing business.

45.     On or about September 30, 2017, Cardinal purchased AAO. The sale took the form of a purchase of LLC member interests. The LLC Member Interest Purchase and Sale Agreement is attached to the Complaint as Exhibit B. As a result of Lupo's interference and efforts to drive up the sale price, Cardinal paid $75,000 more for AAO than Odell and Helmandy otherwise would have sold him their shares in AAO.

46.     Moheba D'Anna worked as a business manager at AAO.  D'Anna was also close friends with Lupo prior to and incident to Cardinal's purchase and consolidation of AAO.  While at AAO, D'Anna had access to and used an email account for the exclusive purpose of conducting AAO business and interacting with existing and prospective AAO customers.

47.     After Cardinal purchased AAO, D'Anna proved to be a difficult employee and was terminated shortly after the sale closed.  Plaintiffs are informed and believe, and on that basis allege, that, promptly following D'Anna's termination, Lupo offered D'Anna employment at a new appliance company he was forming called Appliance Fantastic as an affiliate of Kitchen Fantastic to compete with Kitchen Experts and AAO.  D'Anna accepted employment at Appliance Fantastic where she continues to work.

48.     Following her termination from AAO, and while an employee and agent of Appliance Fantastic, and under the direction and instruction of Lupo, D'Anna continued to access AAO's email account.  This email account contained confidential and proprietary information of AAO for which she did not have a right to access. Pursuant to the LLC Member Interest Purchase and Sale Agreement, all property of the LLC, including AAO computer systems, servers, and email accounts, vested in Cardinal upon the closing of the sale.

49.     At the behest of Lupo, D'Anna accessed unopened email communications sent to AAO's email accounts for the purpose of intercepting these communications and diverting these inquiries and prospective business relationships away from AAO and to Appliance Fantastic. D'Anna also communicated with AAO's existing and prospective customers, employees, and vendors to disparage AAO and its owners, executives, officers and directors.

### FIRST CAUSE OF ACTION
**Fraudulent Misrepresentation**
**(Cardinal against John Lupo)**

50.     Plaintiffs incorporate the preceding paragraphs as if set forth herein in full.

51.     Prior to the execution of the Stock Purchase Agreement, Lupo made the following affirmative representations to Cardinal:

        a.      Kitchen Experts did not have liabilities in excess of $5,000 that were

1   known to Lupo at that time that were required to be reflected on the books of the Company (SPA

2   ¶3.6);

3               b.      The Company had good and valid title to all of its assets, free and clear of

4   all liens (SPA¶ 3.7);

5               c.      The Company was not in breach of any contracts or other legal obligations

6   (SPA ¶ 3.11);

7               d.      Lupo had provided complete and correct copies of the Company's financial

8   statements and payroll records (SPA ¶3.13);

9               e.      Nothing that Lupo represented to Cardinal in the SPA was false or

10  contained any material omissions (SPA ¶ 3.16);

11              f.      Lupo would make himself available after the closing for up to 15 hours per

12  week to consult and assist Kitchen Experts about the operations of its business (SPA ¶ 4.6);

13              g.      After the closing, Lupo would not solicit the employees of Kitchen Experts

14  (excepting Bryce Phelton, who would later assist Lupo in the solicitation of Kitchen Experts'

15  employees, among other wrongs) because, among other reasons, he would be moving his family

16  to Tennessee to start a new life (SPA ¶ 4.7.); and

17              h.      After closing, Lupo would be starting a cabinet business, with Kitchen

18  Experts obligated to buy a certain type of cabinet exclusively from Lupo's putative new company

19  (SPA ¶ 4.8).

20      52.    Lupo also failed to disclose the following material facts despite having a duty to

21  do so:

22              a.      Lupo had incurred massive unpaid debts on behalf of Kitchen Experts,

23  debts which had not been paid by the time of the Stock Purchase Agreement;

24              b.      Lupo, prior to the execution of the Stock Purchase Agreement, had already

25  decided to form a new venture to compete with Kitchen Experts after the deal closed and in fact

26  was actively soliciting the Kitchen Experts Operations Manager, Anne Barlow, to join this new

27  venture;

28

        c.     Lupo harbored a secret intent at the time of the Stock Purchase Agreement to undermine the business prospects of Kitchen Experts after the deal closed;

        d.     Lupo had no present intention to produce the company's books and records – and still to this day Lupo has not done so.

53.     At the time Lupo made these misrepresentations and omitted these material facts, he knew they were not true or he had no reasonable grounds to believe that they were true, and he knew that they were material or had no reasonable grounds to believe they were immaterial.

54.     Lupo made the misrepresentations and omitted these facts with the intent of inducing Cardinal to enter into the Stock Purchase Agreement and to offer more consideration than what the Company was actually worth.

55.     Cardinal relied on Lupo's representations and entered into the Stock Purchase Agreement in reliance on Lupo's representations. Cardinal's reliance was reasonable since they had no reason to know that Lupo's representations were false.

56.     As a proximate result of Lupo's misrepresentations, Cardinal has suffered damages for the difference between the value of the shares he was fraudulently induced into believing and the actual value of the shares he purchased as well as his emotional distress, both of which are in an amount to be proven at trial.

57.     Lupo's actions were oppressive, fraudulent and malicious, entitling Cardinal to award of exemplary damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

**SECOND CAUSE OF ACTION**
**Negligent Misrepresentation**
**(Cardinal against John Lupo)**

58.     Plaintiffs incorporate the preceding paragraphs as if set forth herein in full.

59.     If Lupo did not act intentionally, recklessly, and/or maliciously in making the misrepresentations and omissions alleged above, then Cardinal alleges that Lupo acted at least unreasonably at the time he made the misrepresentations and omissions and without any reasonable ground for believing the misrepresentations to be true or for the omitted material and information to be immaterial.

1    WHEREFORE, Plaintiffs pray for judgment as set forth below.

2    ### THIRD CAUSE OF ACTION
### Aiding and Abetting Fraud
3    ### (Cardinal against Andreana Michael)

4    60.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

5    61.    At all relevant times Andreana Michael was married to John Lupo.  Michael held a

6    community property interest in the shares of Kitchen Experts held by John.  Michael also served

7    as a Kitchen Experts employee prior to the sale, and routinely signed checks on behalf of the

8    company. In fact, Michael signed several of the contractual obligations of the company that were

9    not disclosed to the buyers prior to the sale of Kitchen Experts.

10    62.    Michael was familiar with the Stock Purchase Agreement and its terms. Michael

11    knew that Lupo owed duties to Cardinal to speak truthfully and make accurate representations

12    regarding the company in the context of the sale transaction.  She also understood that, as Lupo's

13    wife holding a community property interest in the shares of Kitchen Experts, she would benefit

14    from the sale in an amount proportionate to the sale price.

15    63.    On information and belief, Michael provided substantial assistance and

16    encouragement to Lupo to make false and deceitful statements to Cardinal. Michael's conduct

17    was a substantial factor in causing harm to Cardinal because it induced Cardinal to pay an inflated

18    price for Kitchen Experts.

19    64.    Michael's actions were oppressive, fraudulent and malicious, entitling Plaintiffs to

20    exemplary damages in an amount to be proven at trial.

21    WHEREFORE, Plaintiffs pray for judgment as set forth below.

22    ### FOURTH CAUSE OF ACTION
### Breach of Contract
23    ### (Kitchen Experts against Lupo)

24    65.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

25    66.    Lupo and Cardinal entered into a contract, the Stock Purchase Agreement.

26    Kitchen Experts was an intended third party beneficiary of that contract.

27    67.    Cardinal and Kitchen Experts did all, or substantially all, of what the contract

28    obligated them to do.

Complaint

68.     Lupo breached the Stock Purchase Agreement by, inter alia:

a.     Soliciting Kitchen Experts' employees in violation of ¶ 4.7.  Lupo solicited Luis Daza along with his crew, which was Kitchen Experts' most productive and important crew. The poaching of Luis Daza crew cost Kitchen Experts monthly revenue of over $500,000;

b.     Attempting to solicit a foreman named Christian Mendoza along with his 3 person crew; Mendoza declined, despite Lupo's offer to "double" his salary;

c.     Spreading false rumors to Kitchen Experts' employees that Kitchen Experts was "going out of business" in an effort to induce Kitchen Experts' employees to fear for their jobs and to leave for Kitchen Fantastic;

d.     Instructing Kitchen Fantastic workers who were still employed with Kitchen Experts to spread rumors among Kitchen Experts employees that Kitchen Experts' business was in jeopardy;

e.     Inducing Bryce Phelton, while still employed with Kitchen Experts, to pass along confidential business information to Lupo and Kitchen Fantastic, and induce him to undermine Kitchen Experts' business operations;

f.     Refusing to perform consulting services for Kitchen Experts and instead using this position to actively undermine the business;

g.     Continued refusal to turn over company books, records, and equipment to Kitchen Experts.

69.     Lupo's breach was a substantial factor in causing harm to Kitchen Experts and Cardinal.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## FIFTH CAUSE OF ACTION
**Breach of Contract**
**(Cardinal against Lupo)**

70.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein

71.     Lupo and Cardinal entered into a contract, the Stock Purchase Agreement. The SPA contained numerous representations and warranties without which Cardinal would not have entered into the contract.

72.     Cardinal did all, or substantially all, of what the contract obligated him to do.

73.     Lupo breached the SPA and this breach was a substantial factor in causing harm to Cardinal.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

**SIXTH CAUSE OF ACTION**
**Breach of the Duty of Good Faith and Fair Dealing**
**(Cardinal and Kitchen Experts against John Lupo)**

74.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

75.     Implied in the Stock Purchase Agreement is Lupo's obligation to act in good faith and deal fairly with Plaintiffs and to refrain from any act that would frustrate Plaintiffs' rights and abilities to enjoy the benefits of the contract.

76.     Lupo breached the implied covenant by engaging in improper, immoral, unlawful or objectionable business activities including, *inter alia*, starting a competing business using the employees and intellectual property of Kitchen Experts.

77.     As a proximate result of Lupo's breaches, Cardinal and Kitchen Experts have been damaged in an amount that will be proven at trial.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

**SEVENTH CAUSE OF ACTION**
**Trade Libel/Commercial Disparagement**
**(Kitchen Experts and AAO against Lupo, Kitchen Fantastic, and D'Anna)**

78.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

79.     Lupo intentionally made false statements about Kitchen Experts' business and business practices which are untrue and disparaging as to the nature and manner in which Plaintiffs conduct business.  Lupo knew these statements were false. Lupo published the untrue and disparaging statements to third parties orally, through posting the statements via the internet, and in written communications with third parties including email. Lupo knew that the false statements were likely to influence prospective users of Plaintiffs' business to avoid Kitchen Experts.

80.     Kitchen Fantastic, by and through its employees and duly authorized representatives, intentionally made false statements about Kitchen Experts' business and business

Complaint

1    practices which are untrue and disparaging as to the nature and manner in which Plaintiffs

2    conduct business.  Kitchen Fantastic knew these statements were false. Kitchen Fantastic

3    published the untrue and disparaging statements to third parties orally, through posting the

4    statements via the internet, and in written communications with third parties including email.

5    Kitchen Fantastic knew that the false statements were likely to influence prospective users of

6    Plaintiffs' business to avoid Kitchen Experts.

7         81.    D'Anna intentionally made false statements about American Appliance Outlet's

8    business and business practices which are untrue and disparaging as to the nature and manner in

9    which AAO conducts business.  D'Anna knew these statements were false. D'Anna published the

10    untrue and disparaging statements to actual and potential customers and suppliers of AAO.

11    D'Anna knew that the false statements were likely to influence prospective users and suppliers of

12    Plaintiffs' business to avoid AAO. Specifically, while still employed by AAO, D'Anna

13    intentionally disparaged AAO to a critical supplier, Riggs Distributing, a company that AAO

14    relied upon for obtaining Wolf/Sub-Zero appliances which were highly valued by customers.

15    D'Anna slanderous statements disrupted the business relationship between AAO and Riggs

16    Distributing to the detriment and harm to AAO.

17         82.    Defendants' defamatory statements have induced customers and/or prospective

18    customers and suppliers not to deal with Kitchen Experts and AAO.

19         83.    As a result of Defendants' defamatory statements, Kitchen Experts has been

20    damaged in an amount subject to proof.

21         84.    As a result of Defendants' defamatory statements, AAO has been damaged in an

22    amount subject to proof.

23         85.    Defendants' actions were oppressive, fraudulent and malicious, entitling Plaintiffs

24    to punitive damages in an amount to be proven at trial.

25         WHEREFORE, Plaintiffs pray for relief as set forth below.

26    **EIGHTH CAUSE OF ACTION**
**Intentional Interference with Contractual Relations**

27    **(Kitchen Experts against John Lupo and Moheba D'Anna)**

28         86.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

87.     Kitchen Experts enjoyed the benefits of several valid contracts including but not limited to valid at-will employment contracts that existed between Kitchen Experts and its employees.

88.     Lupo knew about these contracts, and engaged in acts designed to induce a breach and/or disruption of said contracts by virtue of the following acts: (a) using his intimate knowledge of the relationships, including the exact amount the employees were earning at Kitchen Experts, to induce those employees to move to Kitchen Fantastic; and (b) spreading false rumors among Kitchen Experts' employees that Kitchen Experts was facing imminent bankruptcy, and that its employees had a limited amount of time in which to find new employment.

89.     Actual breach or disruption of these employment contracts occurred as alleged herein, in that several employees were induced to leave Kitchen Experts for Kitchen Fantastic.

90.     As a result of Lupo's conduct, Plaintiffs have been damaged in an amount to be proven at trial.

91.     Lupo's commission of these wrongful acts was willful, malicious, oppressive, and in conscious disregard of Plaintiffs' rights, and Plaintiffs are therefore entitled to an award of punitive damages to punish their wrongful conduct and deter future wrongful conduct.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### NINTH CAUSE OF ACTION
**Intentional Interference with Prospective Economic Relations**
**(Kitchen Experts against John Lupo)**

92.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

93.     Kitchen Experts and its employees were in an economic relationship that probably would have resulted in an economic benefit to Kitchen Experts.

94.     Lupo knew of these relationships, and intended to disrupt, or knew that disruption of the relationships was certain or substantially certain to occur.

95.     In intentionally poaching employees and spreading lies about Kitchen Experts, Lupo committed various separate wrongs beyond his mere intent to interfere with and disrupt Kitchen Experts' prospective economic advantages and relations. This separate and independently

wrongful conduct included (a) a blatant violation of the Stock Purchase Agreement's non-solicitation clause, which in turn was subject to and consistent with California Business and Professions Code section 16601; as well as (b) defamatory as to Kitchen Experts' business in violation of Civil Code section 48. Lupo's conduct significantly disrupted Plaintiffs' contractual relationship with its at-will employees, customers, and suppliers.

96.     As a result of Lupo's conduct, Plaintiffs suffered injury as set forth above in an amount to be proven at trial.

97.     Lupo's commission of these wrongful acts was willful, malicious, oppressive, and in conscious disregard of Plaintiff's rights, and Plaintiff is therefore entitled to an award of punitive damages to punish their wrongful conduct and deter future wrongful conduct.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## TENTH CAUSE OF ACTION
### Breach of Duty of Loyalty
### (Kitchen Experts against Bryce Phelton)

98.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

99.     Defendant Bryce Phelton, while not a senior officer of Kitchen Experts, was an employee and as such owed a fiduciary duty of absolute loyalty to Kitchen Experts to avoid self-dealing and fraud and otherwise act in good faith and in the best interests of Kitchen Experts.

100.     Phelton breached this duty by participating in and materially assisting Lupo's fraudulent scheme outline above, by helping spread false rumors to Kitchen Experts employees while employed by Kitchen Experts; by taking cash payments from Kitchen Fantastic/Lupo; by sending confidential Kitchen Experts business information to Lupo/Kitchen Fantastic.

101.     Kitchen Experts suffered damages as set forth above. As a result of Phelton's actions in breaching his duties to Kitchen Experts, in addition to monetary damages, Kitchen Experts is entitled to equitable relief in the form of injunctive relief and full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Phelton as a result of such actions, including the imposition of a constructive trust over the proceeds of such actions. These moneys include salary paid by Kitchen Experts to Phelton during the course of the fraud scheme.

102.   In doing the acts alleged above, Phelton acted with oppression, fraud, and malice, such that Kitchen Experts is entitled to punitive damages.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**ELEVENTH CAUSE OF ACTION**
**Inducing Breach of Duty of Loyalty**
**(Kitchen Experts against John Lupo and Kitchen Fantastic)**

103.   Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

104.   After the Stock Purchase Agreement closed, Lupo and Kitchen Fantastic induced Luis Daza to work for Kitchen Fantastic despite the fact that Daza was still employed by Kitchen Experts.  At the behest of Lupo, by and through Lupo's offering of financial incentives and false and defamatory statements about Kitchen Experts, Daza provided substantial and material assistance to Kitchen Experts' competitor, Kitchen Fantastic, by helping set up Kitchen Fantastic's showroom for the purpose of actively competing with Kitchen Experts.  Lupo did so despite his knowledge that Daza was an employee of Kitchen Experts and owed Kitchen Experts an ongoing duty of loyalty.

105.   Lupo and Kitchen Fantastic also induced, through cash incentives and promises of professional advancement, Bryce Phelton to breach his duty of loyalty to Kitchen Experts by encouraging and inducing Phelton to backchannel confidential and competitively sensitive customer information and leads, financial information, and business strategic information to Lupo and Kitchen Fantastic to the detriment of Kitchen Experts and for the benefit of Kitchen Fantastic.

106.   In doing the acts alleged above, Lupo and Kitchen Fantastic acted with oppression, fraud, and malice, such that Kitchen Experts is entitled to punitive damages.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**TWELFTH CAUSE OF ACTION**
**(Conversion)**
**(Kitchen Experts against John Lupo and Kitchen Fantastic)**

107.   Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

108.   At all relevant times, Kitchen Experts owned and had the right to possess tangible personal property including without limitation certain computer equipment, financial records,

Complaint

1    accounts, and other tangible items set forth above.

2        109.    Beginning on a date unknown and continuing to the present, Lupo and Kitchen

3    Fantastic converted to their own use all such tangible goods.  Defendants continue to exercise

4    improper dominion and control over Kitchen Experts' property to the detriment of the company.

5        110.    As a direct and proximate cause of Defendants' conversion of the Company's

6    property, Kitchen Experts has been, and continues to be, harmed.

7        111.    The conduct of Defendants was malicious, oppressive, and fraudulent, entitling the

8    Company to an award of punitive and/or exemplary damages under Civil Code section 3294.

9        112.    WHEREFORE, Plaintiffs pray for judgment as set forth herein.

10                        **THIRTEENTH CAUSE OF ACTION**
                    **Violation of the Computer Fraud and Abuse Act**
11            **(Kitchen Experts against John Lupo and Kitchen Fantastic)**

12       113.    Plaintiffs incorporate the preceding paragraphs as if set forth herein in full.

13       114.    Lupo and Kitchen Fantastic have violated the Computer Fraud and Abuse Act

14   ("CFAA"), 18 U.S.C. § 1030(a)(2)(C), by intentionally accessing at least one Kitchen Experts

15   computer used in or affecting interstate commerce or communications, without authorization or

16   by exceeding authorized access to such computer(s), and by obtaining information from the

17   Company's protected computer(s).

18       115.    The computer files Defendants accessed without authorization were maintained on

19   the Company's computers and computer system, which are "protected computers" within the

20   meaning of 18 U.S.C. § 1030(e)(2), in that they were used by Kitchen Experts to engage in

21   interstate and foreign commerce and communications, including email communications with

22   individuals located in foreign states, and to otherwise conduct Kitchen Experts' business across

23   state lines, via the Internet.

24       116.    Defendants were not authorized to access the computer and email files described

25   above, and his accessing and transmission of those files was without authorization and contrary to

26   the interests and policies of Kitchen Experts.

27       117.    Defendants kept their unauthorized activities a secret from Kitchen Experts for

28   months. By engaging in the conduct described above:

1           a.      Defendants intentionally accessed at least one computer without

2 authorization or exceeded his authorized access, and thereby obtained information from a

3 protected computer, in violation of the CFAA, 18 U.S.C. § 1030(a)(2)(C);

4           b.      Defendants knowingly and with the intent to defraud, and in violation of

5 his duty of loyalty and fiduciary duty to Kitchen Experts, accessed at least one of Kitchen

6 Experts' protected computers without authorization and/or exceeding his authorized access. By

7 means of such conduct, Lupo furthered his intended fraud, including without limitation accessing,

8 obtaining, transmitting, and removing, without authorization, and disclosing to third parties

9 electronic files and information belonging to Kitchen Experts, including, but not limited to, files

10 containing its valuable business information, including confidential, proprietary, and trade secret

11 information, by dishonest methods in violation of the CFAA, 18 U.S.C. § 1030(a)(4);

12           c.      Defendants knowingly caused and commanded the transmission of

13 computer files and information and as a result of such conduct, intentionally and without

14 authorization caused damage in violation of the CFAA, 18 U.S.C. § 1030(a)(5)(A); and

15           d.      Defendants intentionally accessed a protected computer without

16 authorization, and as a result of such conduct, recklessly and/or intentionally caused damage and

17 loss, in violation of the CFAA, 18 U.S.C. § 1030(a)(5)(B) and (C).

18      118.    As a result of Defendants' misconduct and violations of the CFAA, Kitchen

19 Experts suffered "damage" and/or "loss," as those terms are interpreted under the CFAA, in an

20 amount exceeding $5,000, and is entitled to an award of damages under 18 U.S.C. § 1030(g) for

21 Defendant's multiple breaches of the CFAA. The damage and loss suffered by Kitchen Experts

22 includes the cost of reasonably investigating and otherwise responding to Defendants' violations

23 (including the hiring of a forensic computer analyst to conduct investigation and analysis) as well

24 as impairment of the integrity of Kitchen Experts' computers and system, and of the data stored in

25 that system.

26      119.    Wherefore, Kitchen Experts requests judgment against Defendants for actual

27 damages and preliminary and permanent injunctive relief, and such other relief as this Court may

28 deem just and proper.

1

**FOURTEENTH CAUSE OF ACTION**
**Violation of the Stored Communications Act**

2

**(American Appliance Outlet against John Lupo, Appliance Fantastic and Moheba D'Anna)**

3

120.   Plaintiffs incorporate the preceding paragraphs as if set forth herein in full.

4

121.   Defendants violated the Stored Communications Act ("SCA"), 18 U.S.C. § 2701,

5

by intentionally accessing without authorization or by intentionally accessing in excess of

6

authorization a facility through which an electronic service is provided and thereby obtaining,

7

altering or preventing authorized access to unopened electronic communications while they were

8

in storage in such system.

9

122.   D'Anna, individually and in her capacity as agent for Appliance Fantastic and

10

Lupo, intentionally accessed without authorization AAO's email systems and accounts. To access

11

the AAO's email systems, D'Anna failed to turn over the password to the AAO Yahoo email

12

address – aao_outlet@yahoo.com – even after D'Anna had been terminated from AAO, and

13

continued to use this password to access unopened emails sent from AAO's potential and actual

14

customers to that email account.

15

123.   The emails and electronic files obtained and reviewed by D'Anna were in storage

16

in the above-mentioned facilities at the time she accessed them without authorization or in excess

17

of her authorization.

18

124.   Defendants' actions in violation of the SCA were willful and intentional. D'Anna,

19

despite knowing that her access to the facility was not authorized and in violation of AAO policy,

20

continued to access and retrieve electronic communications on a regular basis for months.

21

125.   AAO has been damaged by Defendants' illegal access of its facilities.

22

126.   AAO requests all damages allowed by the SCA. 18 U.S.C. § 2707. Those damages

23

include, but are not limited to, actual damages, statutory damages, punitive damages, injunctive

24

relief, and any other relief that the Court deems appropriate.

25

**FIFTEENTH CAUSE OF ACTION**
**Business & Professions Code section 17200**

26

**(Kitchen Experts and AAO against Kitchen Fantastic and Appliance Fantastic)**

27

127.   Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

28

128.   The acts and conduct of Defendants as alleged above in this Complaint constitute unlawful, unfair, and/or fraudulent business acts or practices as defined by Cal. Bus. & Prof. Code section 17200 et seq.

129.   Defendants' acts of unlawful, unfair, and fraudulent competition have caused harm to competition and to consumers.  Defendants' acts of unlawful, unfair, and fraudulent competition have proximately caused Plaintiffs to suffer injury in fact and loss of money and/or property in an amount to be proven at trial. Defendants' acts of unlawful, unfair, and fraudulent competition also have caused irreparable and incalculable injury to Plaintiffs.

130.   WHEREFORE, Plaintiffs pray for relief as set forth below.

## **PRAYER**

WHEREFORE, Plaintiffs pray for relief as follows:

1.   Judgment in favor of Plaintiffs and against all Defendants on all of Plaintiffs' claims asserted in the Complaint;

2.   Rescission of the Stock Purchase Agreement and restitution to Cardinal;

3.   Compensatory damages in an amount to be proven at trial;

4.   Restitution to Plaintiffs of money acquired by Defendants by means of their unfair competition, pursuant to California Business and Professions Code § 17203;

5.   Exemplary damages as a result of Defendants' willful and malicious conduct;

6.   An accounting of Defendants' ill-gotten gains, profits, and savings obtained or derived from their improper conduct;

7.   A preliminary and permanent injunction that Defendants, their successors, agents, representatives, employees, and all persons who act in concert with them be permanently enjoined from soliciting Kitchen Experts' employees;

8.   A preliminary and permanent injunction pursuant to California Business and Professions Code section 17203 that all Defendants, their successors, agents, representatives, employees, and all persons who act in concert with them be permanently enjoined from committing any acts of unfair competition in violation of § 17200, including, but not limited to the violations alleged herein;

9.    Attorneys' fees pursuant to pursuant to the SPA;

10.   Costs of suit incurred herein;

11.   Prejudgment interest from the date of first injury to the date for verdict; and

12.   For such other and further relief as the Court deems just and proper.

Dated: January11, 2018                    CARR McCLELLAN P.C.


By: *J. Craig Crawford*
      J. Craig Crawford
      Christian P. Foote
      Attorneys for Plaintiffs
      Christopher Cardinal, Kitchen Experts of
      California, Inc. and American Appliance Outlet,
      LLC

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by Jury on all issues.

Dated: January 11, 2018                    CARR McCLELLAN P.C.


By: *J. Craig Crawford*
      J. Craig Crawford
      Attorneys for Plaintiffs
      Christopher Cardinal, Kitchen Experts of
      California, Inc. and American Appliance Outlet,
      LLC

iManage\9161814.1

Complaint

# EXHIBIT A

## STOCK PURCHASE AGREEMENT

This **STOCK PURCHASE AGREEMENT** dated as of May _____, 2017 (the "Effective Date") by and among John Lupo, ("*Lupo*") and **Kitchen Experts of California Incorporated**, a California corporation (the "Corporation") controlled by John Lupo, a California resident (the "*Seller*"), on the one hand, and Christopher Cardinal, a California resident, or nominee ("*Buyer*"), on the other hand.

### Recitals

**WHEREAS, Kitchen Experts of California Incorporated** is a California corporation that was incorporated in 2013 (the "*Corporation*");

**WHEREAS,** the Corporation remodels kitchens and bathrooms for residential customers (the "*Business*");

**Whereas,** John Lupo is sole shareholder and the sole officer and sole director of the Corporation and has been since the inception of the Corporation;

**WHEREAS,** the Seller desires to sell 100% of his equitable interest, including any and all stock in the Corporation (the "*Shares*"), and the Buyer desires to purchase from the Seller all of his rights, title and interest in the Shares in exchange for the purchase price described herein, inclusive of all of the assets of the Business, except as otherwise set forth herein, and pursuant to the terms and subject to the conditions of this Agreement;

**NOW, THEREFORE,** in consideration of the premises and of the mutual representations, warranties, covenants and agreements herein contained, and for other good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged), the parties hereto, intending to be legally bound, hereby agree as follows:

### ARTICLE 1.

### DEFINITIONS; INTERPRETATION & INCORPORATION

1.1     **Incorporation of Recitals**. The undersigned acknowledge that the above recitals are true and correct at the time of the execution of this Agreement, that they express the parties' intent at the time of the execution hereof and that they are incorporated herein and binding on the parties.

1.2     **Definitions**. The following terms shall have the following meanings for the purposes of this Agreement:

"*Action*" means any action, suit, claim, proceeding, mediation, arbitration, regulatory proceedings or other litigation proceedings before any Governmental Authority, mediator or arbitrator including any investigation related thereto or in connection therewith.

"*Agreement*" means this Stock Purchase Agreement, including all Exhibits and Schedules hereto.

"*Business*" shall have the meaning set forth in the recitals.

Stock Purchase Agreement     5/25/2017     1

"*Buyer*" shall mean the signatory named in the opening paragraph of this Agreement and any successor entity or corporation thereof such that any obligation of the Buyer under this Agreement shall also become the obligation of any successor entity or corporation without the need of any further action, assignment or consent of any kind.

"*Closing*" means the closing of the purchase of the Shares.

"*Closing Date*" shall have the meaning set forth in Section 2.3.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Contract*" means any contract, lease, commitment, understanding, sales order, purchase order, agreement, indenture, mortgage, note, bond, right, warrant, instrument, plan, permit or license.

"*Corporation*" shall have the meaning set forth in the Recitals.

"*Debt*" means all obligations (i) for borrowed money, (ii) evidenced by notes, bonds, debentures or similar instruments (including principal, interest, fees, charges, expenses and other amounts payable under the applicable agreement or instrument), but not including leases, contracts or undrawn letters of credit/credit lines, (iii) trade payables whether or not reflected on any financial statements and/or (iv) without duplication, in the nature of Guarantees of the obligations described in clauses (i) through (iii) above of any other Person.

"*Employees*" has the meaning set forth in Section 4.4.

"*Governmental Authority*" means any U.S., state, provincial or municipal entity, any foreign government and any political subdivision or other executive, legislative, administrative, judicial, quasi-judicial or other governmental department, commission, court, board, bureau, agency or instrumentality, domestic or foreign.

"*Guarantee*" means (i) any guarantee of the payment or performance of any debt or other obligation of any other Person and (ii) any other arrangement whereby credit or value is extended to any obligor (other than such Person) on the basis of any promise or undertaking of such Person (A) to pay the debt or perform the obligations of such obligor, (B) to purchase any obligation owed by such obligor, (C) to purchase or lease assets under circumstances that are designed to enable such obligor to discharge one or more of its obligations or (D) to maintain the capital, working capital, solvency or general financial condition.

"*IRS*" means the Internal Revenue Service.

"*Law*" means with respect to any Person, any federal, state, foreign, local, municipal or other law, statute, constitution, principle of common law, ordinance, code, duty, by-law, permit, rule, regulation, ruling or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Authority and any orders, writs, injunctions, binding awards of a court, mediator or arbitrator, judgments and decrees applicable to such Person or its Subsidiaries, their business or any of their respective assets or properties.

"*Liability*" or "*Liabilities*" means any and all debts, claims, demands, liabilities, obligations (contractual or otherwise), commitments, responsibilities, fines, tax responsibilities or tax liabilities (regardless of kind and whether imposed by a local, state, or federal taxing authority), lawsuits/arbitrations and/or judgments (whether based in law or equity, regardless of legal or equitable theory, including alter ego claims against the Seller), penalties and sanctions, absolute or contingent,

matured or unmatured, liquidated or unliquidated, joint, several or individual, asserted or unasserted, accrued or unaccrued, known or unknown, due or to become due, including but not limited to those arising because of a Contract, Debt, Guarantee, a Loss or an Action.

*"Lien"* means any title defect, conflicting or adverse claim of ownership, mortgage, deed of trust, hypothecation, security interest, lien, pledge, claim, right of first refusal, option, charge, restrictive covenant, lease, order, decree, judgment, stipulation, settlement, attachment, objection or other encumbrance of any nature whatsoever other than (a) encumbrances for Taxes not yet due and payable and (b) restrictions on securities imposed by securities law.

*"Loss"* or *"Losses"* means any and all losses, *Liabilities*, costs, lawsuits, demands, claims, damages, interest, costs of mitigation, penalties and expenses, remedial correction, responsive actions and loss of tax benefits, in each case whether or not involving a Third Party Claim. In the event any of the foregoing are indemnifiable hereunder, the terms "Loss" and "Losses" shall include any and all reasonable attorneys' fees and expenses and costs of investigation, litigation, defense and settlement incurred by the indemnified party in connection therewith, including in connection with enforcing any indemnity hereunder therefor.

*"Material Adverse Effect"* with respect to any entity means any change, event, violation, inaccuracy, circumstance or effect (each, an *"Effect"*) that, individually or taken together with all other Effects, and regardless of whether or not such Effect constitutes a breach of the representations or warranties made by such entity in this Agreement, is, or is reasonably likely to be or become materially adverse in relation to the condition (financial or otherwise), of the properties, assets (including intangible assets), business, prospects, operations or results of operations of the Corporation.

*"Parties"* shall mean the Seller and the Buyer.

*"Purchase Price"* shall have the meaning set forth in Section 2.1.

*"Person"* means any individual, corporation, partnership, association, limited liability Corporation, trust, Governmental Authority or other body, entity or organization in any jurisdiction.

*"Shares"* means the shares to be sold by the Seller herein.

*"Tax"* or *"Taxes"* mean all taxes, charges, fees, duties, levies or other assessments, including income, gross receipts, capital stock, net proceeds, ad valorem, turnover, real, personal and other property (tangible and intangible), sales, use, franchise, excise, value added, stamp, payroll, unclaimed property and escheat obligations, leasing, lease, user, transfer, fuel, excess profits, occupational, interest equalization, windfall profits, unitary, severance and employees' income withholding, unemployment and Social Security taxes, duties, assessments and charges (including the recapture of any tax items such as investment tax credits), which are imposed by any Governmental Authority, including any interest, penalties or additions to tax related thereto imposed by any Governmental Authority.

*"Tax Return"* means all returns, reports, documents or other information or filing, with respect to income, sales and employment Taxes filed or required to be filed by the Corporation, including information returns, any documents with respect to or accompanying payment of estimated Taxes, any claim or request for refunds, or any documents with respect to accompanying requests for extension of time in which to file any such report, return, document, questionnaire, declaration or other information.

*"Third Party Claims"* mean any Action, or claim of Loss or Losses, or Lien asserted, filed or made by a third party made upon a party to this Agreement or the Corporation.

Initials  JL  _JL_  CC  _CC_  5/25/17  3

1.3   **Interpretation**.  The headings preceding the text of articles and sections included in this Agreement and the exhibits and schedules hereto are for convenience only and shall not be deemed part of this Agreement or be given any effect in interpreting this Agreement. The use of the terms "including" or "include" shall in all cases herein mean "including, without limitation" or "include, without limitation," respectively.  Reference to any Person includes such Person's successors and assigns to the extent such successors and assigns are permitted by the terms of any applicable agreement.  Reference to any agreement (including this Agreement), document or instrument means such agreement, document or instrument (including its exhibits and schedules) as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof.  Underscored references to articles, sections, paragraphs, clauses or exhibits shall refer to those portions of this Agreement.  The use of the terms "hereunder," "hereby," "hereof," "hereto" and words of similar import shall refer to this Agreement as a whole and not to any particular article, section, paragraph or clause of, or exhibit or schedule to, this Agreement.

## ARTICLE 2.

### PURCHASE AND SALE; PURCHASE PRICE; CLOSING

2.1   **Purchase and Sale**.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing and in reliance upon the representations and warranties contained in the Agreement or made pursuant hereto, Seller shall sell, assign, transfer, convey and deliver to the Buyer and the Buyer shall purchase, acquire and accept from the Seller all of his right, title and interest in and to all of the Shares free and clear of all Liens.  Simultaneously, upon the terms and subject to the conditions set forth in this Agreement, at the Closing in consideration for the transfer of Shares contemplated herein, and in reliance upon the representations and warranties contained in the Agreement or made pursuant hereto, the Buyer shall pay the Seller, $2,000,000 payable as follows:

(a)   $1.25 million, in guaranteed funds in the form of a cashier's check or by wire transfer, at the Closing. In the event that such a check or wire is not honored by the either Party's banking institution, this Agreement shall be null and void and that shall constitute a material breach of this Agreement by Buyer entitling the Seller to damages, and

(b)   $250,000, in guaranteed funds in the form of a cashier's check or by wire transfer, without any setoff, on or before fourteen (14) days after the Closing. In the event that payment is not made on that date and/or that such check or wire is not honored by the either Party's banking institution: (i) this Agreement shall be null and void and that shall constitute a material breach of this Agreement by Buyer and (ii)  Seller shall return $925,000 of the Purchase Price to Seller and retain $300,000 as  liquidated damages, and

(c)   $500,000, in guaranteed funds in the form of a cashier's check or by wire transfer, without any setoff, within sixty (60) days of the Closing. In the event that the payment required under this subsection (c) is not made on the required date and/or that check is not honored by the Seller's banking institution: (i) this Agreement shall be null and void and that shall constitute a material breach of this Agreement by Buyer and (ii) Seller shall return $925,000 of the Purchase Price to Seller and retain $550,000 as  liquidated damages.

The Buyer agrees:

(i) that the liquidated damages provision of this section is reasonable compensation under the circumstances existing at the time of the execution of this Agreement and is not a penalty provision, and

Initials  JL _____  CC _____        5/25/17        4

(ii) that the liquidated damages bears a reasonable relationship to the range of harm that reasonably could be anticipated at the time of the making of the contract (which includes the damage to the reputation of the Seller in the market place), and

(iii) that at the time of the making of this contract, the parties of are equal bargaining power, and

(iv) that the Buyer and the Seller are both represented by attorneys, and

(v) that is the belief and the anticipation of the Parties that the proof of actual damages would be costly or inconvenient, and

(vi) that there would be difficulty of proving causation and foreseeability in the event of a breach of the Buyer as set forth herein.

*CC*

Buyer's Initials

2.2 Security for Payment. As security for full payment of the Purchase Price, as set forth above, the Buyer hereby assigns and grants to Seller a continuing security interest in Shares acquired hereunder by Buyer ("Collateral"). The Buyer covenants that he/it will keep the Collateral free and clear of all liens, encumbrances, and security interests, except the security interest created by this Agreement. Contemporaneously with the execution of this Agreement, the Buyer authorizes the Seller to file a UCC-1 financing statement regarding the Collateral to enable Seller to perfect his security interest in the Collateral. The Buyer shall not, without prior written consent of Seller, sell, hypothecate, encumber, lien, or otherwise transfer any interest, in whole or in part, in the Collateral. The security interest granted here by the Seller shall terminate in its entirety at such time the Seller is paid in full. Upon the full payment of the Purchase Price and not before, Buyer is hereby authorized to file a termination statement to evidence the termination of the security interest. Notwithstanding the foregoing, Seller understands that it is Buyer's intention to merge the Corporation into a newly-formed California corporation ("Newco"), of which Buyer shall be the sole shareholder, as soon as practicable following the Closing. Such merger shall be permissible hereunder without any requirement of further consent from Seller, provided that Buyer shall have given Seller not less than three (3) business days' prior written notice of the filing of the merger documents for such merger with the California Secretary of State's Office and that upon the effectiveness of any such merger, the security interest granted in the Shares pursuant to this Section 2.2 shall be deemed to extend to all shares of stock in such Newco in the same manner and for the same duration as would have applied to the Shares hereunder. Seller shall have the right to file a UCC-1 financing statement regarding such Newco shares in the same manner and subject to the same termination statement filing right as otherwise provided in this Section 2.2 with respect to the Shares.

**2.3 Closing**. Unless this Agreement has been terminated in accordance with Article 8, the Closing shall be at 12:00 noon on May 26, 2017. The date on which the Closing actually occurs is referred to herein as the *"Closing Date."*

Initials  JL  ___  CC  ___  5/25/17  5

2.3     **Closing Deliveries and Payments**.

(a)  Upon the terms and subject to the conditions set forth in this Agreement, the Seller shall deliver or cause to be delivered to the Corporation at the Closing the following:

(i)   One or more certificates representing the Shares, accompanied by an Assignment of Shares Separate from Certificate in the form set forth as **Exhibit 1** hereto or otherwise endorsed in favor of Buyer ; and

(ii)  a letter pursuant to which John Lupo resigns, effective as of the Closing, as an officer and the director of the Corporation, in the form attached hereto as **Exhibit 2**; and

(iii) The Consent of the Sole Shareholder of the Corporation approving of the transaction contemplated by this agreement, in the form attached hereto as **Exhibit 3**; and

(iv)  The Consent of the Sole Director of the Corporation approving of the transaction contemplated by this agreement, in the form attached hereto as **Exhibit 4**; and

(v)   The Seller's Closing Certificate as of the Closing, in the form attached hereto as **Exhibit 5**; and

(vi)  Such other documents as may be reasonably requested by the Buyer to accomplish the transactions contemplated hereby.

(b)  Upon the terms and subject to the conditions set forth in this Agreement, the Buyer shall deliver or cause to be delivered to the Seller at the Closing the following:

(i)     Payment of the required portion of the **Purchase Price** payable pursuant to Section 2.1(a) above, by cashier's check or wire transfer; and

(ii)  In the event the Buyer is a corporation:

a)  The Consent of the Shareholder(s) of the corporation approving of the transaction contemplated by this agreement, in the form attached hereto as **Exhibit 6; and**

b)  The Consent of the Director(s) of the Corporation approving of the transaction contemplated by this agreement, in the form attached hereto as **Exhibit 7**; and

(iii) The Buyer's Closing Certificate as of the Closing, in the form attached hereto as **Exhibit 8**; and

(iv)  Such other documents as may be reasonably requested by the Seller to accomplish the transactions contemplated hereby.

Initials  JL _____  CC _____               5/25/17          6

# ARTICLE 3.

## REPRESENTATIONS AND WARRANTIES OF THE PARTIES

To induce the Parties to enter into this Agreement and to consummate the transactions contemplated hereby, the Parties represent and warrant to each other, as applicable, that the statements contained in this Article 3 are true and correct as of the date of this Agreement and will be true and correct as of the Closing Date (other than such representations and warranties that address matters only as of a particular date, which shall be true and correct as of such date), except as otherwise specified in such representation or warranty or as set forth in the disclosure schedules attached hereto (which disclosure schedules will makes explicit reference to one or more of the particular representations and warranties as to which exception is taken):

### 3.0(A). Seller's Representations and Warranties.

**3.1 Ownership of Shares/Absence of Liens and Encumbrances**. The Seller is the sole owner, beneficially and of record, of all of the shares of the Corporation and no one has a claim to any equitable interest in the Corporation whatsoever. Seller has good and marketable title to the Shares free and clear of all liens, mortgages, pledges, encumbrances, and charges of any kind. In the event that any stock certificates representing any of the Shares have been previously lost or stolen, they have been replaced by the issuance of replacement stock certificates issued upon the delivery to the Corporation of an Affidavit of Lost Share Certificates in form acceptable to Buyer and its counsel and containing an indemnification from the holder of the shares represented by the lost certificate with respect to any Loss or Liability incurred by the Corporation as the result of the issuance of such replacement certificate.

**3.2 Power to Sell**. The Seller has full legal power and authority to enter into and perform this Agreement. This Agreement constitutes the valid and binding obligation of the Seller, enforceable in accordance with its terms. The Seller is not a party to any contract or agreement or subject to any charges or other corporate restriction, related to the Shares. Neither the execution nor delivery of this Agreement, nor the performance of and compliance with the terms, provisions, and conditions of such instruments will conflict with, or result in a breach of, any of the terms, provisions, or conditions of any charter, bylaw, mortgage, indenture, lease, instrument, franchise, permit, judgment, decree, order, statute, rule, regulation, or lawfully enforceable contract or agreement applicable to the Shares.

**3.3 Due Incorporation**. The Corporation was incorporated in 2013 and is a corporation validly existing under, and by virtue of, the laws of the State of California and is in good standing under such laws, with all requisite legal and corporate power and authority to own, lease and operate all of the property now owned by the Corporation, to lease all of the property used by the Corporation under lease, to operate its properties and assets and to carry on its business as it is now being conducted. The Corporation is not in violation of, in conflict with, or in default under, its articles of incorporation, by-laws, shareholder agreements, subscription agreements, stock ledgers and other organizational or charter documents, as amended through the date hereof (the "*Charter Documents*"), and there exists no condition or event which, after notice or lapse of time or both, would result in any such violation, conflict or default.

**3.4 Sellers Consents and Approvals; No Conflicts**. Except those consents of the Seller provided in connection herewith, no consent, waiver, authorization or approval of, filing or registration with, notification, declaration or filing with, or cooperation from, any Person not a party to this Agreement, including any Governmental Authority, is necessary in connection with the execution, delivery and performance by the Seller of this Agreement and the transactions and other agreements and instruments contemplated hereby, except where the failure to obtain any such consent, authorization or

Initials  JL  _JL_     CC  _CC_ _____     5/25/17                    7

approval of, filing or registration with, or cooperation from, such Person, individually or in the aggregate, could not be material (the "*Required Consents*").

**3.5  Outstanding Stock.** The authorized capital of the Corporation consists of 10,000 shares of Common Stock. Other than the Shares, no shares of capital stock or voting securities have ever been issued by the Corporation and there are no issued or outstanding, options, warrants, calls, puts, preemptive rights, other securities, instruments, agreements or arrangements that are exercisable, convertible or exchangeable into or otherwise grant the right to purchase, subscribe for or otherwise acquire any issued or unissued capital stock or voting securities of the Corporation. All purchase of all of the Common Stock has been fully paid and nonassessable. The Shares are free and clear of all Liens. There are no voting agreements or voting trusts or stock restriction agreements with respect to any of the Shares. Upon the consummation of the transactions contemplated by this Agreement, Buyer shall be the holder of one hundred percent (100%) of the fully-diluted equity capital of the Corporation (full dilution to include allowance not only for all issued and outstanding shares, but also all shares which have been reserved or ought to be reserved for later issuance to accommodate the requirements of any and all existing stock bonus, stock option or stock purchase plans, all warrants to purchase stock and any and all claims on equity capital of any kind held by or accrued in favor of any persons, whether or not fully vested.) No person has any right of first refusal or any preemptive rights in connection with the sale of the Shares or any future issuances of securities by the Corporation.

**3.6  Books of the Corporation.** To the best of John Lupo's knowledge, there are no liabilities in excess of $5,000 which are presently known to John Lupo that are required to be reflected on the books of the Company in accordance with the historic accounting practices of the Company. The Corporation has not guaranteed and is not a current guarantor of the liabilities or obligations of any other Person or entity.

**3.7  Assets.** The Corporation has good and valid title to all of its assets, free and clear of all Liens.

**3.8  Taxes.**

(a)     All Tax Returns filed or required to be filed by the Corporation have been timely filed after giving effect to any extensions.

(b)     To the best of John Lupo's knowledge, there is no claim or dispute concerning any Tax Liability of the Corporation claimed or raised by any authority in writing. To the best of John Lupo's knowledge, there is no audit, examination or similar proceeding currently in progress, or pending or contemplated with respect to Taxes or Tax Returns of the Corporation.

**3.9  Brokers or Finders.** Neither the Corporation nor Seller has incurred, nor will either of them incur, directly or indirectly, any Liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement or the transactions contemplated hereby.

**3.10  Disclaimer of Additional Representations and Warranties.**  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY OTHER AGREEMENT ENTERED INTO IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, THE SELLER, DOES NOT MAKE ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY ON BEHALF OF THE CORPORATION RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT.

**3.11  No Violation of Statute or Breach of Contract.  To the best of John Lupo's knowledge,** the Corporation is not in default under, or in violation or breach of, nor has the Corporation received any notice of such default or violation, of (a) any applicable statute, law, act, ordinance, building or other

Initials  JL ___JL___   CC ___CC___ _____     5/25/17          8

code, decree, order, rule, regulation, injunction or judgment of any governmental body or court; (b) any provision of any permit or license to which the Corporation is a party; (c) any provision of the Corporation's Articles of Incorporation or Bylaws, as amended and in effect on and as of the date of Closing; (d) any promissory note, indenture or any evidence of indebtedness or security therefor, any lease, contract, purchase or other commitment (whether written or oral); or (e) any other agreement, instrument or contract by which the Corporation is bound, or to which it or its property is subject. No event has occurred which with the passage of time or the giving of notice, or both, would constitute a breach or violation of or default under any of the foregoing. The execution, delivery and performance of and compliance with this Agreement, will not result in any such violation or breach or be in conflict with or constitute a material default under any of the foregoing, or result in the creation of any pledge, lien, encumbrance or charge upon any of the properties or assets of the Corporation pursuant thereto; and there is no such contract, agreement, instrument, judgment, decree, order, statute, rule or regulation which materially and adversely affects or may reasonably be expected to have a material and adverse effect on the properties, assets, operations or prospects of the Corporation.

3.12 **Subsidiaries.** The Corporation does not own or control, directly or indirectly, any interest or investment in any other corporation, association, partnership or other business entity.

3.13 **Financial Information; Due Diligence Materials.** The Corporation has delivered to Buyer true, correct and complete copies of the Corporation's federal and state tax returns filed with respect to the tax years ended December 31, 2014 and December 31, 2015, and has allowed Buyer to review true, correct and complete copies of all of the Corporation's bank statements, payroll records and checking account registers for the years ended December 31, 2014 and December 31, 2015, and the period from January 1, 2017 through April 30, 2017, and all customer contracts entered into during the period from January 1, 2017 through April 30, 2017. Except as set forth in the Schedule of Exceptions, to the best of John Lupo's knowledge all of the foregoing tax returns, books and records are complete and correct in all material respects and have been accurately prepared from the Corporation's books and records in accordance with the Corporation's customary practices and policies, applied on a consistent basis.

3.14 **Real Property Holding Corporation.** The Corporation is not a AUnited States real property holding corporation@, (as that term is defined in Section 897(c)(2) of the U.S. Internal Revenue Code of 1986, as amended, and the Treasury Regulations thereunder) and an officer of the Corporation shall deliver to Buyer a certificate of non-U.S. real property holding corporation status in form and substance satisfactory to Buyer.

3.15 **Employee Classification.** The Corporation is and since the incorporation of the Corporation has been in compliance in all material respects with all applicable state and federal laws and regulations regarding employment and employment practices, terms and conditions of employment, wages and hours, anti-discrimination and occupational health and safety. There are no pending proceedings brought by or on behalf of any employee or former employee of the Corporation seeking benefits under the workers' compensation laws of any jurisdiction.

3.16 **Disclosure.** No representation or warranty or other statement made by Seller in this Agreement or the Schedules or certificates to be delivered by Seller pursuant to this Agreement contained, contains or will contain any untrue statement or omitted, omits or will omit t state a material fact necessary to make any of them, in light of the circumstances in which they were made, not misleading.

**3.0(B). Buyer's Representations and Warranties.**

3.11 **Due Incorporation.** In the event the Buyer is a corporation, the Buyer was incorporated in 2017 and in good standing under the laws of California, with all requisite power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted. The Buyer is not

Initials  JL _____  CC _____  _____  5/25/17          9

in violation of, in conflict with, or in default under any **Charter Documents**, and there exists no condition or event which, after notice or lapse of time or both, would result in any such violation, conflict or default.

3.13 **Power to Purchase**. The Buyer has full legal power and authority to enter into and perform this Agreement. This Agreement constitutes the valid and binding obligation of the Buyer, enforceable in accordance with its terms. Neither the execution nor delivery of this Agreement, nor the performance of and compliance with the terms, provisions, and conditions of such instruments will conflict with, or result in a breach of, any of the terms, provisions, or conditions of any charter, bylaw, mortgage, indenture, lease, instrument, franchise, permit, judgment, decree, order, statute, rule, regulation, or lawfully enforceable contract or agreement.

3.13 **Buyer's Consents and Approvals; No Conflicts.** Except those consents of the Buyer provided in connection herewith, no **Required Consents** are necessary in connection with the execution, delivery and performance by the Buyer of this Agreement and the transactions and other agreements and instruments contemplated hereby.

3.14 **Operation of the Corporation & The Business**. The Buyer understands the nature of the Business and the licensing requirements the Business needs to operate. The Buyer is aware of all of the obligations for which John Lupo is the guarantor of the Corporation and has the wherewithal to qualify as a guarantor on any and all obligations of the Corporation for which John Lupo currently acts as the Guarantor for the Corporation, including but not limited to General Electric Financing, Synchrony Financial and Green Sky Financial. The Buyer is aware of the legal proceedings listed on Exhibit 9 hereto. Buyer is aware that Gonzalez matter listed on Exhibit 9 has been filed by a law firm with the likely intent to discovery whether it can procure other potential claimants/plaintiffs from the existing or prior Employees of the Corporation to make claims against the Corporation and/or John Lupo.

3.15 **Brokers or Finders**. To the Buyer's knowledge, the Buyer has not incurred, nor will it incur, directly or indirectly, any Liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement or the transactions contemplated hereby.

3.16 **Disclaimer of Additional Representations and Warranties.** EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY OTHER AGREEMENT ENTERED INTO IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, THE BUYER, DOES NOT MAKE ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY ON BEHALF OF THE CORPORATION RELATED TO THE SUBJECT MATTER OF THIS AGREEMENT.

3.17 **Due Diligence**. The Buyer has or will have inspected and performed the requisite due diligence, to the extent the Buyer deems necessary, in its sole and absolute discretion, with respect to every element and facet of the Corporation and the Business prior to the Closing. **THE BUYER WOULD NOT AND WILL NOT CLOSE THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT UNLESS THE BUYER IS SATISIFIED WITH SAID INSPECTION AND DUE DILIGENCE.**

_____
Buyer's Initials

Initials  JL _____  CC _____  5/25/17          10

## ARTICLE 4

### COVENANTS

**4.0A Pre-Closing Covenants.**

**4.1 Implementing the Agreement**. Subject to the terms and conditions hereof, each party hereto shall use commercially reasonable efforts to facilitate the consummation of the transactions contemplated hereby. Without limiting the generality of the foregoing, after the date hereof and prior to the Closing, John Lupo will cause the Corporation not to sell or encumber any of the assets of the Corporation to any Person, and will cause the Corporation not to take any other action, other than in the normal course of business, that would have the effect of preventing or disabling the performance of its obligations under this Agreement.

**4.2 Further Assurances**. From time to time after the Closing Date, upon the reasonable request of any party, each party hereto shall execute, acknowledge and deliver all such other instruments and documents and shall take all such other actions required to consummate and make effective the transactions contemplated by this Agreement.

**4.3 Access to Information and Facilities**. From and after the date of this Agreement until the Closing Date, the Seller shall cause the Corporation to (a) upon reasonable notice, provide the Buyer, and their representatives reasonable access during normal business hours to all properties, books, records and Contracts of the Corporation, and (b) upon reasonable notice, furnish the Buyer, and their representatives with any and all information concerning the Corporation which the Buyer, and their representatives reasonably request provided, that nothing herein will obligate the Corporation to take any actions that would unreasonably interrupt the normal course of business of the Corporation or to violate any Law or the terms of any Contract to which the Corporation is a party.

**4.4 Corporate Assets**. The Seller shall leave no less than $500 in the checking account of the Corporation after accounting for all outstanding checks written against the Corporation's checking account(s) prior to the Closing. All deposits made by Seller into the bank accounts of the Corporation on or prior to Saturday, May 27, 2017, shall belong to Seller. All deposits thereafter shall belong to Buyer/the Corporation. The Seller shall be entitled to take all other monies out of said account(s), including but not limited to any customer deposits. Except with respect to aforementioned checking account, the Seller shall not assign, transfer, or alter any rights to any asset of the Corporation, including but not limited to any inventory item, any customer contract or accounts receivable, except in the ordinary course of business, without the prior written consent of the Buyer.

**4.0A Post-Closing Covenants.**

**4.4. Employees.**

a) As additional consideration for the sale of the Shares, after the Closing Date, the Buyer shall use reasonable efforts to cause the Corporation to offer continuing employment, on an at-will basis, to the existing employees of the Corporation as of the Closing Date (the "*Employees*"). The Buyer shall offer to pay each Employee the same compensation that each such Employee was receiving from the Corporation immediately prior to the Closing Date, subject to the at-will nature of such employment. The Employees who accept such offer of employment from the Buyer as of the Closing who satisfy the Buyer's normal pre-hiring procedures and who become employed by the Corporation as of the Closing Date are referred to herein as "*Continuing Employees.*"

b)   The Corporation (or, to the extent applicable, any insurance of the Corporation providing applicable coverage) shall be responsible for all workers' compensation benefits with respect to injuries occurring to any Employee on, prior or after the Closing date.

4.5 **Release of Personal Guarantees**. After the Closing, the Corporation and Buyer (a) agree to promptly provide good faith assistance to John Lupo with respect to obtaining releases for any and all personal guarantees (if any) listed in Section 3.14 above that John Lupo may have made to vendors, lending institutions and customer of the Corporation and (b) replace John Lupo with respect to any such personal guarantees as necessary so the Corporation and the Business can continue to function as they have prior to the Closing.

4.6 **Consulting by John Lupo**.  John Lupo agrees to make himself available by phone or in person, after reasonable notice, during normal business hours, for up to 15 hours per week from the time of the Closing until December 15, 2017, for the purpose of consulting with the Buyer about the operations of the Business. Lupo shall receive $5,000 per month payable in accordance with the Corporation's standard payroll practices after the Closing.

4.7 **Non-Solicitation Covenant**. For a period of five (5) years after the Closing Date, Seller shall not at any time directly or indirectly, by or for himself, or as the agent of another, or through others as his agent, in any way solicit or take away, or attempt to solicit or take away, any employee, officer, director, representative, consultant, or other agent of the Corporation (with the exception of Bryce Phelton) whether such person is presently employed by Buyer or the Corporation or may hereafter be so employed.

4.8 **Cabinet Purchase**. The parties acknowledge that the Corporation/Business resells "white shaker" cabinets to a substantial number of its customers. The Corporation/Business currently purchases the "white shaker" cabinets it sells to customers from Grand J & K Corporation. The current Grand J & K specification sheet/price sheet is attached hereto as Exhibit 10. Subject to the terms hereof, the Buyer hereby agrees to exclusively purchase from the Seller, or his nominee corporation of which he owns a controlling interest, all of the "white shaker" style cabinets sold by the Corporation/Business to its existing and future customers (hereinafter "***Buyer's Cabinet Purchasing Obligation***." Said Buyer's Cabinet Purchasing Obligation shall begin when (1) Seller provides written notice to Buyer that he/it has an existing inventory of "white shaker" cabinets, and (2) Buyer has confirmed, to a commercially reasonable standard, that the Seller's cabinets are of like quality and workmanship to the "white shaker" cabinets previously sold to JF Construction by John Lupo on 3 occasions prior to the Closing, and (3) Buy has confirmed with Seller that Seller can pickup the required cabinets in a commercially reasonable timeframe, and (4) the price for Seller's cabinets is no more than 90% the comparable Grand J & K Corporation cabinets. Buyer shall be required to purchase all of its white shaker cabinet needs/requirement from Seller unless if the foregoing conditions can be met. Buyer acknowledges that Seller would not be entering into this transaction without Buyer agreeing to the obligations required under this section.  Christopher Cardinal agrees that he will take all necessary action for the Buyer and any successor entity  to complete its obligations under this section. Buyer's obligation hereunder shall be for a term of five (5) years from the date of the Closing after which Seller shall have the right to renew this obligation for an additional period of five (5) years with no less than sixty (60) days written notice to Buyer and/or the Corporation provided Buyer reconfirm that all of the above conditions have been met.

4.9 **Tax Returns for 2016 and 2017 Tax Years**.  The Corporation will prepare and file California state and federal tax returns for the 2016 tax year and the 2017 tax year when required under applicable law, including any extensions permitted thereunder. Buyer agrees to cause the Corporation not to change the characterization of expenses incurred by the Corporation during 2016 and during the portion of 2017 prior to the Closing from the manner in which such expenses were characterized prior to the Closing Date in accordance with the Corporation's historical accounting practices.

Initials  JL _____ CC _____               5/25/17               12

**Article 5**

**CONDITIONS PRECEDENT TO OBLIGATIONS OF THE SELLER**

The obligation of the Seller to consummate the transactions contemplated hereby is subject to satisfaction or waiver of each of the following conditions precedent on or before the Closing Date:

**5.1 Accuracy of Representations and Warranties**.  Each of the representations and warranties made by the Buyer in Article 3 shall be true and correct in all respects as of the Closing, in each case as though then made and as though the Closing Date was substituted for the date of this Agreement throughout such representations and warranties (other than such representations and warranties that address matters only as of a particular date, including the date of this Agreement, which shall be true and correct as of such date).

5.2 **Compliance with Covenants**.  The Buyer shall have performed or complied in all material respects with all Pre-Closing obligations, agreements and covenants contained herein to be performed or complied with by the Buyer prior to the Closing.

**5.3 Closing Certificate**.  The Corporation shall have furnished to the Seller a certificate dated as of the Closing Date and executed by the Buyer, to the effect that each of the conditions specified in Sections 5.1 and 5.2 have been satisfied in all respects in the form of Exhibit 11 hereto.

**5.4 No Violation of Law**.  There shall not be in effect any statute, regulation, order, decree, judgment or injunction (whether temporary, permanent or preliminary) of any Governmental Authority that challenges, prohibits, makes illegal, enjoins or prevents the consummation of the transactions contemplated by this Agreement.

**5.5 No Litigation**.  There shall not be any action taken by, or proceeding asserted with, any court of competent jurisdiction or other Governmental Authority or any other Person that, in the reasonable judgment of the Seller, would be expected to, directly or indirectly make illegal or enjoin, restrain or otherwise prohibit or materially delay consummation of the transactions contemplated by this Agreement or that seeks to obtain damages from the Buyer or make more costly for the Buyer the consummation of the transactions contemplated by this Agreement.

**ARTICLE 6**

**CONDITIONS PRECEDENT TO OBLIGATIONS OF THE BUYER**

The obligation of the Buyer to consummate the transactions contemplated hereby is subject to the satisfaction or waiver of each of the following conditions precedent on or before the Closing Date:

**6.1 Accuracy of Representations and Warranties**.  Each of the representations and warranties made by the Seller in Article 3 shall be true and correct in all respects at and as of the Closing and in each case as though then made and as though the Closing Date was substituted for the date of this Agreement throughout such representations and warranties (other than such representations and warranties that address matters only as of a particular date, including the date of this Agreement, which shall be true and correct as of such date).

Initials   JL _____   CC _____                    5/25/17          13

**6.2 Compliance with Covenants**. The Seller shall have performed or complied in all material respects with all obligations, agreements and covenants contained herein to be performed or complied with by the Seller prior to the Closing.

**6.3 Closing Certificate**. The Seller shall have furnished to the Corporation a certificate dated as of the Closing Date and executed by Seller to the effect that each of the conditions specified in Sections 6.1 and 6.2 have been satisfied in all respects in the form of Exhibit 12 hereto.

**6.4 No Violation of Law**. There shall not be in effect any statute, regulation, order, decree, judgment or injunction (whether temporary, permanent or preliminary) of any Governmental Authority that challenges, prohibits, makes illegal, enjoins or prevents the consummation of the transactions contemplated by this Agreement.

**6.5 No Litigation**. There shall not be any action taken by, or any proceeding asserted with, any court of competent jurisdiction or other Governmental Authority or any other Person that, in the reasonable judgment of the Buyer, would be expected to, directly or indirectly make illegal or enjoin, restrain or otherwise prohibit or materially delay consummation of the transactions contemplated by this Agreement or that seeks to obtain damages from the Corporation or make more costly for the Corporation its future operations.

**6.6 No Material Adverse Change**. Since the date of this Agreement, there shall not have been any fact, circumstance, change, event or development that, individually or in the aggregate with all such other facts, circumstances, changes, events or developments since the date of this Agreement, that has had, or could reasonably be expected to have, a Material Adverse Effect on the Business.

## Article 7

### SURVIVAL AND INDEMNIFICATION

**7.1 Survival**. The representations and warranties of the Parties hereto contained in this Agreement and the documents to be delivered in connection with this Agreement, including the certificates delivered pursuant to Sections 5.3 and 6.3, shall survive the Closing indefinitely. All covenants and agreements of the parties hereto contained herein not fully satisfied or waived prior to the Closing shall survive the Closing, continue in effect and expire in accordance with their respective terms.

**7.2 Indemnification by the Corporation & Buyer of Seller**. The Buyer and the Corporation (hereinafter the Indemnifying Party), jointly and severally, shall defend and hold harmless the Seller John Lupo and his wife (if she is named based on community property liability) (collectively, the "*Seller Indemnified Parties*") for, and will pay to such Seller Indemnified Parties the amount of, any Losses relating to:

    a.  any breach of or any inaccuracy in any representation or warranty made by the Buyer in this Agreement or any certificate or other document delivered by the Buyer at the Closing, and/or

    b.  any breach of or failure by the Buyer to perform any covenant or obligation of the Buyer set out in this Agreement or any related agreement or document delivered by the Buyer at the Closing, except that Seller's remedy in the case of any breach of Section 2.1 above shall be limited to the liquidated damages set forth in Section 2.1, and/or

Initials  JL  _____  CC  _____  _____  5/25/17  14

    c. regardless of when it arises, any Liability, Loss or Action, including but not limited to those referenced in Section 7.2.A below and the accounts payable of the Corporation, arising from John Lupo's association with, ownership of the Shares, or operation of the Business and/or the Corporation since its incorporation, including, but not limited to, any Third Party Claims, and/or the lawsuits set forth on Exhibit 9 hereto, excluding, however, any personal Taxes owed by the Seller for the year 2016 and 2017 for his ownership of shares of the Corporation or arising out of the payment of the Purchase Price (which Tax obligations shall remain the exclusive obligation of the Seller).

**7.2A Piercing the Corporate Veil/Labor Claims.** In addition to the above 7.2 obligations, (a) if the Corporation's corporate veil is pierced and disregarded at any time, regardless of when the Third Party Claim requesting such a remedy occurs and regardless of when the underlying facts arose justifying such a claim, or (b) if John Lupo is sued personally by any employee based on the operation or existence of the Business, in connection with or as a result of any Third Party Claim arising out of or related to the operation of the Business, which subjects the Seller to actual or potential personal liability for such Third Party Claim, regardless of when the underlying facts arose justifying such a claim ("*Alter Ego Losses*"), the provisions of this entire Article 7 shall apply.

**7.3 Indemnification by Seller of Buyer and the Corporation.** Seller (hereinafter the Indemnifying Party), shall defend and hold harmless Buyer and the Corporation (collectively, the "*Buyer Indemnified Parties*") for, and will pay to such Buyer Indemnified Parties the amount of, any Losses relating to:

    a. any breach of or any inaccuracy in any representation or warranty made by Seller in this Agreement or any certificate or other document delivered by Seller or the Corporation at the Closing, and/or

    b. any breach of or failure by the Seller to perform any covenant or obligation of Seller set out in this Agreement or any related agreement or document delivered by Seller at the Closing, and/or

    c. any Tax, penalty or interest owed by or assessed against the Seller with respect to income or compensation earned by or distributed to Seller by the Corporation, or allocated to Seller on Seller's K-1 with respect to the Corporation's tax returns for any year or any partial year prior to the Closing Date during or with respect to any time period ending on or prior to the Closing Date, including without limitation any personal Taxes owed by Seller for the years 2016 and 2017 for his ownership of shares of the Corporation or arising out of the payment of the Purchase Price (which Tax obligations shall remain the exclusive obligation of the Seller).

**7.4 Procedures for Indemnification – Third Party Claims.** For purposes of this Section 7.4, the Seller Indemnified Parties may be referred to as an "Indemnified Party" with respect to any claim for indemnification brought pursuant to Section 7.2 above and the Buyer and the Corporation may be referred to as an "Indemnifying Party" for purposes of such indemnification pursuant to Section 7.2. For purposes of this Section 7.4, the Buyer Indemnified Parties may be referred to as an "Indemnified Party" with respect to any claim for indemnification brought pursuant to Section 7.3 above and Seller may be referred to as the "Indemnifying Party" for purposes of such indemnification pursuant to Section 7.3. The

Indemnified Parties agree to give the Indemnifying Parties reasonably prompt written notice of any written claim, action, suit, demand, assessment, investigation, arbitration or other proceeding by or in respect of a third party (a "*Third Party Claim*") of which the Indemnified Parties have knowledge, for which such Indemnified Parties are entitled to indemnification under this Article 7; provided that the failure of the Indemnified Parties to give such notice shall not relieve the Indemnifying Parties of their obligations under this Article 7 except to the extent (if any) that the Indemnifying Parties shall have been actually prejudiced thereby. In the case of a Third Party Claim, after receipt of notice from the Indemnified Parties of any Third Party Claim, upon the giving of written notice to the Indemnified Parties of the Indemnifying Party's election to direct the defense or handling of such Third Party Claim, the Indemnifying Party will have the right to direct, through counsel of its own choosing that is reasonably acceptable to the Indemnified Party, the defense or settlement of any such Third Party Claim at its own expense. In such case, the Indemnified Parties and their counsel may participate in such defense, but in such case the reasonable expenses of the Indemnified Parties will be paid by the Indemnified Party. Notwithstanding the foregoing, the Indemnifying Party shall not be entitled to assume the defense of, defend, compromise and settle any such Third Party Claim in the name of the Indemnified Parties (and the reasonable fees and expenses of the Indemnified Party's separate counsel shall be borne by the Indemnifying Party) if (i) the Indemnified Parties shall have determined in good faith that an actual or potential conflict of interest makes representation of the Indemnifying Party and Indemnified Parties by the same counsel or the counsel selected by the Indemnifying Party inappropriate, (ii) the Third Party Claim is a criminal proceeding, or (iii) the Third Party Claim seeks an injunction or other equitable or non-monetary relief. The Indemnified Parties will promptly provide the Indemnifying Party with access to the Indemnified Party's records and personnel relating to any Third Party Claim being defended by the Indemnifying Party during normal business hours and will otherwise cooperate with the Indemnifying Party in the defense of such Third Party Claim, and the Indemnifying Party will reimburse the Indemnified Parties for all of its reasonable out-of-pocket costs and expenses incurred in providing such access, personnel and cooperation. Upon assumption of the defense of any such Third Party Claim by the Indemnifying Party, the Indemnified Parties will not pay, or permit to be paid, any part of the Third Party Claim, unless the Indemnifying Party consents in writing to such payment (which consent will not be unreasonably withheld or delayed) or unless a final judgment from which no appeal may be taken by or on behalf of the Indemnified Parties is entered against the Indemnified Parties for such Liability. Notwithstanding anything to the contrary herein, the Indemnifying Party shall not compromise or settle, or admit any Liability with respect to, any Third Party Claim without the prior written consent of the Indemnified Parties, unless the relief consists solely of (i) money damages (all of which the Indemnifying Party shall pay) and (ii) includes a provision whereby the plaintiff or claimant in the matter releases the Indemnified Parties from all Liability with respect thereto. If the Indemnifying Party fails to defend or fails to prosecute or withdraws from such defense, then the Indemnified Parties will have the right to undertake the defense or settlement thereof, at the Indemnifying Party's expense. If the Indemnified Party assumes the defense of such Third Party Claim pursuant to this Section 7.4(a) and proposes to settle such claim prior to a final judgment thereon or to forgo any appeal with respect thereto, then the Indemnified Parties will give the Indemnifying Party prompt written notice thereof and the Indemnifying Party will have the right to participate in the settlement or assume or reassume the defense of such Third Party Claim.

7.5   **Application of Article 7/Calculation of Losses.**   Any Losses as to which indemnification provided for in this Article 7 may apply shall be determined net of (i) any insurance coverage applicable to the matter for which indemnification is sought less any current or prospective costs associated with obtaining such recovery and (ii) any Tax benefits derived by the Indemnified Party with respect to such Loss.

Initials  JL   _JL_   CC  _CC_   _____   5/25/17        16

**ARTICLE 8**

**TERMINATION**

**8.1  Termination**.  This Agreement may be terminated at any time on or prior to the Closing Date:

    a.    with the mutual written consent of the parties hereto;

    b.    by either the Corporation or the Seller, if the Closing shall not have taken place on or before June 2, 2017, provided, that the right to terminate this Agreement under this Section 8.1(b) shall not be available to (i) the Corporation if the failure of the Corporation or the Seller to fulfill any of their respective obligations under this Agreement has resulted in the failure of the Closing to occur on or before such date, or (ii) the Seller if the failure of the Seller or the Corporation to fulfill any of their respective obligations under this Agreement has resulted in the failure of the Closing to occur on or before such date, (iii) the Buyer if the failure of the Buyer to fulfill any of their respective obligations under this Agreement has resulted in the failure of the Closing to occur on or before such date;

    c.    by either the Corporation or the Seller if a Governmental Authority shall have issued an order, decree or ruling or taken any other action (which order, decree or ruling the parties hereto shall use commercially reasonable efforts to lift), in each case permanently restraining, enjoining or otherwise prohibiting the transactions contemplated hereby, and such order, decree, ruling or other action becomes final and non-appealable;

    d.    by the Seller, if there shall have been a material breach of any covenant, representation or warranty of the Buyer hereunder, and such breach shall not have been remedied within three (3) Business Days after receipt of a notice in writing from the Seller specifying the breach and requesting such breach be remedied; or

    e.    by the Buyer, if there shall have been a material breach of any material covenant, representation or warranty of the Seller hereunder, and such breach shall not have been remedied within three (3) Business Days after receipt by the Seller of notice in writing from the Buyer specifying the breach and requesting such breach be remedied.

In the event of any termination pursuant to this Section 8.1 (other than pursuant to clause (a)), written notice setting forth the reasons thereof shall promptly be given by the terminating party to the other party.

**8.2  Effect of Termination**.  If this Agreement is terminated pursuant to Section 8.1, all obligations of the parties hereunder shall terminate, except for the obligations set forth in Section 9.1 (Expenses) which shall survive the termination of this Agreement, and except that no such termination shall relieve any party from Liability for any prior breach of this Agreement or its failure to comply with the term and conditions of this Agreement or to perform its obligations thereunder prior to termination.

## Article 10

### MISCELLANEOUS

**10. 1 Expenses.** The attorney's fees and transaction costs of Seller and the Corporation shall be borne by Seller (or the Corporation if paid prior to the Closing). The attorney's fees and transaction costs of Buyer shall be borne by Buyer.

**10.2 Amendment.** This Agreement may be amended, modified or supplemented only in writing signed by the Buyer and the Seller.

**10.3 Notices.** Any written notice to be given hereunder shall be deemed given: (a) when received if given in person or by nationally recognized courier; (b) on the date of transmission if sent by telecopy or other wire transmission (receipt confirmed); (c) three Business Days after being deposited in the U.S. mail, certified or registered mail, postage prepaid; and (d) if sent by an internationally recognized overnight delivery service, the second Business Day following the date given to such overnight delivery service (specified for overnight delivery and receipt confirmed). All notices shall be addressed as follows:

> **John Lupo via**
> **Thomas Del Beccaro, Esq.**
> **Del Beccaro, Hornsby & Blake**
> 800 S. Broadway, Suite 301
> Walnut Creek, CA 94596
> tgfdb@aol.com
>
> **Christopher Cardinal**
> **Philip Wilson**
> Wilson Marshall & Taylor
> 4410 El Camino Real, Suite 111
> Los Altos, California 94022
> pwilson@wmtlaw.com

**10.4 Waivers.** The failure of a party to require performance of any provision hereof shall not affect its right at a later time to enforce the same. No waiver by a party of any term, covenant, representation or warranty contained herein shall be effective unless in writing. No such waiver in any one instance shall be deemed a further or continuing waiver of any such term, covenant, representation or warranty in any other instance.

**10.5 Counterparts.** This Agreement may be executed and delivered in one or more counterparts (including by means of facsimile or electronic transmission in portable document format (pdf) transmission)), all of which taken together shall constitute one and the same instrument.

**10.6 Applicable Law.** This Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of California without giving effect to the principles of conflicts of law thereof. Each of the Parties to this Agreement hereby submits to the personal jurisdiction of the courts of the State of California located in Contra Costa County. If any action or proceeding shall be commenced to interpret or enforce this Agreement or any right arising in connection with this Agreement, the prevailing party in such action or proceeding shall be entitled to recover from the others

the reasonable attorneys' fees, costs and expenses incurred by such prevailing party in connection with such action or proceeding or negotiation to avoid such action or proceeding.

**10.7  Assignment**.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns; provided that no assignment by the Buyer of any rights or obligations may be made without the written consent of the Selling Shareholder except to name a nominee for the purchase hereunder provided said nominee assumes all of the obligations hereunder pursuant to Exhibit 13 hereof. The Seller may in its sole discretion assign any of its rights and obligations under Section 4.7 of this Agreement to one or more of its Affiliates upon written notice to the Buyer.  No assignment by any party pursuant to this Section 10.7 shall relieve the assigning party of its obligations hereunder.

**10.8  Exhibits**.  A matter set forth in an Exhibit to this Agreement shall be deemed disclosed for purposes of any other Exhibit to this Agreement so long as its relevance to such other Exhibit is reasonably apparent on the face of the information so disclosed.

**10.9  Incorporation of Exhibits**.  The respective Exhibits attached hereto and referred to herein are incorporated into and form a part of this Agreement.

**10.10  Complete Agreement**.  This Agreement constitutes the complete agreement of the parties with respect to the subject matter hereof and supersede all prior discussions, negotiations and understandings.

**10.11  Further Assurances**.  From and after the Closing, the parties shall execute and deliver any and all documents, and shall cause any and all other reasonable action to be taken, which may be necessary or proper to effect or evidence the provisions of this Agreement and the transactions contemplated hereby.

**10.12  Severability**.  If any term or other provision of this Agreement is held invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect and there shall be deemed substituted for the provision at issue a valid, legal and enforceable provision that effects the original intent of the parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

IN WITNESS WHEREOF, the parties hereto have caused this **Stock Purchase Agreement** to be executed and delivered on the date first above written.

SELLER:

BY: _____

JOHN LUPO

BUYER:

BY: _____

CHRISTOPHER CARDINAL

Initials  JL _____  CC _____          5/25/17          19

Date:

Date:

Consent of Spouse

    I, _Andreana Michael_ spouse of John Lupo, acknowledge that I have read this Stock Purchase Agreement dated as of May ____, 2017 (the "Agreement"). I am aware that by its provisions my spouse is selling all of the shares of KITCHEN EXPERTS OF CALIFORNIA INCORPORATED, a California corporation (the "Corporation"), including any community property interest I may have in such shares. I agree to the sale and purchase described in the Agreement and I hereby consent to the sale of the Shares by my spouse in accordance with the provisions of the Agreement.

Dated _May 26 2017_     _____
                          (Signature of Spouse)
                     _Andreana Michael_
                          (Print Name of Seller's Spouse)

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**  CIVIL CODE § 1189

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

State of California  )
County of _Contra Costa_  )

On _05/26/17_ before me, _Dwain Jefferson Notary Public_.
　　　　Date　　　　　　　　　　*Here Insert Name and Title of the Officer*

personally appeared _Annapurna Michael_
　　　　　　　　　　　　*Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Dwain E. Jeff_
　　　　　　　*Signature of Notary Public*

DWAIN E. JEFFERSON
Notary Public - California
Contra Costa County
Commission # 2145706
My Comm. Expires Mar 10, 2020

*Place Notary Seal Above*

──────────── OPTIONAL ────────────
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _Stock Purchase Agreement_
Document Date: _05/26/17_ _____ Number of Pages: _38_
Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited  ☐ General
☐ Individual　　 ☐ Attorney in Fact
☐ Trustee　　　 ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited  ☐ General
☐ Individual　　 ☐ Attorney in Fact
☐ Trustee　　　 ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

---

©2016 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #5907

Exhibit 1

## LOST CERTIFICATE DECLARATION

### AND

### INDEMNITY AGREEMENT

The undersigned, John Lupo and Andreana Antonette Michael, husband and wife as community property, declare as follows:

1.      We are the record and beneficial owners of Certificate No. C-1, representing Ten Thousand (10,000) shares of Common Stock of Kitchen Experts of California Incorporated, a California corporation (the "Company").

2.      Such certificate has been lost or stolen and, after diligent search therefor, has not been found.

3.      We have made no assignment, endorsement, transfer or other disposition of the shares represented by such certificate except pursuant to that certain Stock Purchase Agreement dated as of May 25, 2017 by and among the Company, John Lupo (as the Seller) and Christopher Cardinal (as the Buyer).

4.      In consideration of the Company authorizing the issuance of a replacement certificate in the name of the Buyer or its nominee, we jointly and severally agree to deliver such lost certificate to the Company immediately should it be recovered by either of us, and to defend, indemnify and hold harmless the Company, and any officer, director or transfer agent of the Company, from and against any claim that may be made against it, including any expense or liability, on account of the alleged loss, theft or destruction of the certificate or the issuance of such replacement certificate.

We declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California, on May 25, 2017.

_____
John Lupo

_____
Andreana Antonette Michael

ASSIGNMENT OF SHARES SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto Christopher Cardinal, a California resident, Ten Thousand (10,000) shares of Common Stock of KITCHEN EXPERTS OF CALIFORNIA INCORPORATED, a California corporation (the "Corporation"), standing in the undersigned's name on the books of the Corporation and represented by Share Certificate Number C-1 (or any replacement certificate issued in replacement of Certificate Number C-1), and does hereby irrevocably constitute and appoint *CHRISTOPHER CARDINAL* or the Secretary of the Corporation attorney-in-fact, with full power of substitution in the premises, to transfer said shares on the books of the Corporation.

Dated: May 25, 2017

SHAREHOLDER

By: _____
Name: John Lupo

By: _____
Name: Andreana Antonette Michael

Exhibit 2

Lupo Letter of Resignation from Corporation

May 26, 2017

To: Board of Directors, **Kitchen Experts of California Incorporated**, a California corporation (the "Company")

Re: Resignation

I hereby resign as an officer and director of the Company, effective as of the date hereof.

Sincerely,

John Labo

Exhibit 3

Consent of Sole Shareholder of the Corporation

## ACTION TAKEN BY THE

## WRITTEN CONSENT OF THE SHAREHOLDERS

## OF KITCHEN EXPERTS OF CALIFORNIA INCORPORATED,

## A CALIFORNIA CORPORATION

The undersigned, is the sole shareholder of the Corporation and hereby adopts and approves of the following resolution as if adopted and approved at a duly noticed and held annual meeting of the shareholders:

Whereas, it is in the best interests of the corporation for the Shareholder to sign the the Stock Purchase Agreement attached hereto:

> **BE IT THEREFORE RESOLVED**, that the Stock Purchase Agreement attached hereto is hereby approved by the sole Shareholder of the record date of May 24, 2017.

Dated: 5.24.17

_____
John Lupo

# Exhibit 4

## Consent of Sole Director of the Corporation

## ACTION TAKEN BY THE

## WRITTEN CONSENT OF THE DIRECTOR

## OF KITCHEN EXPERTS OF CALIFORNIA INCORPORATED,

## A CALIFORNIA CORPORATION

The undersigned, is the sole Director of the Corporation and hereby adopts and approves of the following resolution as if adopted and approved at a duly noticed and held annual meeting of the Directors:

**Whereas**, it is in the best interests of the corporation for the Director to sign the the Stock Purchase Agreement attached hereto:

**BE IT THEREFORE RESOLVED**, that the Stock Purchase Agreement attached hereto is hereby approved by the sole Director of the record date of May 24, 2017.

Dated:  5.25.17

_____
John Lupo

**Exhibit 5**

**Seller's Closing Certificate**

## SELLER'S CLOSING CERTIFICATE

The undersigned, **John Lupo** (the "Seller"), hereby declares under penalty of perjury as follows:

Each of the conditions specified in Sections 6.1 and 6.2 have been satisfied in all respects.

Dated:  May 25, 2017

By: _____
Name:  John Lupo

## Exhibit 6

### Buyer's Consent of Shareholder(s)

# Exhibit 7

## Buyer's Consent of Directors

Intentionally Blank

Initials  JL  _JL_  CC  _CL_  5/25/17  27

**Exhibit 8**

**Buyer's Closing Certificate**



Initials JL ___ CC ___                    5/25/17                    28

## BUYER'S CLOSING CERTIFICATE

The undersigned, **Christopher Cardinal** (the "Buyer"), hereby declares under penalty of perjury as follows:

Each of the conditions specified in Sections 5.1 and 5.2 have been satisfied in all respects.

Dated: May 25, 2017

By: _____
Name: Christopher Cardinal

**Exhibit 9**

**Corporations Legal Proceedings as of the Closing Date**

1. Hector F. Gonzalez Castanedad, Plaintiff, vs. Kitchen Experts of California Incorporated, et. al. Defendants. RG 16840896 Alameda County

2. Bianachini/Kitchen Experts – CSLB claim – original contract amount $62,570 – balance owing $11,514

3. Yaschuk/Kitchen Experts – original contract amount $33,500 – halance owing of approx. $3,500.00

**Exhibit 10**

**Grand J & K specification sheet/price sheet as of the Closing Date**



## CERTIFICATE OF NON-U.S. REAL PROPERTY HOLDING CORPORATION STATUS

Section 1445 of the Internal Revenue Code provides that a transferee (buyer) of a U.S. real property interest must withhold tax if the transferor (seller) is a foreign person. To inform the transferee (buyer) that withholding of tax is not required upon the disposition of a U.S. real property interest by Applied Osteo Systems, Inc., a California corporation, the undersigned hereby certifies the following on behalf of Applied Osteo Systems, Inc.:

1.  Kitchen Experts of California Incorporated is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.  Kitchen Experts of California Incorporated's U.S. employer identification number is *15-5291236;

3.  Kitchen Experts of California Incorporated's office address is 7055 Commerce Circle, Pleasanton, California 94588; and

4.  Kitchen Experts of California Incorporated is not and has not been a U.S. real property holding corporation within the meaning of Internal Revenue Code Section 897(c)(2) during the applicable period specified in Internal Revenue Code Section 897(c)(1)(A)(ii), and the stock of the Corporation does not constitute a U.S. real property interest.

Kitchen Experts of California Incorporated understands that this certification may be disclosed to the Internal Revenue Service by the transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury, I declare that I have examined this certificate and, to the best of my knowledge and belief, it is true, correct and complete and I further declare that I have authority to sign this document on behalf of Kitchen Experts of California Incorporated.

_____

John Lupo, President and Chief Financial Officer

Dated May 25, 2017

CDL01\IRC 897c2 Cert.pdf
FIRPTA Certificates - Entity as Seller of Interest in Domestic Corp

# EXHIBIT B

# LLC MEMBERSHIP INTEREST PURCHASE AND SALE AGREEMENT

This LLC Membership Interest Purchase and Sale Agreement (the *"Agreement"*) is made and entered into effective as of September 30, 2017 2017 (the *"Effective Date"*), by and among Christopher Cardinal, a California resident (*"Buyer"*), Tristin Odell (*"Odell"*), and Mariam Helmandy (*"Helmandy"*), California residents as common law husband and wife, and American Appliance Outlet, LLC, a California limited liability company (the *"Company"*). (Odell and Helmandy may be collectively referred to herein as the *"Sellers".*)

## RECITALS

A.     Sellers currently constitute all of the members of the Company and own one hundred percent (100%) of the issued and outstanding limited liability company membership interests in the Company as of the Effective Date, as set forth opposite such Sellers' names on the Schedule of Sellers attached to this Agreement as Exhibit A.

B.     Sellers wish to withdraw from the Company, and Buyer wishes to purchase all of Sellers' membership interests in the Company, thereby making Buyer the sole member of the Company on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, the parties hereto hereby agree as follows:

## AGREEMENT

1.     **Definitions.**  The capitalized terms used herein and not otherwise defined shall have the following meanings:

(a)     *"Base Purchase Price"* means Five Hundred Seventy-Five Thousand and No/100 Dollars ($575,000.00).

(b)     *"Business"* means the appliance distribution and sales business operated by the Company.

(c)     *"Closing Date"* means September 30, 2017, or such other date to which Buyer and Sellers shall have agreed in writing.

(d)     *"Consulting Agreement"* means the Consulting Agreement referred to in Section 12 below.

(e)     *"Covenant Not to Compete"* means the Covenant Not to Compete, Non-Solicitation, and Confidentiality Agreement referred to in Section 13 below.

(f)     *Intentionally Omitted.*

(g)     *"Knowledge,"* as used with reference to a representation or warranty that is made to the "Knowledge" or to the best "Knowledge" of a person or entity, means that the representation or warranty is made based on the current actual awareness of facts by such person or the executive officers of such entity.  Notwithstanding the foregoing with respect to Sellers,



"Knowledge" includes facts or matters which a reasonably prudent business person should have known through the exercise of ordinary prudence and diligence, and neither the Company nor Buyer shall have the burden of proving actual knowledge by Sellers.

(h)    *"Operating Agreement"* means the Operating Agreement of American Appliance Outlet, LLC, dated as of February 25, 2013.

(i)    *"Sellers"* means Odell and Helmandy, jointly and severally, and *"Seller"* refers to each of Odell and Helmandy, individually. Unless the context requires otherwise, Odell and Helmandy shall be considered one Seller for purposes of this Agreement.

(j)    *"Working Capital"* means the net sum of cash in the Company's bank accounts, after giving effect to all checks written, electronic payments made and other debits effected against such bank accounts as of the date on which Working Capital is measured.

2.    **Purchase of Membership Interests**. Subject to the terms and conditions of this Agreement, Buyer shall purchase from Sellers, and Sellers shall jointly and severally sell to Buyer, all of the issued and outstanding limited liability company membership interests in the Company as set forth opposite their respective names on the Schedule of Sellers attached as Exhibit A to this Agreement (collectively, the *"Membership Interests"*).

3.    **Purchase Price.** As the purchase price to be paid for the Membership Interests to be purchased hereunder, Buyer shall pay the aggregate sum of Five Hundred Seventy-Five Thousand and No/100 Dollars ($575,000.00) (the *"Base Purchase Price"*), subject to adjustment as set forth below, payable to each of the respective Sellers in the amount of (a) such Seller's share of the Base Purchase Price in the amounts set forth for such respective Sellers on the Schedule of Sellers attached to this Agreement as Exhibit A, plus (b) the Adjustment Amount for such Seller determined in accordance with Section 3(a) and 4(b) below (such sum for each Seller equals the *"Purchase Price"* for such Seller).

(a)    **Adjustments to Purchase Price.** The Base Purchase Price shall be adjusted by an amount equal to the difference (positive or negative) of (a) the Company's Working Capital on the Closing Date immediately prior to the Closing minus (b) $10,000 (the *"Adjustment Amount"*). On the morning of the Closing, Buyer and Sellers shall confirm the net balances in the bank accounts of the Company as of such date, which Sellers shall adjust to reflect any checks, electronic payments or other debits made by the Company on such bank accounts but not yet posted by such banks, and Buyer and Seller shall calculate the Adjustment Amount in accordance with this Section 3(a). In the event that the Adjustment Amount is a positive number, then Buyer shall increase the amount of the Purchase Price payment to be made pursuant to Section 4(b) below by the Adjustment Amount. In the event that the Adjustment Amount is a negative number, then Buyer shall decrease the amount of the Purchase Price payment to be made pursuant to Section 4(b) below by the Adjustment Amount.

4.    **Payment of Purchase Price.**

(a)    Prior to the execution of this Agreement, Buyer has delivered to Sellers a refundable deposit in the form of a check in the amount of One Hundred Seventy-Five Thousand and No/100 Dollars ($175,000.00), which shall be deemed to constitute a portion of the Purchase

Price upon the completion of the Closing hereunder, and which shall be refunded by Sellers to Buyer within forty-eight hours of any failure to complete the Closing by the Closing Date, unless otherwise agreed to in writing by Buyer.

(b)    At the Closing, Buyer shall deliver to Sellers, by wire transfer or certified check, the sum of Three Hundred Thousand and No/100 Dollars ($300,000.00), as adjusted by the Adjustment Amount, if any, in accordance with Section 3(a) above.

(c)    Following the Closing, Buyer shall hold back an additional sum of One Hundred Thousand and No/100 Dollars ($100,000.00) (the *"Holdback Amount"*) to be used to satisfy any claims by Buyer based on breaches of the representations and warranties by Sellers and/or relating to the Company in Sections 8 and 9 below, as well as to reimburse Buyer and the Company for any payments by the Company after the Closing of pro-rated operating expenses of the Company (including without limitation payroll expenses) incurred or accrued during or relating to time periods ending on or before the Closing Date.  Ninety (90) days after the Closing Date, any portion of the Holdback Amount not applied to such claims by Buyer shall be released to Seller as a final payment of the Purchase Price.

5.    **Sales, Use and Value-Added Taxes.**  Sellers, on the one hand, and Buyer, on the other hand, believe, based on their independent analysis, that the transfer of the Membership Interests pursuant to this Agreement does not result in the imposition of any sales, use, value-added and similar taxes and shall act in a manner consistent with such belief.  If, contrary to the judgment of the parties, any sales, use, value-added or similar taxes are imposed by any taxing authority, tax or revenue service, or tax tribunal, the party upon which such taxes are legally imposed (either Sellers, on the one hand, or Buyer, on the other hand) shall pay such taxes and any related interest and penalties to the applicable taxing authority and the other party (either Buyer, on the one hand, or Sellers, on the other hand) shall promptly pay to, indemnify and hold the paying party harmless from and against fifty percent (50%) of such taxes and any related interest, penalty, etc.; provided, however, that such taxes are not recovered by the other party.

6.    **Resignation and Withdrawal.**  Effective on the Closing Date, and without any further action, each of the Sellers withdraws as, and shall cease to be, a Member of the Company, and each of the Sellers resigns all positions in the Company as a manager, officer, employee or other agent of the Company.

7.    **Return of Confidential Information.**   On the Closing Date, each of the Sellers shall return to the Company all confidential and proprietary information of the Company, including without limitation all records, reports, financial statements, documents, customer lists, vendor lists, and software programs, whether in written, recorded, or electronic form.  In the event that any such information resides in electronic form, Sellers shall either return the physical drive on which such electronic data is stored, or shall certify that all relevant Company confidential information residing on such drive has been erased.  Notwithstanding the foregoing, Sellers shall have the right to retain one set of copies of all accounting and tax-related records relating to the Company currently in their possession for use in connection with Sellers' personal tax reporting.

8.     **Representations and Warranties of Sellers.**  Each of the Sellers hereby jointly and severally represents and warrants to Buyer as follows:

(a)     Sellers are the sole owners of the Membership Interests to be sold by Sellers hereunder, free and clear of all liens, claims, charges, pledges, mortgages, encumbrances, security interests, and other restrictions of any nature whatsoever, and the Membership Interests are not subject to any agreement, order, or other restriction which prohibits their disposition.

(b)     Sellers have not pledged, granted an option to purchase, or entered into any other contract or agreement for the sale of the Membership Interests to be sold by Sellers hereunder.

(c)     Sellers have not transferred any portion of the Membership Interests originally acquired on formation of the Company or any other time, and the Membership Interests to be sold by Sellers to Buyer pursuant to this Agreement represent all of the membership interests of Sellers in the Company.

(d)     Sellers are not in default or breach of any term or provision of the Operating Agreement of Company.

(e)     Neither of the Sellers is a "foreign person" within the meaning of Internal Revenue Code § 1445.

(f)     Neither of Sellers is a party to any litigation or similar proceeding in which a charging order against the Membership Interests to be sold by Sellers hereunder has been sought or awarded.

(g)     Neither the execution and delivery of this Agreement by Sellers, nor the consummation of the transactions contemplated hereunder, will conflict in any way with, result in a breach of terms, conditions and provisions of, or constitute a default under, any agreement, understanding, document or instrument to which Sellers, or either of them, are a party or by which Sellers, or either of them, are bound, or any judgment, decree, order, statute, rule or regulation applicable to Sellers.

(h)     Sellers have the legal capacity to enter into this Agreement and to perform their respective obligations hereunder.  This Agreement constitutes a valid and legally binding obligation of Sellers, enforceable against Sellers in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and other laws of general application affecting enforcement of creditors' rights generally.

(i)     There is no action, suit, proceeding or investigation pending or, to the Knowledge of Sellers, or either of them, currently threatened against the Company (or against Odell in respect of his status with or services with respect to the Company) by any person, nor are Sellers aware of any facts or circumstances that could form (or that a third party has alleged could form) the basis for any such action, suit, proceeding or investigation.

(j)     Sellers are not a party or otherwise subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality that (i) relates to his, her or their status with or services to the Company, or (ii) impacts his, her or their right or ability to consummate the transactions contemplated by this Agreement or otherwise to perform his, her or their obligations under this Agreement.

(k)     There are no agreements, understandings or proposed transactions between the Company and Sellers or any affiliate or family member of Sellers (collectively, "Seller Affiliates").  The Company is not indebted, directly or indirectly, to any of Seller Affiliates in any amount whatsoever, other than in connection with expenses or advances of expenses incurred in the ordinary course of business by Sellers as members of the Company.  No Seller Affiliate is, directly or indirectly, indebted to the Company.  To the Knowledge of Sellers, no Seller Affiliate has any direct or indirect ownership interest in any business entity with which the Company has a business relationship or that competes with the Company.  To the Knowledge of Sellers, no Seller Affiliate has, directly or indirectly, any financial or other interest in any material contract with the Company.

(l)     No representation or warranty of Sellers contained in this Agreement, or any certificate furnished or to be furnished by Sellers to the Company or to Buyer pursuant to this Agreement, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made. No representation or warranty of Sellers contained in this Agreement, or any certificate furnished or to be furnished by Sellers to the Company or to Buyer pursuant to this Agreement, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.

9.     **Representations and Warranties regarding the Company.**  Each of the Sellers hereby jointly and severally represents and warrants to Buyer regarding the Company as follows:

(a)     **Organization and Good Standing of the Company.**  The Company is a limited liability company duly organized and validly existing under the laws of the State of California and is in good standing under such laws.  The Company has the requisite corporate power and authority to own and operate its properties and assets, and to carry on its business as presently conducted. The Company is duly qualified to transact business in each jurisdiction in which the failure to be so qualified would reasonably be expected to have a material adverse effect on the business, properties or financial condition of the Company, taken as a whole. Sellers have furnished to Buyer copies of the Company's Articles of Organization and original Operating Agreement dated February 25, 2013 (the **"Original Operating Agreement"**).  Such copies are true, correct and complete and contain all amendments through the Effective Date.

(b)     **Corporate Power.**  The Company has now, and will have at the Closing Date, all requisite legal and corporate power and authority to enter into and deliver this Agreement, and to carry out and perform its other obligations under the terms of this Agreement.

(c)     **Authorization by the Company.**  All corporate action on the part of the Company, its officers, managers and members necessary for the authorization, execution and

delivery of this Agreement, the performance of the Company's obligations hereunder, and for the transfer, sale, assignment and delivery of the Membership Interests by Sellers pursuant hereto has been taken or will be taken prior to the Closing Date. This Agreement has been duly executed and delivered by the Company and, assuming due execution and delivery by the other parties, shall constitute the valid and legally binding obligations of the Company, enforceable in accordance with its terms, except as enforcement may be limited by laws of general application relating to bankruptcy, insolvency and the relief of debtors and rules of law governing specific performance, injunctive relief or other equitable remedies.

(d)     **Capitalization.** As of the Effective Date, Sellers are the sole members of the Company, holding one hundred percent (100%) of all issued and outstanding membership interests in the Company. Sellers own the Membership Interests beneficially and of record. At the Closing, Sellers shall deliver to Buyer good and marketable title to the Membership Interests to be transferred at the Closing, free and clear of all liens, security interests, or other encumbrances. Except as otherwise set forth in this Agreement or the Operating Agreement, there are no options, warrants, conversion privileges or other rights, or agreements with respect to the issuance thereof, presently outstanding to purchase any of the membership interests or other equity interests in the Company. Except as otherwise set forth in this Agreement and the Operating Agreement as disclosed to Buyer, Sellers have not transferred, assigned or otherwise pledged (directly or indirectly), or agreed to transfer, assign or otherwise pledge (directly or indirectly), any membership interests, equity securities, partnership interests, profit participation rights, voting rights, or similar ownership interests of any class of equity securities of the Company, or any securities exchangeable or convertible into or exercisable for such equity securities, membership interests, profit participation interests, partnership interests, voting rights, or similar ownership interests in the Company to any Person (as defined below) other than Buyer. For purposes of this Agreement, the term **"Person"** means any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, trust, unincorporated organization or other organization, whether or not a legal entity, or any governmental entity.

(e)     **Financial Statements.** The Company has delivered to Buyer its unaudited financial statements for each of the Company's fiscal years from the Company's formation on February 25, 2013 through the Effective Date of this Agreement (collectively, the **"Financial Statements"**). All of the Financial Statements are complete and correct in all material respects and have been accurately prepared from the Company's books and records in accordance with the Company's customary practices and policies and present fairly the consolidated financial condition and position of the Company at the dates shown and the results of operations of the Company for such periods. Seller did not, as of the dates of such Financial Statements, have any liabilities or obligations of any nature which relate to the business of the Company, whether accrued, absolute or contingent, and whether due or to become due, which were material, either singly or in the aggregate, to the financial position of the business other than those identified on the Financial Statements; nor does there exist to the Sellers' knowledge a set of circumstances resulting from transactions effected or events occurring on or prior to the date of any of the Financial Statements which could be expected to result in any such material liabilities or obligations. For purposes of this Agreement, "material" shall mean any amount equal to or greater than $5,000.

(f)     **Conduct of Operations since the Financial Statements Date and Pending the Closing.**  Since the date of the most recent Financial Statements, there has not been: Since the Interim Financial Statements Date, there has not been:  (a) any material adverse change in the assets of the Company or the condition, liabilities, operations or prospects of the Business; (b) any damage, destruction or loss of any of the assets or inventory of the Business (whether or not covered by insurance) which materially adversely affects the conduct of the Business; (c) any material obligation or liability (absolute or contingent) relating to the Business incurred by the Company or Sellers, or to which the Company or Sellers have become subject, except current liabilities incurred in the ordinary course of conduct of the Business and obligations under contracts entered into in the ordinary course of Business; (d) any entering into, amendment or termination by Sellers or the Company of any material contract, distribution, resale or other agreement, permit or lease relating to the Business; (e) any cancellation of any debt or claim which would constitute an asset of the Company or any transfer of title other than in the ordinary course of business, any abandonment, any pilferage or any material loss with respect to any material property, plant or equipment of the Company; (f) any labor dispute which affects the conduct of the Business; or (g) any event or condition of any character, materially adversely affecting the operation or prospects of the Business, except as expressly identified on the Schedule of Exceptions attached to this Agreement.

(g)     **Tax Returns and Payments.**  To the best knowledge of Sellers, the Company (a) is characterized as a partnership for U.S. federal income tax purposes, and (b) has prepared and filed all federal, state and local tax and/or informational returns for all tax reporting periods ending prior to the Effective Date, except as otherwise described in the Schedule of Exceptions attached hereto.  All taxes shown to be due and payable by the Company on such returns, any assessments, fees or charges and all other taxes due and payable by the Company on or before the Effective Date hereof and prior to the date of each Closing have been paid or will be paid prior to the time they become delinquent.  To the knowledge of Sellers, the Company has not been advised in writing (a) that any of the Company's tax returns have been or are being audited, or (b) of any deficiency in assessment or proposed judgment with respect to the Company's federal, state or local taxes.

(h)     **Title to and Condition of Properties and Assets; Liens, etc.**  The Company has good and marketable title to its properties and assets, and has good title to all its leasehold estates, in each case subject to no mortgage, pledge, lien, lease, security interest, encumbrance or charge, other than liens and encumbrances which do not materially detract from the value of the property subject thereto or materially impair the operations of the Company, and which have not arisen otherwise than in the ordinary course of business.  On the Effective Date, except as otherwise set forth on Schedule 9(h), if any, all of the Company's vehicles, machinery, equipment, inventory and other items of tangible personal property are in good operating condition and repair, reasonable wear and tear excepted, and are suitable for use in the ordinary conduct of the Business.   Notwithstanding the foregoing, the parties acknowledge that one delivery truck owned by the Company (a 20__ _____ model _____, California license plate _____) currently requires significant repairs and servicing to bring it into good operating condition and Sellers agree to cause such repairs and servicing to be completed at their expense (or through charges to the Holdback Amount set aside pursuant to Section 4(c) above) not later than 15 days after the Closing.

(i)    **Due Diligence Deliveries.**  Sellers have delivered to Buyer (i) a list of current inventory owned by the Company attached to this Agreement as as Schedule 9(i)(l), (ii) a list of distributorship and other reseller agreements between the Company and its appliance and other vendors attached to this Agreement as Schedule 9(i)(2), (iii) a list of all open orders showing all current orders from customers from whom the Company has received a deposit and not yet delivered the purchased appliances or other products as attached to this Agreement as Schedule 9(i)(3); and (iv) a set of copies of bank statements for each of the Company's bank accounts for the period from May 2017 through July 2017 attached to this Agreement as Schedule 9(i)(4).  The inventory listed on Schedule 9(i)(l) has all been paid for in full by the Company, all such inventory is in good and marketable condition, and the Company has good and marketable title to all of such inventory, in each case subject to no mortgage, pledge, lien, lease, security interest, encumbrance or charge.  Each of the distributorship and other reseller agreements listed on Schedule 9(i)(2) is in full force and effect, no breach or default by either party has occurred thereunder, no such agreement contains any provision that prohibits the assignment of such agreement to Buyer, and each such agreement is renewable by the Company for an additional term of at least one year following the Closing hereunder.  Except for the open orders listed on Schedule 9(i)(3), the Company has not received any deposit or other payment from any customer for which the Company has not delivered in full all products and services required to be delivered by the Company to such customer.  The bank statements provided as Schedule 9(i)(4) are true and complete copies of such statements and accurately and fairly present all banking activity by the Company during the respective periods covered by such statements.

(j)    **Compliance with Other Instruments.**  The Company is not in violation of any term of its Articles of Organization or Operating Agreement, as amended and in effect on and as of the Closing Date, and is not in breach of or in default under, in any material respect, any contract, agreement, or instrument to which it is a party, or to which it or its property is subject.  Neither the execution, delivery and performance of and compliance with this Agreement, nor the consummation of the transactions contemplated hereby, will result in any such violation or be in conflict with or constitute a material default under any of the foregoing.

(k)    **Governmental Consent, Etc.**  No consent, approval or authorization of or qualification, designation, declaration or filing with any governmental authority on the part of Sellers or the Company is required in connection with the valid execution, delivery and performance of this Agreement, or the transfer, assignment and sale of the Membership Interests or the consummation of any other transaction contemplated hereby, except (i) the qualification (or filings with respect to exemptions from qualification) under the Securities Act of 1933, as amended (the **"Securities Act"**), and the California Corporate Securities Law of 1968, as amended, and the state securities laws of any other applicable states, which qualifications will have been obtained and will be effective on the Closing Date unless, in the opinion of counsel to the Company and Buyer, adequate exemptions from such qualifications are then available, and (ii) the filing of notices required or permitted to be filed with certain state and federal securities commissions after each Closing, which the Company will file within the applicable filing periods.

(l)    **Brokers or Finders.**  None of the parties, as a result of any action taken by either of the Sellers, have incurred or will incur, directly or indirectly, any liability for

MH

brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement or the transactions contemplated hereby.

(m) **Licenses.** Sellers have furnished Buyer with Schedule 10(l) hereto which includes a correct and complete list of all licenses, permits, consents or approvals held and used by the Company in connection with conduct of the Business. Seller knows of no other business operating licenses, permits, consents or approvals required for the conduct of the Business by the Company in its current form that have not been obtained and are not currently valid and effective.

(n) **Insurance.** Schedule 10(m) sets forth a list and brief description of all policies of fire, extended coverage, liability and all other kinds of insurance held by the Company in connection with the conduct of the Business and all claims made on the foregoing policies since January 1, 2015. Such policies are in full force and effect, and the Company is not delinquent with respect to any premium payments thereon.

(o) **Contracts, Obligations and Commitments.** The Sellers have provided copies of lease agreements pursuant to which the Company leases its two store locations and its warehouse. Except as set forth on Schedule 10(o), the Company has no contract, obligation or commitment (written or oral) of any nature (other than obligations involving annual payments of less than $1,000 individually or $10,000 in the aggregate), as respects the operation of the Business by the Company including without limitation the following: (i) Employment, sales commission, bonus or consulting agreements, retirement, stock bonus, stock option, or similar plans; (ii) Loan or other agreements, notes, indentures, or instruments relating to or evidencing indebtedness for borrowed money or mortgaging, pledging or granting or creating a lien or security interest or other encumbrance on any of the assets or inventory of the Company or any agreement or instrument evidencing any guarantee by the Company of payment or performance by any other person; (iii) Any contract or series of contracts with the same person for the furnishing or purchase of equipment, goods or services; (iv) Any joint venture contract or arrangement or other agreement involving a sharing of profits or expense to which the Company is party or by which it is bound; (v) Agreements limiting the freedom of the Company to compete in any line of business or in any geographic area or with any person; (vi) distribution, sales representative, or resale agreements to which the Company is a party; or (vii) Agreements providing for disposition of the assets of the Company, businesses or a direct or indirect ownership interest in the Business, including any agreement which the Company or either of the Sellers might have with any previous potential purchaser of the Business or the Company. Except as set forth on Schedule 10(o), each of the contracts to which the Company is currently a party (including without limitation each real property lease and each distribution and resale agreement) is a valid and binding obligation of the parties thereto, enforceable in accordance with its terms, and is in full force and effect on the date hereof, and the Company has not breached any material provision of, nor is it in default in any material respect under the terms of (and no condition exists which, with the passage of time, the giving of notice, or both, would result in a default under the terms of), any of such agreements. Except as set forth in Schedule 10(o), each of such agreements is validly assignable to Buyer through the purchase of the Membership Interests contemplated by this Agreement without the consent of any other party thereto so that, after the assignment thereof to Buyer pursuant to this Agreement, Buyer will be entitled to the full economic and other benefits thereof.

MH

(p)    **Product Warranties.**    There are no outstanding service or product warranties and guarantees of the Company with respect to services or products sold by the Business and the Company.  There are no outstanding claims of any Person against the Company based on any warranty or guarantee or on any contention that services or products sold in connection with the Business failed to meet quality standards with respect to such services or products or any other basis whatsoever.

(q)    **Intellectual Property.**    Except as otherwise provided in Schedule 10(p), the Company owns all right, title and interest in and to all of the Intellectual Property used by the Company in the Business.  None of such Intellectual Property or such content infringes, or conflicts with or misuses the copyright, or to the Best of Seller's knowledge, the patent, trademark, trade secret or other proprietary rights and interests of any third party.  Except as set forth in Schedule 10(p), the Company has neither granted licenses to others nor received licenses from others for any of such Intellectual Property.  There is no action, suit, litigation or other proceeding pending, or to the best of Sellers' Knowledge, threatened, contending that any of the Intellectual Property or the products or services marketed, used or sold (or otherwise disposed of) under or by use of any such Intellectual Property, or the marketing of such products and services or use thereby by any customer, infringe, or conflict with or misuse the patent, trademark, copyright, trade secret or other proprietary rights and interests of any Person.  The Company has not received any notice or claim with respect to, and is not aware of any fact or circumstance which could give rise to, any such action, suit, litigation or other proceeding.

(r)    **Prepaid Expenses.**    There are no prepaid expenses or revenues relating to the conduct of the Business after December 31, 2016 except as accurately reflected on the Financial Statements of the Company.  No payments have been received from any customer of the Company with respect to services or products to be performed, delivered or provided by the Business on or after the Closing Date except as listed on Schedule 10(q).

(s)    **Foreign Investment in Real Property Tax Act.**    Under the Foreign Investment in Real Property Tax Act ("FIRPTA"), Section 1445 of the Internal Revenue Code of 1986, as amended, every buyer of U.S. real property must, unless an exemption applies, deduct and withhold from the proceeds of a selling "foreign person" ten percent (10%) of the gross sales price.  Neither of the Sellers is a "foreign person" as defined under FIRPTA and Sellers have provided, or will prior to the Closing provide, federal affidavits under penalty of perjury to that effect attached as Exhibit E hereto (together with such other related affidavits as may reasonably be required by Escrow Holder or Buyer) in order to meet the requirements for exemption from these statutes and the regulations promulgated thereunder (collectively, the "FIRPTA Certificates") or, if either Seller is a "foreign person" as defined under FIRPTA or fails to so provide such FIRPTA Certificates, Sellers acknowledge and agree that Buyer shall withhold and pay over to the appropriate taxing authorities the amounts required under FIRPTA and any applicable withholding requirements under California state law out of the payment otherwise required pursuant to Section 4(b) above.

(t)    **Showroom License Tenant.**    Notwithstanding Section 9(o) above, a third party doing business as "Today's Kitchen" (the "Subtenant") currently occupies a portion of the

premises leased by the Company at 6070 Johnson Drive, Pleasanton, California pursuant to a written license or sublease agreement which has expired and Sellers represent and warrant has converted to a month to-month-tenancy.  Sellers warrant that they shall cause the Subtenant to vacate such premises not later than sixty (60) days after the Closing Date and that Sellers shall defend, indemnify and hold harmless Buyer and the Company from and against any and all losses, expenses, liabilities and costs, including without limitation attorneys' fees, costs and expenses, incurred by Buyer and/or the Company in connection with, relating to or arising out of the eviction of the Subtenant from such premises or any failure of Sellers to cause such Subtenant to so vacate such premises by such date.

(u)     **Warehouses Included.**  The Company has one or more lease agreements pursuant to which the Company leases two warehouses located at 221 and 229 Oak Street in Manteca, California.   Sellers own or lease a third warehouse located at 219 Oak Street in Manteca, California, which is not included in the assets of the Company to be transferred to Buyer as part of the transactions contemplated by this Agreement.   Notwithstanding the foregoing, however, all of the appliances and other contents of such warehouse at 219 Oak Street are assets of the Company and Buyer shall have the right, and Sellers agree to reasonably cooperate with Buyer and the Company, to remove all such appliances and other contents from the warehouse at 219 Oak Street and relocate them to one of the two warehouses at 221 or 229 Oak Street during normal business hours within thirty (30) days after the Closing.

10.     **Representations and Warranties of Buyer.**  Buyer represents and warrants to each of the Sellers as follows:

(a)     Buyer is purchasing the Membership Interests for his own account and not on behalf of any other person or with a view to or for sale in connection with any distribution of the Membership Interests within the meaning of the Securities Act of 1933, as amended.  Buyer understands that the securities to be purchased hereunder have not been registered under the Securities Act or qualified under the California Corporate Securities Law of 1968 in reliance on specific exemptions from the registration and qualification provisions, respectively, thereunder which depend upon, among other things, the bona fide nature of the investment intent as expressed herein.

(b)     To the Knowledge of Buyer, neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereunder, will conflict in any way with, result in a breach of terms, conditions and provisions of, or constitute a default under, any agreement, understanding, document or instrument to which Buyer is a party or by which Buyer is bound, or any judgment, decree, order, statute, rule or regulation applicable to Buyer.

(c)     This Agreement constitutes a valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and other laws of general application affecting enforcement of creditors' rights generally.

MH

(d)    There is no action, suit, proceeding or investigation pending or, to the Knowledge of Buyer, currently threatened against Buyer by any person that would affect Buyer's ability to consummate the transactions contemplated by this Agreement, nor is Buyer aware of any facts or circumstances that could form the basis for any such action, suit, proceeding or investigation.

(e)    Buyer has sufficient knowledge and experience in investments of the type contemplated by this Agreement that he is capable of understanding and evaluating the merits and risks of an investment in the Company and has the ability to bear a complete loss of the investment. Buyer has an existing relationship with one or more of the Company's managers or officers which enables him to judge the business and financial acumen of the person(s) with whom such relationship exists.

11.    **Intentionally Omitted.**

12.    **Consulting Agreement.**    Concurrently with the Closing, and in further consideration of the covenants set forth in this Agreement, the Company and Odell shall each execute and deliver a Consulting Agreement in the form of Exhibit B attached hereto.

13.    **Covenant Not to Compete; Non-Solicitation.**    Concurrently with the Closing, and in further consideration of the covenants set forth in this Agreement, each of the Sellers shall execute and deliver to Buyer a Covenant Not to Compete, Non-Solicitation, and Confidentiality Agreement in the form of Exhibit C attached hereto.

14.    **Liquidating Distribution.**    The Parties acknowledge and agree that the Purchase Price will be paid to each of the Selelrs in complete liquidation of the respective membership interest of such Seller in the Company, including, without limitation, all interest of each in such Seller's Company capital account.

15.    **Consent of the Members.**    Buyer and the Sellers each hereby consent to the withdrawal of each of the Sellers, and the purchase of the Sellers' respective membership interests by Buyer, and Buyer and each of the Sellers waive any notice requirements that they would otherwise be entitled to under the terms of the Operating Agreement.

16.    **Closing.**    The consummation of the transactions contemplated by this Agreement (the *"Closing"*) shall take place at a location to be agreed upon in writing by Buyer and Sellers , and shall be deemed effective as of the Closing Date, notwithstanding the actual date of Closing. All acts, deliveries and confirmations comprising the Closing regardless of chronological sequence shall be deemed to occur contemporaneously and simultaneously upon the occurrence of the last act, delivery or confirmation of the Closing and none of such acts, deliveries or confirmations shall be effective unless and until the last of same shall have occurred. Regardless of when the last act, delivery or confirmation of the Closing shall take place, the transfer of the Membership Interests to be made at the Closing shall be deemed to occur as of the close of business at the principal office of the Company on such Closing Date. From and after the Closing, all equitable rights, title and interests in the Membership Interests transferred at the Closing shall be owned, held and exercised by Buyer, subject to the terms and conditions of this Agreement and the Operating Agreement. At the Closing the Parties shall deliver the following:

(a)      Sellers shall deliver executed originals of each of the following, the execution and delivery of each of which shall be a condition to the closing obligations of Buyer hereunder unless waived in writing by Buyer:

(i)      An Assignment of Membership Interest in a form acceptable to counsel of Buyer with respect to the Membership Interest to be sold by Sellers hereunder;

(ii)     The Resignation of Odell as an employee and as a Manager, officer and all other capacities with the Company, in a form acceptable to counsel for Buyer;

(iii)    The Resignation of Helmandy as an employee and as a Manager, officer and all other capacities with the Company, in a form acceptable to counsel for Buyer;

(iv)     The Consulting Agreement in the form of <u>Exhibit B</u> attached hereto;

(v)      The Covenant Not to Compete, Non-Solicitation, and Confidentiality Agreement in the form of <u>Exhibit C</u> attached hereto;

(vi)     (Intentionally Omitted); and

(vii)    the FIRPTA Certificate described in Section 9(s) above.

(b)      Buyer shall deliver, or cause to be delivered, executed originals of each of the following, the execution and delivery of each of which shall be a condition to the closing obligations of Sellers hereunder unless waived in writing by Sellers:

(i)      The Purchase Price payment pursuant to Section 4(b) above;

(ii)     (Intentionally omitted);

(iii)    Evidence of the Holdback Amount being available pursuant to Section 4(c) above;

(iv)     The Covenant Not to Compete, Non-Solicitation, and Confidentiality Agreement for each of the Sellers in the form of <u>Exhibit C</u> attached hereto; and

17.     **Survival.** All representations and warranties made by a party herein, or in any certificate or schedule delivered pursuant hereto, will survive the Closing and will continue in full force and effect until eighteen (18) months after the Closing Date (the *"Expiration Date"*); provided, however, that if a claim or notice is given prior to the Expiration Date (a) under this Section 19 with respect to a Third Party Claim (as defined below) or (b) by a party against another party with respect to a breach of a representation or warranty or covenant hereunder, such claim shall continue until it is finally resolved. All covenants and obligations of the parties to be performed after the Closing shall survive the Closing.

18.     **Indemnification.** Sellers shall jointly and severally indemnify, defend, and hold the Company and Buyer harmless from and against any and all losses, costs, diminutions of

-13-



value, damages, liabilities, fees (including, without limitation, reasonable attorneys' fees) and expenses (collectively "Losses"), and from any and all claims, demands, actions, and causes of action (collectively, "Claims"), arising out of any breach of or default in connection with any of the representations, warranties, or obligations given, made or assumed by Sellers in or related to this Agreement.

      (a)   <u>Procedures for Indemnification</u>.  The obligations of the parties provided for under Section 20 shall be performed in accordance with the following procedures:

      (i)   Each Person entitled to indemnification under this Section 20 (each, an "Indemnified Party") shall give the Party from whom it is seeking indemnification hereunder (the "Indemnifying Party") written notice as promptly as reasonably practicable after the written assertion of any third-party claim (a ***"Third-Party Claim"***) or commencement of any action, suit or proceeding in respect thereof or otherwise identifying a claim for indemnification hereunder (and in any event within thirty (30) days after receipt of such written authorization); provided, however, that, if an Indemnified Party fails to give the Indemnifying Party written notice as provided herein, the Indemnified Party's rights to indemnification under this Section 20 in respect of such Third-Party Claim shall not be impaired except to the extent that the Indemnifying Party incurs an out of pocket expense or is prejudiced by such failure (whether as a result of the forfeiture of substantive defenses or otherwise).

      (ii)   Promptly after receipt of written notice of a Third-Party Claim as contemplated by Section 20(a)(i) above, the Indemnifying Party shall be entitled to assume the defense, control and settlement of such Third-Party Claim; provided, however, that (i) if, after receipt of written notice of such Third-Party Claim, the Indemnifying Party fails within a reasonable time to assume the defense thereof, the Indemnified Party shall have the right to undertake the defense of such Third-Party Claim on behalf of and for the account and risk of the Indemnifying Party (including the reasonable fees, costs and expenses of counsel for the Indemnified Party, as applicable), subject to the right of the Indemnifying Party (upon notifying Indemnified Party of its election to do so) to assume the defense of such Third-Party Claim at any time prior to the judgment or other final determination thereof (in which event the Indemnified Party shall have the right to participate and be informed with respect to such defense), and (ii) if the Indemnified Party so elects, it shall be entitled to employ separate counsel and to participate in, but not control, the defense of such Third-Party Claim (and the Indemnifying Party shall cooperate with the Indemnified Party so as to allow it to participate in, but not control, the defense thereof), but the fees, costs and expenses of counsel so employed shall (except as otherwise contemplated by clause (i) above) be borne solely by the Indemnified Party.

      (iii)   Notwithstanding the foregoing, the Indemnifying Party shall not (A) settle or compromise any Third-Party Claim, or consent to the entry of any judgment relating thereto, that does not include as an unconditional term thereof the grant by the claimant or plaintiff to each Indemnified Party of a release from any and all liability in respect thereof or (B) settle or compromise any Third-Party Claim, or consent to the entry of any judgment relating thereto, that would materially and adversely affect the Indemnified Party other than as a result of money damages or other money payments to be fully paid by the Indemnifying Party, without the prior written consent of the Indemnified Party, which shall not be unreasonably withheld or

CDL01\2201-000.V5 LLC Membership Interest Purch Agmt (PJW)(clean) 2017-09-14.doc



delayed. In addition, notwithstanding the foregoing, to the extent that the Indemnified Party shall be permitted to assume the defense of a Third Party Claim under the provisions of Section 20(a)(ii) above, the Indemnified Party shall not settle or compromise such Third-Party Claim, or consent to the entry of any judgment relating thereto, without the consent of Indemnifying Party, which consent shall not be unreasonably withheld or delayed.

19.    **Miscellaneous.**

(a)    **Exhibits and Schedules; Recitals.** The Exhibits and Schedules attached hereto are incorporated by reference as if fully set forth herein. The recitals first stated above are agreed to be true and correct and are incorporated into this Agreement by reference.

(b)    **Public Statements.** None of the parties hereto shall make any disclosure to any person, nor shall any party make any public statement or press release regarding, the existence or status of this Agreement or any of the transactions contemplated hereby, except (a) with the prior written consent of the other parties hereto, (b) any disclosure required by applicable law, or (c) to any party whose consent or approval is required to be obtained in connection with the consummation of the transactions contemplated hereby.

(c)    **Entire Agreement; Amendments.** This Agreement, including any other documents delivered pursuant hereto (and including any and all exhibits and schedules hereto and thereto) sets forth the entire understanding and agreement between the parties relating to the subject contained herein and therein, and supersedes and merges all prior and contemporaneous agreements and discussions between the parties with respect thereto, including without limitation that certain Letter of Intent dated as of August 24, 2017. No party shall be bound by any term, condition, representation, warranty, provision, amendment or modification other than as expressly stated in or contemplated by this Agreement or as subsequently shall be set forth in writing and executed by a duly authorized representative of the party to be bound thereby.

(d)    **Governing Law.** The validity, construction and enforceability of this Agreement shall be governed in all respects by the laws of the State of California applicable to agreements negotiated, entered into and performed in California between California residents without regard to its conflicts of law rules to the extent such rules would apply the law of another jurisdiction, regardless of whether one or more of the parties shall now be or hereafter become a resident of another state or country.

(e)    **No Assurance of Tax Consequences.** No Manager, Member or agent of the Company has made any representations to Sellers regarding the tax consequences of this distribution or sale of membership interests and neither of the Sellers nor any agent acting on behalf of either Seller has made any representations to Buyer or the Company regarding the tax consequences of the distributions or sale of membership interests contemplated by this Agreement. Sellers acknowledge that neither the Company, nor its agents will be responsible or liable for the tax consequences to them and Buyer and the Company acknowledge that neither of the Sellers nor any agent acting on behalf of either Seller will be responsible or liable for the tax consequences to Buyer and/or the Company resulting form the transactions contemplated by this Agreement. Each of the parties will look solely to, and rely upon, that party's own tax advisers.

-15-

(f)      **Severability.**   If any provision of this Agreement shall be held illegal, invalid, or unenforceable, in whole or in part, such provision shall be modified to the minimum extent necessary to make it or its application legal, valid and enforceable, and the legality, validity and enforceability of all other provisions of this Agreement and all other applications of such provisions shall not be affected thereby.

(g)      **Jurisdiction and Venue.**   The parties hereby submit to the jurisdiction of any California state or United States federal court sitting in Santa Clara County over any action or proceeding arising out of or relating to this Agreement, and the parties hereby agree that all claims in respect of such action or proceeding may be heard and determined in such California state or federal court.

(h)      **Counterparts.**   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall together constitute one and the same instrument.  Execution and delivery of this Agreement by exchange of facsimile copies bearing the facsimile signature of a party hereto shall constitute a valid and binding execution and delivery of this Agreement by such party.  Such facsimile copies shall constitute enforceable original documents.

(i)      **Further Assurances.**   Each party agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

(j)      **Notices.**   Any notice required or permitted hereunder shall be given to the intended party at the address specified on the Schedule of Sellers, in the case of a Seller, beneath such party's signature below, or at such other address as the party may hereafter specify in writing.  Such notice shall be deemed given (i) upon personal delivery to the appropriate address, (ii) three (3) business days after the date of mailing if sent by certified or registered mail, (iii) one business day after the date of deposit with Federal Express or similar overnight courier, and (iv) immediately if sent by facsimile or e-mail with a simultaneous copy sent by one of the other methods provided in this section.

(k)      **Attorneys' Fees.**   If any action or proceeding is commenced to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, expert witness fees, costs of suit and expenses in addition to any other relief to which such prevailing party may be entitled.

IN WITNESS WHEREOF, the parties hereto have executed this LLC Membership Interest Purchase and Sale Agreement as of the date first written above.

**"Buyer"**

_____
Christopher Cardinal, a California resident

**"Sellers"**

_____
Mariam Helmandy, a California resident

_____
Tristin Odell, a California resident

**"COMPANY"**

American Appliance Outlet, LLC,
a California limited liability company

By: _____
Mariam Helmandy, Manager

EXHIBITS:
EXHIBIT A     Schedule of Sellers
EXHIBIT B     Consulting Agreement
EXHIBIT C     Covenant Not to Compete, Non-Solicitation, and Confidentiality Agreement
EXHIBIT D     [Intentionally Omitted]
EXHIBIT E     FIRPTA Certificate

## CONSENT OF MANAGERS

Mariam Helmandy, the sole Manager of American Appliance Outlet, LLC, hereby consents to the transfer of the Sellers' respective membership interests to Buyer pursuant to this Agreement.

_____
Mariam Helmandy, Manager

# EXHIBIT A

## SCHEDULE OF SELLERS

| Name of Seller(s) | Percentage Interest | Share of Base Purchase Price |
|---|---|---|
| Mariam Helmandy and Tristin Odell, common law husband and wife as community property 4060 Chiaviri Way Manteca, CA 95337 | 100.0% | $575,000.00 |

**EXHIBIT C**

**COVENANT NOT TO COMPETE, NON-SOLICITATION AND CONFIDENTIALITY AGREEMENT**

**EXHIBIT E**

**FIRPTA CERTIFICATE (Certificate of Non-Foreign Status)**

Section 1445 of the Internal Revenue Code provides that a transferee (buyer) of a U.S. real property interest must withhold tax if the transferor (seller) is a foreign person. To inform the transferee (buyer) that withholding of tax is not required upon the disposition of a U.S. real property interest by Tristin Odell and Mariam Helmandy, California residents as common law husband and wife, relating to the sale of American Appliance Outlet, LLC, a California limited liability company (the "Company"), each of the undersigned hereby certifies the following on behalf of such Sellers and the Company:

1. American Appliance Outlet, LLC is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations) and neither Tristin Odell nor Mariam Helmandy is a foreign person (as that term is defined in the Internal Revenue Code and Income Tax Regulations;

2. American Appliance Outlet, LLC's U.S. employer identification number is 44-2110651 Tristin Odell's U.S. taxpayer identification number is 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 and Mariam Helmandy's U.S. taxpayer identification number is 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.

3. American Appliance Outlet, LLC's office address is 6070 Johnson Drive, Pleasanton, California 94588; Tristin Odell's home address is 4060 Chiaviri Way, Manteca, California 95337; and Mariam Helmandy's home address is 4060 Chiaviri Way, Manteca, California 95337.

The Company and each of the Sellers understands that this certification may be disclosed to the Internal Revenue Service by the transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury, each of the undersigned declares that he or she has examined this certificate and, to the best of his or her knowledge and belief, it is true, correct and complete and he or she further declares that he or she has authority to sign this document on behalf of American Appliance Outlet, LLC and himself or herself.

Dated Sep 30 , 2017

AMERICAN APPLIANCE OUTLET, LLC, a California limited liability company

By: _____
Mariam Helmandy, Managing Member

_____
Mariam Helmandy, a California resident

_____
Tristin Odell, a California resident

CDL01\2201-000.V5 LLC Membership Interest Purch Agmt (PJW)(clean) 2017-09-14.doc

**SCHEDULE 9(i)(1)**

**CURRENT LIST OF INVENTORY**

**SCHEDULE 9(i)(3)**

**CURRENT LIST OF OPEN ORDERS**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of _C A_

County of _San Joaquin_

On _Sept. 30, 2017_ before me, _H. Reese_ , Notary Public,
(here insert name and title of the officer)

personally appeared _Miriam Helmandy_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_H. R_

Signature

(Seal)

H. REESE
COMM. # 2167594
NOTARY PUBLIC ● CALIFORNIA
SAN JOAQUIN COUNTY
Comm. Exp. OCT. 13, 2020

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of _CA_

County of _San Joaquin_

On _Sept 30, 2017_ _____ before me, _____H. Reese_____ , Notary Public,
(here insert name and title of the officer)

personally appeared ____Tristan  Odell_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature

(Seal)

H. REESE
COMM. # 2167594
NOTARY PUBLIC ● CALIFORNIA
SAN JOAQUIN COUNTY
Comm. Exp. OCT. 13, 2020

## NON-COMPETITION AND NON-DISCLOSURE AGREEMENT

THIS NON-COMPETITION AGREEMENT (the "Agreement") is entered into effective as of _____, 2017, by and among American Appliance Outlet, LLC, a California limited liability company ("AAO"), Christopher Cardinal, a California resident ("Buyer"), and Tristin Odell and Mariam Helmandy, California residents as common law husband and wife (collectively, "Sellers" and each individually, a "Seller").

### RECITALS

A.      Buyer is purchasing from Sellers all of the outstanding membership interests in AAO pursuant to that certain LLC Membership Interest Purchase and Sale Agreement dated as of _____, 2017, by and among Buyer, Sellers and AAO (the "Purchase Agreement").

B.      Pursuant to the terms and conditions of the Purchase Agreement, each of the Sellers has agreed not to compete with AAO, not to invest in certain enterprises, and not to disclose certain information, as provided herein.

NOW, THEREFORE, in consideration of these premises, the mutual promises contained herein and the consideration provided pursuant to the Purchase Agreement, the parties hereto hereby agree as follows:

1.      Covenant Not to Compete.  Subject to satisfactory completion of the closing of the transaction contemplated in the Purchase Agreement (the "Closing"), neither of the Sellers shall at any time during the three (3) year period immediately following the Closing (the "Term") actively or directly engage in, or actively or directly have any interest in any person, firm, corporation, or business (whether as an agent, representative, officer, director, consultant, or otherwise) that engages in any activity that is the same as, substantially similar to, or competitive with, the appliance sales business of AAO (such person, entity, or business hereinafter referred to as a "Competing Entity") anywhere in the United States, including without limitation each of the following California counties:

|  |  |
|---|---|
| Sonoma County | Contra Costa County |
| Napa County | Santa Clara County |
| Marin County | San Mateo County |
| Alameda County | Solano County |
| San Francisco County |  |

Neither of the Sellers shall own any interest in, direct, manage, establish, or control any investment device or other entity which, if such entity were a party to this Agreement, would result in a violation of this Agreement.  The covenant not to compete contained in this Section 1 shall not apply to any interest solely as a holder of equities in any company constituting less than five percent (5%) of the voting securities of such company.

1.

2.    Non-Disclosure.  Subject to the Closing, neither of the Sellers shall disclose any information pertaining to AAO which is confidential or in which AAO has proprietary rights (including material received in confidence or under license from third parties), whether specifically designated as such or not, and shall maintain in confidence all such knowledge and information until it shall come into the public domain through no act of the Sellers or any other party to the Purchase Agreement.  Neither of the Sellers shall make any use, or authorize others to make any use, of any such knowledge or information.

3.    Non-Solicitation of Employees.  Subject to the satisfactory completion of the Closing, each of the Sellers agree that they shall not at any time during the Term directly or indirectly, by or for himself, or as the agent of another, or through others as his agent, in any way solicit or take away, or attempt to solicit or take away, any employee, officer, director, representative, consultant, or other agent of Buyer or AAO whether such person is presently employed by Buyer or AAO or may hereafter be so employed.

4.    Enforcement of Covenant Not to Compete.

(a)    It is the intention of the parties hereto that the covenant not to compete contained in Section 1 be enforceable as set forth in Section 1.  To the extent that any court of competent jurisdiction finds such covenant to be unenforceable by reason of its duration or scope, it shall be enforced insofar as it may be enforced within the limits of the law of that jurisdiction, but the Agreement as a whole shall be unaffected elsewhere.

(b)    This Agreement shall be enforceable either by AAO or by Buyer.  The parties recognize that the rights and obligations set forth in this Agreement are unique and inherently difficult or impossible to value monetarily and that the remedy at law for breach of Section 1, Section 2 or Section 3 hereof is inadequate to protect the unique rights of the parties hereto.  AAO and Buyer shall therefore be entitled, in addition to such other remedies as AAO and Buyer may have, to a temporary restraining order and to preliminary and permanent injunctive relief to enjoin any breach or threatened breach of Section 1, Section 2 or Section 3 without proof of any actual damages that have been or may have been caused to AAO or Buyer by such breach.

5.    Effectiveness of Agreement.  This Agreement shall be effective only upon the consummation of the sale of Sellers' interest in AAO, as provided in the Purchase Agreement.

6.    Miscellaneous.

(a)    Notices and Other Communications.  Every notice or other communication required or contemplated by this Agreement by any party hereto shall be delivered either by (i) personal delivery, (ii) postage prepaid return receipt requested registered or certified mail (airmail if available), or the equivalent of registered or certified mail under the laws of the country where mailed, (iii) nationally recognized overnight courier, such as Federal Express or UPS, or (iv) facsimile or e-mail with a confirmation copy sent simultaneously by registered or certified mail, in each case addressed to the party for whom intended at the following addresses set forth in the Purchase Agreement or at such other address as the intended

2.

recipient previously shall have designated by written notice to the other party. Notice by registered or certified mail shall be effective on the date it is officially recorded as delivered to the intended recipient by return receipt or equivalent, and in the absence of such record of delivery, the effective date shall be presumed to have been the fifth (5th) business day after it was deposited in the mail. All notices and other communications required or contemplated by this Agreement delivered in person or sent by courier with simultaneous confirmation copy by registered or certified mail shall be deemed to have been delivered to and received by the addressee and shall be effective on the date of personal delivery; notices delivered by facsimile or e-mail with a simultaneous confirmation copy by registered or certified mail shall be deemed delivered to and received by the addressee and shall be effective on the date sent. Notice not given in writing shall be effective only if acknowledged in writing by a duly authorized representative of the party to whom it was given.

(b)  <u>Law to Govern</u>.  The validity, construction and enforceability of this Agreement shall be governed in all respects by the law of California without regard to its conflicts of laws rules. Each of the parties to this Agreement hereby submits to the jurisdiction of the courts of the State of California, U.S.A., and to the federal courts of the U.S.A. for the Northern District of California.

(c)  <u>Written Agreement to Govern</u>.  This Agreement sets forth the entire understanding and supersedes all prior and contemporaneous agreements between the parties relating to the subject matter contained herein and merges all prior and contemporaneous discussions between them. No party shall be bound by any definition, condition, representation, warranty, covenant or provisions other than as expressly stated in or contemplated by this Agreement or as subsequently may be set forth in writing and executed by a duly authorized representative of the party to be bound thereby.

(d)  <u>Assignability</u>.  Neither this Agreement nor any right or obligation hereunder is assignable in whole or in part, whether by operation of law or otherwise, by any party without the express written consent of the other parties and any such attempted assignment shall be void and unenforceable; <u>provided</u>, <u>however</u>, that this Agreement may be assigned to any successor or successors of Buyer or AAO.

(e)  <u>No Waiver of Rights</u>.  All waivers hereunder must be made in writing, and failure at any time to require any party's performance of any obligation under this Agreement shall not affect the right subsequently to require performance of that obligation. Any waiver of any breach of any provision of this Agreement shall not affect the right subsequently to require performance of that obligation and shall not be construed as a waiver of any continuing or succeeding breach of such provision or a waiver or modification of the provision.

(f)  <u>Attorneys' Fees</u>.  If any action or proceeding shall be commenced to enforce this Agreement, the prevailing party in such action or proceeding shall be entitled to recover from the other party in such action or proceeding the reasonable attorneys' fees, costs and expenses incurred by such prevailing party in connection with such action or proceeding or negotiation to avoid such action or proceeding.

3.

(g)    <u>Headings</u>.   The headings used in this Agreement are solely for convenience and are not to be considered in construing or interpreting this Agreement.

(h)    <u>Further Assurances</u>.  The parties hereto shall each perform such acts, execute and deliver such instruments and documents, and do all such other things as may be reasonably necessary to accomplish the purposes of this Agreement.

(i)    <u>Termination</u>.  If there fails to occur a successful Closing of the Purchase Agreement, this Agreement shall be null and void and of no further effect.

(j)    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original instrument, but all of which together shall constitute only one and the same instrument. Execution and delivery of this Agreement by exchange of facsimile copies bearing the facsimile signature of a party hereto shall constitute a valid and binding execution and delivery of this Agreement by such party. Such facsimile copies shall constitute enforceable original documents.

(k)    <u>Severability</u>.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provisions shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provisions were so excluded and shall be enforceable in accordance with its terms.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

"Sellers"

_____
Tristin Odell, a California resident

_____
Mariam Helmandy, a California resident

"Buyer"

_____
Christopher Cardinal, a California resident

"AAO"

AMERICAN APPLIANCE OUTLET, LLC
a California limited liability company

By: _____
    Its Managing Member

4.

## CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT (the "Agreement") is entered into effective as of _____, 2017, by and among American Appliance Outlet, LLC, a California limited liability company ("AAO"), Christopher Cardinal, a California resident ("Buyer"), and Tristin Odell and Mariam Helmandy, California residents as common law husband and wife (collectively, "Sellers" and each individually, a "Seller").

### RECITALS

A.      Buyer is purchasing from Sellers all of the outstanding membership interests in AAO pursuant to that certain LLC Membership Interest Purchase and Sale Agreement dated as of _____, 2017, by and among Buyer, Sellers and AAO (the "Purchase Agreement").

B.      Pursuant to the terms and conditions of the Purchase Agreement, each of the Sellers has agreed not to compete with AAO, not to invest in certain enterprises, and not to disclose certain information, as provided herein.

NOW, THEREFORE, in consideration of these premises, the mutual promises contained herein and the consideration provided pursuant to the Purchase Agreement, the parties hereto hereby agree as follows:

1.      Tristin Odell agrees to make himself available by phone or in person, after reasonable notice, during normal business hours, for up to 15 hours per week from the time of the Closing until September 30, 2018, for the purpose of consulting with the Buyer about the operations of the Business.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

"Sellers"

_____
Tristin Odell, a California resident

_____
Mariam Helmandy, a California resident

"Buyer"

_____
Christopher Cardinal, a California resident

"AAO"

AMERICAN APPLIANCE OUTLET, LLC
a California limited liability company

By: _____
      Its Managing Member

1.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of _CA_

County of _San Joaquin_

On _Sept 30, 2017_ before me, _H, Reese_ , Notary Public,

(here insert name and title of the officer)

personally appeared _Tristan Odell_ ,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature

(Seal)

H. REESE
COMM. # 2167594
NOTARY PUBLIC • CALIFORNIA
SAN JOAQUIN COUNTY
Comm. Exp. OCT. 13, 2020

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of ___CA___

County of ___San Joaquin___

On ___Sept. 30, 2017___ before me, ___H. Reese___, Notary Public,
(here insert name and title of the officer)

personally appeared ___Miriam Helmandy___,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature

(Seal)

H. REESE
COMM. # 2167594
NOTARY PUBLIC ● CALIFORNIA
SAN JOAQUIN COUNTY
Comm. Exp. OCT. 13, 2020

## ASSIGNMENT OF LLC MEMBERSHIP INTERESTS SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, the undersigned hereby sell, assign and transfer unto Christopher Cardinal, or his successor(s), the entirety of the undersigned's right, title and interest in and to a Membership Interest in AMERICAN APPLIANCE OUTLET, LLC, a California limited liability company (the "Company"), standing in the undersigned's name on the books of the Company, constituting as of the date hereof a Percentage Interest of One Hundred and No/100 Percent (100.00%) of the total membership interests in the Company, which shall include, without limitation, the undersigned's One Hundred and No/100 Percent (100.00%) capital and profits interest in the Company, the undersigned's capital account balance in the Company with respect to such Membership Interest, the undersigned's distributions and liquidation rights in the Company and the undersigned's voting and management rights and powers in the Company, and the undersigned do hereby irrevocably constitute and appoint _____ or the Secretary of the Company attorney-in-fact, with full power of substitution in the premises, to transfer such Membership Interest on the books of the Company.

This Assignment of the Membership Interest is made, delivered and shall be effective on the date of this Assignment in accordance with and in satisfaction of the requirements of the Operating Agreement of the Company.

Dated as of September 30, 2017

See attached

MEMBER

_____
Mariam Helmandy, a California resident

_____
Tristin Odell, a California resident

_____
(Signature guaranteed or notarized)

Acknowledged and approved by AMERICAN APPLIANCE OUTLET, LLC, a California limited liability company (the "Company"), and its members as of this September ___, 2017, and notwithstanding any provision of the Operating Agreement of the Company, as amended (the "Operating Agreement"), to the contrary, the Company and each of its members hereby consent to the foregoing transfer of Membership Interest in accordance with the Operating Agreement, waive any right of first refusal they may have under the Operating Agreement or otherwise with respect to the foregoing transfer of Membership Interest, consent that Christopher Cardinal, or his successor(s), are and at all times hereafter shall be a substituted Member of the Company with respect to the foregoing Membership Interest as provided under

CDL01\2201-006.STK Assignment Sep fm Cert.pdf

the Operating Agreement of the Company, with all rights, title and interest as a Member in the Company as provided therein.

AMERICAN APPLIANCE OUTLET, LLC,
a California limited liability company

By: _____
Mariam Helmandy, its Manager

and its Members:

_____
Mariam Helmandy, a California resident

_____
Tristin Odell, a California resident

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of _____CA_____

County of _____San Joaquin_____

On __Sept 30, 2017____ before me, ____H. Reese_____, Notary Public,
                                        (here insert name and title of the officer)

personally appeared ___Tristan Odell_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____                                  (Seal)
Signature

H. REESE
COMM. # 2167594
NOTARY PUBLIC • CALIFORNIA
SAN JOAQUIN COUNTY
Comm. Exp. OCT. 13, 2020

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of _CA_

County of _San Joaquin_

On _Sept 30, 2017_ before me, _H. Reese_ , Notary Public,
(here insert name and title of the officer)

personally appeared _Miriam Helmandy_ ,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_[signature]_                                                                    (Seal)
Signature

H. REESE
COMM. # 2167594
NOTARY PUBLIC • CALIFORNIA
SAN JOAQUIN COUNTY
Comm. Exp. OCT. 13, 2020