UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER CARDINAL, et al., | Case No. 18-cv-00272-JCS |
| Plaintiffs, | |
| v. | **ORDER REGARDING MOTION FOR SANCTIONS AND MOTIONS FOR SUMMARY JUDGMENT** |
| JOHN LUPO, et al., | Re: Dkt. Nos. 81, 84, 89, 91, 96, 116 |
| Defendants. | |

## I.     INTRODUCTION

This case concerns Defendant John Lupo's sale of a residential kitchen remodeling company, Kitchen Experts of California, Inc. ("Kitchen Experts"), to Plaintiff Christopher Cardinal.  Kitchen Experts and a second company that Cardinal later purchased, American Appliance Outlet, LLC ("AAO"), are also plaintiffs.  Lupo's wife Andreana Michael, his employees Moheba D'Anna and Bryce Phelton, and his new companies Kitchen Fantastic, Inc. and Appliance Fantastic, Inc. are also defendants.  Defendants now move for summary judgment and Plaintiffs move for discovery sanctions.  The Court held a hearing on September 6, 2019.  For the reasons discussed below, the motions are GRANTED in part and DENIED in part.[1]

## II.     BACKGROUND[2]

In March of 2017, Lupo contacted Cardinal with an offer to sell Kitchen Experts—a kitchen remodeling business—to him for $1 million, purportedly because Lupo was moving out of state.  Cardinal contends that he agreed to the deal based on Lupo's representations about the

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

[2] For the purpose of Defendants' motions for summary judgment, where the Court must draw all reasonable inferences in favor of Plaintiffs, this background section presents the facts generally from Plaintiffs' point of view.  Nothing in this section should be construed as resolving any issue of fact that might be disputed.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  company, and based on an opportunity conduct due diligence, which Lupo hindered by limiting

2  Cardinal's access to documents, ostensibly to avoid employees leaving the company if they

3  learned a sale was likely.  Due diligence was limited to Cardinal's review of certain binders that

4  Lupo provided.  The agreed upon price subsequently increased to $1.5 million, and the stock

5  purchase agreement that the parties signed in May of 2017 called for a price of $2 million.

6  Cardinal claims that, following closing of the deal, he learned that many of Lupo's representations

7  were false, and that Kitchen Experts had significant undisclosed debts, paid many of its employees

8  outside of formal payroll to avoid pay deductions, and lacked basic financial records, among other

9  issues that were not disclosed before the sale.  Later in 2017, rather than move out of state and

10  enter a different line of work, Lupo founded a new kitchen remodeling service, Kitchen Fantastic,

11  which competed with Kitchen Experts.  Certain Kitchen Experts employees, including Defendant

12  Phelton and foreman Luis Daza, ended up leaving Kitchen Experts to work fort Kitchen Fantastic.

13       In September of 2017, Cardinal purchased another business, Plaintiff AAO, from non-

14  parties Tristan Odell and Mariam Helmandy.  Cardinal states that Defendant D'Anna, an AAO

15  employee, encouraged him to falsify documents in an effort to maintain a relationship with Riggs

16  Distributing, Inc., an important supplier.  AAO fired D'Anna on October 16, 2017.  D'Anna

17  continued to use a Yahoo email account that had at times been used as AAO's general office email

18  address for several days after she was fired, until AAO changed the password and security

19  settings.  The parties dispute whether AAO or D'Anna owned that email address.  At some point

20  after she was fired by AAO, D'Anna began working for Defendant Appliance Fantastic, another

21  new company founded by Lupo that competed with AAO.

22       Cardinal eventually consolidated both Kitchen Experts and AAO under a holding company

23  called Good Development, and soon thereafter transferred all of his stock in Good Development to

24  his business partner James Franchini, in exchange for Franchini assuming the companies' debts to

25  Cardinal of more than $2 million.

26       Plaintiffs' complaint includes the following claims: (1) fraudulent misrepresentation,

27  asserted by Cardinal against Lupo, Compl. ¶¶ 50–57; (2) negligent misrepresentation, between the

28  same parties, *id.* ¶¶ 58–59; (3) aiding and abetting fraud, asserted by Cardinal against Michael, *id.*

¶¶ 60–64; (4) breach of contract, asserted by Kitchen Experts against Lupo, *id.* ¶¶ 65–69; (5) breach of contract, asserted by Cardinal against Lupo, *id.* ¶¶ 70–73; (6) breach of the duty of good faith and fair dealing, asserted by Kitchen Experts against Lupo, *id.* ¶¶ 74–77; (7) "Trade Libel/Commercial Disparagement," asserted by Kitchen Experts and AAO against Lupo, Kitchen Fantastic, and D'Anna, *id.* ¶¶ 78–85; (8) intentional interference with contractual relations, asserted by Kitchen Experts against Lupo and D'Anna, *id.* ¶¶ 86–97; (9) intentional interference with prospective economic relations, asserted by Kitchen Experts against Lupo, *id.* ¶¶ 92–97; (10) breach of the duty of loyalty, asserted by Kitchen Experts against Phelton, *id.* ¶¶ 98–102; (11) inducing a breach of the duty of loyalty, asserted by Kitchen Experts against Lupo and Kitchen Fantastic, *id.* ¶¶ 103–06; (12) conversion, asserted by Kitchen Experts against Lupo and Kitchen Fantastic, *id.* ¶¶ 107–12; (13) violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(2)(C), asserted by Kitchen Experts against Lupo and Kitchen Fantastic, *id.* ¶¶ 113–19; (14) violation of the Stored Communications Act ("SCA"), 18 U.S.C. § 2701, asserted by AAO against Lupo, Appliance Fantastic, and D'Anna, Compl. ¶¶ 120–26; and (15) unlawful, unfair, and fraudulent competition in violation of California's unfair competition law (the "UCL"), Cal. Bus. & Prof. Code § 17200, asserted by Kitchen Experts and AAO against Kitchen Fantastic and Appliance Fantastic, Compl. ¶¶ 127–29.

## III.   SUBJECT MATTER JURISDICTION

Although the parties have not raised any question of the Court's subject matter jurisdiction, the Court is required to consider that issue sua sponte and dismiss any claims that fall outside its jurisdiction.  The CFAA and SCA claims arise under federal law, and thus fall within federal question jurisdiction under 28 U.S.C. § 1331.  The only potential basis for jurisdiction over the other thirteen claims, all of which arise under California state law, is supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  That statute authorizes district courts to hear "claims that are so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  In determining whether claims are sufficiently related to meet that test, courts look to whether they share a "'common nucleus of operative fact.'"  *See Mendoza v. Zirkle Fruit Co.*, 301

F.3d 1163, 1173–74 (9th Cir. 2002) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)).  The inclusion of additional plaintiffs in such claims—here, Cardinal, who does not assert either the SCA claim or the CFAA claim—does necessarily preclude supplemental jurisdiction.  *See generally Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005) (holding that, where at least one plaintiff in a class action meets the amount-in-controversy requirement of 28 U.S.C. § 1332, a court may exercise supplemental jurisdiction over the claims of class members who do not meet that requirement).

Although not all of the claims here rest on the same specific facts, all arise from the same course of dealing between Lupo and Cardinal during the sale of Kitchen Experts and their subsequent competition.  The Court concludes that the claims are part of the same constitutional case and that Plaintiffs' state law claims fall within the Court's supplemental jurisdiction.

## IV.     MOTION FOR SANCTIONS

### A.     Legal Standard

"Federal courts have the authority to sanction litigants for discovery abuses both under the Federal Rules of Civil Procedure and pursuant to the court's inherent power to prevent abuse of the judicial process."  *Network Appliance, Inc. v. Bluearc Corp.*, No. C 03-5665 MHP, 2005 WL 1513099, at *2 (N.D. Cal. June 27, 2005) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991); *In re Yagman*, 796 F.2d 1165, 1187 (9th Cir. 1986)).  Rule 16(f) of the Federal Rules of Civil Procedure allows a court to order sanctions where a party or its attorney fails to obey a pretrial order.  Rule 37(b)(2)(A) specifically addresses sanctions that may be imposed on a party that has failed to comply with a discovery order, including striking pleadings in whole or in part, dismissal, entry of default judgment, contempt of court, and, as Plaintiffs seek here, an order "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims."  *See* Fed. R. Civ. P. 37(b)(2)(A)(i).

A district court has inherent authority to impose sanctions for spoliation of evidence.  *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006); *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993).  The majority of courts use a three-part test to determine whether spoliation occurred, consisting of the following elements: "'(1) that the party having control over the evidence had an

obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a "culpable state of mind;" and (3) that the evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'" *Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132, 1138 (N.D. Cal. 2012) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 215 (S.D.N.Y. 2003)) (footnotes omitted).  If spoliation is found, courts often consider three factors to determine whether and what type of sanctions to issue: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party." *Nursing Home Pension Fund v. Oracle Corp.*, 254 F.R.D. 559, 563 (N.D. Cal. 2008) (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994)).

In this Court, "[a]ny motion for sanctions, regardless of the sources of authority invoked, . . . must be made as soon as practicable after the filing party learns of the circumstances that it alleges make the motion appropriate."  Civ. L.R. 7-8.

### B.    The Court's Previous Orders

Although Plaintiffs' briefs regarding sanctions include references to Defendants' purported violation of other "discovery obligations," the focus of the motion is whether Defendants complied with two previous court orders.  *See, e.g.*, Sanctions Mot. (dkt. 116) at 9–10 ("Here, Defendants violated the Court's orders found at Docket Nos. 66 and 69. . . . Accordingly, Plaintiffs are entitled to sanctions under Rules 37 and 16."); *id.* at 12 (identifying "Defendants' refusal to comply with the Court's order" as the basis for sanctions under the Court's inherent authority).  With the exception of a brief discussion of the Court's inherent authority to sanction spoliation of evidence, *see id.* at 13–14, Plaintiffs do not discuss in any detail other obligations that Defendants violated, and do not address authority or legal standards for sanctions related to such obligations.  The Court therefore also focuses on those previous orders, as well as spoliation, in considering Plaintiffs' motion.

In the weeks leading up to January 18, 2019, counsel for the parties had a series of conferences with one another and with the Court regarding discovery disputes, during which

United States District Court
Northern District of California

United States District Court
Northern District of California

defense counsel was at times unable to obtain compliance from his clients and the Court at times admonished defense counsel for failure to comply with Court orders and discovery obligations. On January 18, 2019, the parties submitted a stipulation prepared during a conference that the Court required them to hold in person at the courthouse in an effort to resolve their discovery disputes.  The Court adopted that stipulation as an order (the "January 2019 order") on January 22, 2019, and filed that order on January 23, 2019.  *See* Jan. 2019 Order (dkt. 66).  As is relevant to the current dispute, the January 2019 order required Defendants to take the following actions no later than January 23, 2019 (with respect to Lupo's obligations) and January 25, 2019 (with respect to the other Defendants' obligations):

> Defendant John Lupo to confirm completion of search for documents and records related to Plaintiff Kitchen Experts of California, Inc.'s corporate books and records, including without limitation tax returns and files provided by RKO Tax & Investments, Inc.
>
> Defendant John Lupo to provide update to Plaintiffs regarding his efforts and ability to access his Comcast email account and the Bank of America account.
>
> Defendant John Lupo to provide update to Plaintiffs regarding the status of prior mobile devices and tablets, including dates each device was last used by him and/or transferred to a third party.
>
> Defendant Bryce Phelton to provide update to Plaintiffs regarding the status and location of all prior mobile devices, tablets, and computers, including dates each device was last used by him and/or transferred to a third party.
>
> Defendants Kitchen Fantastic, Inc. and Legacy Appliance (fka Appliance Fantastic, Inc.) to confirm the existence, identity and amount of certain corporate books and records, which the parties understand to mean any balance statements, profit and loss statements, gross sales and receipts, employment agreements, subcontractor agreements, payroll records, payments to any employees outside of payroll, lease agreements, vendor contracts, utility statements, bank statements, and tax returns to facilitate a further meet and confer between lead trial counsel to identify with particularity which, if any, documents to be included in a further production of documents to be made no later than January 31, 2019.
>
> Defendant Andreana Michael to serve verified amended responses to Plaintiff Christopher Cardinal's Request for Production, Set One, including a statement compliant with Civil Standing Order for Magistrate Judge Joseph C. Spero, ¶¶ 10, 11.
>
> Defendant Moheba D'Anna to serve verified amended responses to Plaintiff Christopher Cardinal's Request for Production, Set One,

including a statement compliant with Civil Standing Order for Magistrate Judge Joseph C. Spero, ¶¶ 10, 11.

*Id.* The order also required counsel for both parties to meet and confer on January 28, 2019 regarding a supplemental document production, and required Defendants to complete that document production no later than January 31, 2019. *Id.*

The parties appeared for a case management conference on February 7, 2019, at which time the Court ordered, in relevant part, as follows:

> 1. With respect to all documents sent to Defendant Lupo or to any of his companies by accountant Robert Olson, Defendants shall turn those documents over to defense counsel who shall review them and produce responsive document [sic] on or before 2/15/19.
>
> 2. With respect to document relating to Kitchen Fantastic and to Appliance Fantastic, on or before 2/15/19 defendants shall produce all of the following documents for the period from the sale transaction at issue in this case to present:
>     a. All records relating to any and all compensation paid to any employee, officer or independent contractor;
>     b. All marketing and advertising documents and documents relating to marketing and advertising expenses;
>     c. All leases;
>     d. All monthly banking records;
>     e. All documents reflecting gross receipts;
>     f. All documents relating to any loans.
>
> 3. After production of the documents above, Plaintiff shall take the deposition of Mr. Lupo. If further documentation is produced after the deposition, the court will consider ordering the [sic] Mr. Lupo's deposition be reconvened.
>
> 4. On or before 2/15/19, the parties shall meet and confer and resolve all issues regarding any forensic examination of cell phones, tablets and computers, and any documents requested from plaintiff from defendants [sic]. Any remining issues will be addressed at the next CMC [i.e., case management conference].

Feb. 7, 2019 Civil Minute Order ("Feb. 2019 Order," dkt. 69). At the next case management conference on February 15, 2019, the parties acknowledged that discussions regarding electronic discovery were continuing but expressed no concerns about their ability to resolve the remaining issues, except that they might need to extend the deadline to complete depositions. *See* dkt. 72 (minutes, reflecting no discovery issues).

United States District Court
Northern District of California

7

## C.     Sanctions Requested

### 1.     Order Excluding Diligence Materials

The first sanction that Plaintiffs request is an order excluding Defendants from introducing any evidence of the documents that Lupo made available for Cardinal to review in binders during a meeting at Lupo's attorney's office as part of Cardinal's due diligence investigation before purchasing Kitchen Experts.  Sanctions Mot. at 15–16.  Cardinal was not permitted to keep copies of those documents, and they were not produced in discovery.  According to Lupo's June 26, 2019 deposition testimony, Lupo did not take them with him after the meeting and never saw them again.  Crawford Decl. re Sanctions (dkt. 116-1) Ex. 11 (Lupo Dep.) at 255:18–25, 257:3–9.  Plaintiffs argue that such documents are crucial to rebut Defendants' contention that Cardinal should have been aware of any payroll or accounting irregularities at Kitchen Experts as a result of the due diligence process, and specifically as a result of Bank of the West and American Express account statements included in the diligence materials.  Plaintiffs reasonably contend that bank records procured later are not a substitute for the actual collection of documents provided for Cardinal's diligence review, because such records do not necessarily reflect what was available for Cardinal to review before closing the deal.

Plaintiffs' motion cites no authority requiring Lupo to have preserved or produced in litigation the binders made available during Cardinal's due diligence review.  Sanctions Mot. at 15–16.  Plaintiffs' reply brief suggests that Lupo's failure to produce those documents either constitutes or evinces a violation of the January 2019 order that Lupo "confirm completion of search for documents and records related to Plaintiff Kitchen Experts of California, Inc.'s corporate books and records."  Jan. 2019 Order at 1; *see* Reply re Sanctions (dkt. 119) at 8.

The only evidence regarding the fate of the diligence binders is: (1) Cardinal's declaration that he was not permitted to keep them; and (2) Lupo's testimony that he did not take them with him and does not know what happened to them.  There is no evidence that the binders currently exist or that they existed at the time this lawsuit was filed.  Other than a letter that defense counsel sent to Plaintiffs' counsel confirming that the search required by the January order had been completed—which, as Plaintiffs correctly note, is inadmissible hearsay for the truth of the matter

8

asserted—there is no evidence regarding what, if any, search Lupo conducted for Kitchen Expert's corporate records.  Nor is there any indication that Plaintiffs specifically requested these binders, as opposed to more general requests for production of, for example, "[a]ll documents and communications regarding or relating to . . . the sale of Kitchen Experts."  *See* Crawford Reply Decl. re Sanctions (dkt. 119-1) Ex. 32 (Request No. 6).

Plaintiffs have not shown that Defendants violated a court order with respect to this issue.  The January 2019 order narrowly required Lupo to certify that he completed a search for documents.  Lupo provided a letter to that effect, and despite Plaintiffs having subsequently taken Lupo's deposition, Plaintiffs identify no evidence that the search was inadequate.  The Court did not order Lupo to produce the particular documents at issue.  Plaintiffs therefore have not demonstrated that they are entitled to sanctions for violation of a court order under Rules 16 or 37.

Plaintiffs also have not met the test for spoliation sanctions.  The first element of that test is that the party to be sanctioned must have had a legal duty to preserve the documents at issue. *See Apple*, 881 F. Supp. 2d at 1138.  Plaintiffs have not argued or shown that Lupo had any duty to preserve the diligence binders at the time of the sale.  In the absence of such a showing, or any evidence that the documents survived beyond that point and were destroyed during the pendency of this case, Plaintiffs cannot establish spoliation.  The request for an order precluding evidence of the diligence materials is DENIED, and witnesses for any party may testify regarding their recollections of what documents were included in the binders made available for Cardinal's review.

## 2.    Jury Instruction that Lupo Solicited Daza

Plaintiffs seek an instruction that Lupo solicited foreman Luis Daza to work for Kitchen Fantastic while Daza was still employed by Kitchen Experts, in violation of a non-solicitation provision of the purchase agreement.  Sanctions Mot. at 16–18.  According to Plaintiffs, this sanction is warranted because Defendants have not produced all communications with Daza or records of payments to Daza and refused to provide their electronic devices for forensic review. *Id.*

Lupo testified at his deposition that Daza worked for him and for Kitchen Fantastic, with

United States District Court
Northern District of California

9

United States District Court
Northern District of California

Lupo initially paying Daza personally (for work on "[k]itchens") before "he came to work for the company."  Crawford Decl. re Sanctions Ex. 11 (Lupo Dep.) at 313:10–11, 327:23–328:13.  Lupo suggested that, by the time of his deposition, he had come to know that Daza was still employed by Kitchen Experts when he began working for Lupo and Kitchen Fantastic, but testified that his understanding differed at the time of the events in question, because Daza told Lupo that he had quit his job with Kitchen Experts.  *Id.* at 313:15–314:22.  In an October 16, 2017 text message, Daza informed Lupo that he had given his two weeks' notice resigning from Kitchen Experts, and that "Friday"—presumably October 13, 2017—was his last day.  *Id.* at 324:9–17; Pohls Decl. re Sanctions (dkt. 118-3) Ex. 16.  Lupo testified that Daza had told him the same thing verbally before then.  Crawford Decl. re Sanctions Ex. 11 (Lupo Dep.) at 324:9–24.  There is some indication that Lupo and Phelton had reached out to Daza regarding Kitchen Fantastic in September of 2017, before Daza sent Lupo the text message regarding his resignation.  *Id.* (Lupo Dep.) at 318:12–320:6.

The Court has serious concerns about Lupo's compliance with his discovery obligations regarding financial records.  The absence of records of payment to Daza and others for work performed less than six months before Plaintiffs filed this action is unusual, and Lupo's vague and evasive answers at his deposition regarding his efforts to locate and produce such records do not inspire confidence.  *See id.* (Lupo Dep.) at 305:2–12.[3]  Nevertheless, Plaintiffs have identified no evidence that any records of payment to workers that the Court ordered produced in fact existed at the time of the Court's orders.  Absent such evidence, Plaintiffs have not shown that Defendants violated the orders in that respect.  Nor have Plaintiffs identified evidence that such records

---

[3] The relevant portion of the transcript reads as follows:

> Q: Got it. And you're paying [individuals performing work for Kitchen Fantastic] from a personal account under your name?
> A: Yes.
> Q: Okay. And do you recall whether you looked for copies of those personal checks before today?
> A: I might have.
> Q: Okay. And do you recall whether they have been produced in this action?
> A: I don't know.

Crawford Decl. re Sanctions Ex. 11 (Lupo Dep.) at 305:2–12.

10

existed at a time when Defendants had a duty to preserve them, as would be required for sanctions based on spoliation.  The Court therefore declines to impose a jury instruction as a sanction for Defendants' failure to produce payment records.  Plaintiffs may, however, question Lupo and others about the lack of such records at trial, and the jury may draw inferences from their absence as it sees fit.

The Court also has concerns regarding the scope of Defendants' production of text messages and other communications.  Defendants' produced electronic communications solely in the form of screenshot images, without any associated metadata, and in some cases without indication of the date and time that messages were sent or received.  *See* Crawford Decl. re Sanctions ¶ 24.  Lupo—who filed his answer (dkt. 14) to Plaintiffs' complaint on February 9, 2018, while represented by counsel—has been unable to locate emails in his personal Comcast account predating March 14, 2018, ostensibly as a result of the account having been "hacked" by an unknown person.  Lupo Decl. re Sanctions (dkt. 118-2) ¶ 5; Opp'n to Sanctions Mot. (dkt. 118) at 2 n.1; Crawford Decl. re Sanctions Ex. 13 (Jan. 23, 2019 letter from defense counsel).  Certain messages sent between defendants were only located by one of the parties to the message, and were not included in the other party's production.  *See, e.g.*, Sanctions Mot. at 19; Crawford Decl. re Sanctions Ex. 5 (D'Anna Dep.) at 281:25–282:12; Crawford Decl. re D'Anna & Appliance MSJs (dkt. 104) ¶ 9 (collectively indicating that D'Anna produced only one page of text messages between her and Lupo, which Lupo produced seventy-two pages of messages between D'Anna and Lupo, an assertion not disputed in Defendants' opposition to the motion for sanctions).  Under these circumstances, Plaintiffs' concerns about Defendants' production of electronic communications are reasonable.[4]

---

[4] Plaintiffs might also have had reason to doubt whether Defendants complied with their discovery obligations as a result of not receiving verifications signed by Michael and D'Anna of their discovery responses, which the Court's January 2019 order had required, even after Plaintiffs' attorney flagged that issue.  *See* Crawford Decl. re Sanctions ¶¶ 15–16, 19 & Exs. 16–17, 20. Defense counsel has now produced verifications apparently signed by Michael and D'Anna at the time the responses were served, sent to defense counsel within the weeks following service of the responses, but never provided to Plaintiffs' counsel, although defense counsel states that he "assured" Plaintiffs' counsel by telephone that the verifications had been signed.  Pohls Decl. re Sanctions ¶¶ 2–4 & Ex. 1.  While Plaintiffs' counsel does not now dispute that the verifications were signed as defense counsel states, defense counsel's inexplicable failure to comply with the

That being said, the Court is not persuaded that a jury instruction is an appropriate sanction.  There is no evidence that Defendants in fact withheld any communications regarding Daza's employment, or that they failed to preserve any such communications at a time when they had a duty to do so.  Plaintiffs have a strong argument that Defendants failed to comply with the Court's February 2019 order that the parties "meet and confer and resolve all issues regarding the forensic examination of cell phones, tablets and computers, and any documents requested from plaintiff from defendants [sic]."  *See* Feb. 2019 Order ¶ 4.  After the parties had begun to negotiate regarding this issue, Plaintiffs' counsel sent defense counsel a proposal for forensic examination on March 5, 2019, but Defendants never responded to that proposal and never made their devices available for review.  Crawford Decl. ¶ 22.  But Plaintiffs waited to raise the issue of that noncompliance until the present motion filed August 9, 2019—more than *five months* after the proposal to which Defendants failed to respond, two months after the repeatedly extended deadline to complete non-expert depositions, and days after briefing concluded on Defendants' motions for summary judgment.  This despite the Court's February 7, 2019 order that any issues the parties could not resolve regarding forensic examination should be raised at the subsequence case management conference on February 15, 2019.  Plaintiffs offer no explanation for this delay.

This Court's local rules require that any motion for sanctions "must be made as soon as practicable after the filing party learns of the circumstances that it alleges make the motion appropriate."  Civ. L.R. 7-8(c).  The circumstances here illustrate one reason for that rule.  If Plaintiffs had raised the breakdown in communication regarding forensic examination earlier, the Court would likely have ordered Defendants to respond to Plaintiffs' proposal, or ordered Defendants to submit to a reasonable examination of their devices, likely combined with an order that Defendants pay Plaintiffs' attorneys' fees for the arduous process.  The same is true of Defendants' failure to produce electronic communications in a form that preserved relevant metadata.  Instead, the parties represented to the Court at the February 15, 2019 case management conference that they were on a path towards resolving any remaining issues with electronic

---

basic requirement of providing verified responses at the time the responses were served appears to have contributed to the degree of mistrust now pervading the case.

1    discovery.  No party raised any such issue in the months since then until the briefing on the

2    present motions.  At this point, an order requiring forensic examination of devices would be

3    tantamount to reopening discovery after the briefing on summary judgment has closed and with

4    little time remaining before trial.  The Court declines to do so.

5           Because Plaintiffs have not shown a likelihood that communications wrongfully withheld

6    from production (to the extent any communications have been) would support the factual assertion

7    of their proposed jury instruction, and because Plaintiffs' own delay in raising the issue has

8    precluded the possibility of lesser, more appropriate sanctions, the motion for a jury instruction

9    regarding Lupo's solicitation of Daza to work for Kitchen Fantastic while he was employed by

10   Kitchen Experts is DENIED.  If Plaintiffs wish to question Defendants at trial about gaps in their

11   production of documents, they may do so.

**3.      Jury Instruction Regarding Brach of Duties to Kitchen Experts**

13          Plaintiffs seek a jury instruction related to their claims for breach of duties owed to

14   Kitchen Experts, although the precise instruction they seek varies depending where one looks in

15   their motion.  The lists included in Plaintiffs' notice of motion and in their proposed order, as well

16   as a heading in their memorandum of points and authorities, refer to a "[j]ury instruction that

17   Phelton and Daza breached their fiduciary duties to Kitchen Experts."  *See, e.g.*, Sanctions Mot. at

18   18.  The body of their argument, however, "request[s] that the jury be instructed that Lupo and

19   Kitchen Experts induced Daza and Phelton to breach their duties of loyalty to Kitchen Experts."

20   *Id.* at 19.  The latter instruction is more consistent with Plaintiffs' characterization of their claims

21   in their complaint and particularly in their opposition to Phelton's motion for summary judgment,

22   where Plaintiffs emphasize that the claim is based on an employee's duty of loyalty rather than on

23   a fiduciary duty.  *See, e.g.*, Opp'n to Phelton MSJ (dkt. 86) at 7; Compl. ¶¶ 98–106.

24          Defendants represented to Plaintiffs that Phelton replaced his mobile phone in September

25   or October of 2017 without retaining the previous phone, and replaced it again in September or

26   October of 2018, again without retaining the previous phone.  Crawford Decl. re Sanctions Ex. 13.

27   Phelton states in his declaration that each time he replaced his phone, he understood that all of the

28   data on the old phone was transferred to the new phone.  Phelton Decl. re Sanctions (dkt. 118-1)

United States District Court
Northern District of California

13

¶¶ 2, 5.  In March of 2018, however, Phelton visited an Apple Store to complain about problems with his phone's navigation functions, and an Apple employee instructed him that it would be necessary to reset the phone to its factory settings.  *Id.* ¶ 3(1).[5]  Phelton states that he "took those steps the Apple representative identified for [him] to back-up all of the electronically stored information on [his] cell phone" before resetting the phone, but nevertheless discovered after the phone had been reset "that some of that electronically stored information—in particular, [his] phone call records and text messages—had not been backed-up and were no longer on [his] cell phone."  *Id.* ¶ 3(2).  Phelton was served with the complaint in this action in January of 2018 (by substitute service on a person in charge at his place of business followed by mailing), first obtained counsel on April 19, 2018, and answered Plaintiffs' complaint on April 20, 2018.  *See* dkts. 25, 32; Phelton Decl. re Sanctions ¶ 4.

Plaintiffs have offered no argument or evidence showing that Phelton had a duty to preserve communications when he replaced his phone in 2017.  The Court declines to impose any sanctions for that conduct.

Phelton's conduct in resetting his phone in March of 2018, which in fact resulted in a loss of data, is a closer call.  Phelton had at that time been served with Plaintiffs' complaint and does not claim to have been unaware of this action.  Phelton therefore should have taken reasonable steps to preserve electronically stored information.  *See* Fed. R. Civ. P. 37(e) (discussing the duty to "take reasonable steps to preserve" electronically stored information "in the anticipation or conduct of litigation").  On the other hand, Phelton was not represented by counsel at the time, and claims to have followed instructions from an Apple representative to back up his data before resetting the phone, even though those instructions proved ineffective.  *See* Phelton Decl. re Sanctions ¶¶ 3(2), 4.  With no evidence to contradict Phelton's explanation of what happened, the Court cannot say that his conduct—which, according to his declaration, he believed would be sufficient to preserve his data—was unreasonable for an unrepresented litigant.

Phelton's replacement of his phone in the fall of 2018 also raises concerns.  Phelton had

---

[5] Phelton's declaration includes two paragraphs bearing the number 3, which are designated in this order as 3(1) and 3(2).

United States District Court
Northern District of California

been represented by counsel for several months by that time, and should have taken more rigorous steps to preserve his data than simply transferring it to a new phone and discarding the old one. Nevertheless, Plaintiffs have not shown prejudice as a result of the 2018 phone replacement. There is no indication that data was in fact lost in the process; Plaintiffs do not dispute that Phelton has access to communications dating back to March of 2018.  While Phelton's conduct discarding a phone that he used might have affected the ability for a forensic examination to show past deletion or manipulation of data, no such examination occurred, due in part to Plaintiffs' own lack of diligence in pursuing the issue, as discussed above in the context of the previous jury instruction sought in Plaintiffs' motion.  The hypothetical effect that Phelton's phone replacement might have had on a forensic examination that never occurred is not cognizable prejudice.  The motion for this jury instruction is DENIED.  Plaintiffs may question Phelton about the loss of his data at trial if they so choose.

### 4.       Jury Instructions that D'Anna Was Appliance Fantastic's Agent

Plaintiffs seek a jury instruction that D'Anna was acting as Appliance Fantastic's agent when she made purportedly defamatory statements to AAO's customers and vendors.  Sanctions Mot. at 19–21.  In light of the Court's holding below that Defendants are entitled to summary judgment on Plaintiffs' trade libel claims for reasons unrelated to agency, the jury instruction specifically requested is moot.

Plaintiffs also request an instruction that D'Anna was acting as Appliance Fantastic's agent when she accessed an email account that Plaintiffs contend was owned by AAO, purportedly in violation of the Stored Communications Act.  *Id.* at 21–22.  Plaintiffs arguments for that instruction consist solely of identifying "significant direct and circumstantial evidence that D'Anna was acting pursuant to an agreement with Lupo for the benefit of Appliance Fantastic." *Id.* at 22.  The existence of evidence is not grounds for imposing a jury instruction as a discovery sanction.  Nevertheless, because Plaintiffs' arguments in favor of the former proposed instruction regarding the trade libel claim, which is moot, could also be applied to the proposed instruction regarding the Stored Communication Act claim, which is not, the Court addresses those arguments.

Plaintiffs seek this sanction based on D'Anna's failure to produce complete records of her communications—particularly with Lupo and with Riggs Distributing representative Bob Hostetler—as well as payment records that "tend to show when D'Anna became an agent of Appliance Fantastic." Sanctions Mot. at 20–21.[6] Although the gaps in D'Anna's records raise concerns, Plaintiffs have not shown that the documents at issue existed at any time that D'Anna had a duty to preserve them. Plaintiffs also have not offered any explanation for bringing the present motion months after discovery closed, rather than "as soon as practicable" as required by Local Rule 7-8, which would have preserved the option of imposing lesser sanctions to explore whether any such documents still exist or could be recovered. The motion for these instructions is DENIED.

### 5. Jury Instruction Regarding Unfair Competition

Plaintiffs seek a jury instruction that Kitchen Fantastic and Appliance Fantastic engaged in unfair competition as a sanction for Defendants' failure to produce records of "off-payroll" payments that several witnesses testified occurred. Sanctions Mot. at 23–24. As Defendants correctly note, California's Unfair Competition Law generally provides only for equitable relief, and claims under that statute are generally tried to the court rather than to a jury. *See, e.g.*, *People v. Bhakta*, 162 Cal. App. 4th 973, 979 (2008) (citing *Hodge v. Superior Court*, 145 Cal. App. 4th 278, 284 (2006)).[7] Plaintiffs do not address this issue in their reply.

The Court construes the motion as asking the Court to accept as proven that Defendants paid workers off payroll to avoid otherwise mandatory deductions from the employees' paychecks. There is no real dispute that such payments occurred, including well into 2018, and

---

[6] Plaintiffs also argue that D'Anna "refused to identify customers and suppliers with whom she interacted." Sanctions Mot. at 21. Plaintiffs have not identified any court order requiring D'Anna to identify customers, or any other authority that would justify imposing sanctions for such a refusal. Plaintiffs cite the January 2019 order, *id.* (citing dkt. 66), but that order did not on its face require D'Anna to produce documents identifying customers or suppliers.

[7] A recent California appellate decision held that there can be a limited right to a jury trial on issues of liability in a "government enforcement action seeking statutory penalties" under the UCL. *See generally Nat'l Biweekly Admin., Inc. v. Superior Court*, 24 Cal. App. 5th 438 (2018). The California Supreme Court granted review of that decision and has not yet issued its own decision. *See Nat'l Biweekly Admin., Inc. v. Superior Court*, 426 P.3d 302 (Cal. 2018) (granting review). This potential exception to the general rule is not relevant here—the present case is not a government enforcement action seeking statutory penalties.

that not all of the checks are accounted for in Defendants' document production. *See, e.g.*, Crawford Dec. re Sanctions Ex. 2 (Ohelo Dep.) at 131:23–132:23 (testimony that Ashton Ohelo received payments from Lupo from when he started working for Kitchen Fantastic in late 2017 or early 2018 until he was added to formal payroll in August of 2018); *id.* Ex. 4 (Phelton Dep.) at 226:11–231:24 (describing checks received outside of the payroll system, including in late 2018); *see also id.* Ex. 6 (D'Anna Dep.) at 304:6–309:12 (somewhat equivocal and contradictory testimony as to whether D'Anna received payment in 2018 other than formal payroll and commissions paid directly by vendors). Moreover, because at least some payments that are unaccounted for in Defendants' document production continued into 2018 after this action was filed and Defendants were represented by counsel, there is no question that Defendants were subject to a duty to preserve those records. Defendants either failed to do so or failed to produce them as required by the February 2019 order.

The fact remains that Plaintiffs failed to bring this motion until well after discovery closed, violating Local Rule 7-8 and depriving the Court of the potential to order other forms of effective relief. Because the record appears to be clear that such payments occurred,[8] the need for an evidentiary sanction accepting that fact as proven might well be moot. For the moment, the Court DENIES Plaintiffs' motion for this sanction, without prejudice to Plaintiffs renewing the motion after trial if necessary.[9]

### 6.     Attorneys' Fees

Plaintiffs seek their attorneys' fees for bringing the present motion pursuant to Rule 37(b)(2)(C), which provides that where a party has violated a court order, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." *See* Fed. R. Civ. P. 37(b)(2)(C).

---

[8] Plaintiffs have not moved for partial summary judgment on this or any other issue.
[9] Plaintiffs also argue that Defendants failed to produce Kitchen Fantastic's tax returns for 2017. Sanctions Mot. at 24. Defendants objected to producing the tax returns, and Plaintiffs have not identified any order requiring them to do so. The Court declines to impose sanctions for failure to produce the tax returns.

Although the Court declines to grant much of Plaintiffs' motion, the Court concludes that Defendants failed to comply with, at least, the February 2019 order to "meet and confer and resolve all issues regarding any forensic examination of cell phones, tablets and computers, and any documents requested from plaintiff from defendants [sic]."  February 2019 Order.  Defendants argue that they complied by initially meeting and conferring regarding a potential procedure for forensic examination.  Opp'n to Sanctions Mot. at 4–5.  The Court's order called for the parties to negotiate the issue to a resolution, which they did not do.  While failure to reach a resolution could be excused if the parties reached an impasse after negotiating in good faith, the record does not reflect that.  Plaintiffs offer undisputed evidence that, at Defendants' request, Plaintiffs provided a proposal for a review process, but Defendants never responded.  Crawford Decl. re Sanctions ¶ 22.  Responsibility for the breakdown in the meet-and-confer process required by the Court's order therefore lies with Defendants.  The motion is GRANTED as to fees incurred as a result of that violation.

Plaintiffs seek their attorneys' fees for preparing the present motion, most of which is not attributable to Defendants' failure to continue negotiations regarding forensic review.  Instead, the Court awards Plaintiffs their attorneys' fees for the preparing the proposal to which Defendants failed to respond, and for any subsequent work related to Defendants' failure to continue negotiations, including preparing the portions of the present motion addressing that issue.  Plaintiffs are ORDERED to provide a calculation of such fees to Defendants within one week of this order.  Defendants shall respond within three business days.  If Defendants object to the calculation of fees, the parties shall meet and confer and attempt to reach an agreement.  Within three weeks of this order, the parties shall file either a stipulation as to the amount of fees awarded, or separate statements not exceeding three pages addressing any areas of disagreement as to the calculation of fees.  The Court will not reconsider the categories of work for which fees are awarded.[10]

---

[10] Although, as noted above, Plaintiffs failed to comply with the timeliness requirement of Local Rule 7-8, Plaintiffs would have been entitled to the same attorneys' fees regardless of when they had brought the motion, and there is no prejudice to Defendants in imposing this sanction later rather than earlier in the case.

1 | United States District Court / Northern District of California

## V.     MOTIONS FOR SUMMARY JUDGMENT

### A.     Legal Standard

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "'specific facts showing there is a genuine issue for trial.'"  *Id.* (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . .").  "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986).  The non-moving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment.  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  Thus, it is not the task of the court to scour the record in search of a genuine issue of triable fact.  *Id.*; *see Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

A party need not present evidence to support or oppose a motion for summary judgment in a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable to presentation in an admissible form.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003).  Neither conclusory, speculative testimony in affidavits nor arguments in moving papers are sufficient to raise genuine issues of fact and defeat summary judgment.  *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate.

1    *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

2        **B.    Bryce Phelton's Motion**

3        Phelton moves for summary judgment on the only claim against him, that he breached a

4   duty of loyalty to Kitchen Experts.  *See generally* Phelton MSJ (dkt. 81); Compl. ¶¶ 98–102.  The

5   only argument presented in Phelton's motion is that California law recognizes no tort for breach of

6   duty of loyalty separate from breach of fiduciary duty, and Plaintiffs have not shown that Phelton

7   owed a *fiduciary* duty to Kitchen Experts.  Phelton MSJ at 3–4 (relying on *Mattel, Inc. v. MGA*

8   *Entm't, Inc.*, No. CV 04-9049 DOC (RNBx), 2011 WL 8427611 (C.D. Cal. Mar. 28, 2011)).

9        Phelton is correct that the district court in *Mattel* declined to recognize a cause of action for

10   breach of duty of loyalty by an employee absent any fiduciary duty.  *See Mattel*, 2011 WL

11   8427611, at *2–3 ("Mattel's request that the Court adopt a broad and vague extra-contractual

12   common law duty that binds all employees in all aspects of their employment, is denied.").  As

13   Plaintiffs note in their opposition brief, however, the *Mattel* case represents a minority view that

14   has been explicitly rejected in subsequent district court decisions.  Opp'n to Phelton MSJ; *see,*

15   *e.g.*, *Becquer v. Mirantis, Inc.*, No. CV 18-1072(DSD/HB), 2018 WL 4654748, at *3 (D. Minn.

16   Sept. 27, 2018) (considering arguments regarding California law); *E.D.C. Techs., Inc. v. Seidel*,

17   216 F. Supp. 3d 1012, 1016 (N.D. Cal. 2016); *Integral Dev. Corp. v. Tolat*, No. C 12-06575 JSW,

18   2013 WL 5781581, at *3 (N.D. Cal. Oct. 25, 2013); *Zayo Grp. LLC v. Hisa*, No. SACV

19   13-752-JST (JPRx), 2013 WL 12201401, at *7 (C.D. Cal. Sept. 17, 2013).  In a decision predating

20   *Mattel*, Judge Illston held that "the California Supreme Court would likely follow the Restatement

21   [of Agency] to recognize that [even] a lower-level employee, such as a sales clerk or a laborer,

22   owes a duty of loyalty to his employer" capable of supporting a claim for breach of that duty.

23   *Otsuka v. Polo Ralph Lauren Corp.*, No. C 07-02780 SI, 2007 WL 3342721, at *2–3 (N.D. Cal.

24   Nov. 9, 2007) (citing *Eckard Brandes, Inc. v. Riley*, 338 F.3d 1082, 1085–86 (9th Cir. 2003)

25   (reaching the same conclusion with respect to Hawaii law); *Stokes v. Dole Nut Co.*, 41 Cal. App.

26   4th 285, 295 (1995) (recognizing a duty of loyalty in a case involving managerial employees,

27   without indicating that the duty was limited managers); *Fowler v. Varian Assocs., Inc.*, 196 Cal.

28   App. 3d 34, 41 (1987) (same)).  Phelton does not address those authorities in a reply brief, instead

United States District Court
Northern District of California

1  filing a "statement in lieu of reply" asserting, incorrectly, that Plaintiffs did not file an opposition

2  brief.  *See* dkt. 93; *cf.* Opp'n to Phelton MSJ.

3      *Otsuka*'s interpretation of *Eckard*, *Stokes*, *Fowler*, and the Restatement is more persuasive

4  than *Mattel*'s reliance on the general policy against imposing common law tort duties on an

5  employment relationship.  This Court therefore follows the majority view that California law

6  recognizes a claim for breach of an employee's duty of loyalty while still employed.  As Phelton

7  presents no other arguments in his motion, the motion is DENIED.

8      **C.  Moheba D'Anna's Motion**

9      D'Anna moves for summary judgment on the three claims asserted against her, for trade

10  libel, interference with contractual relations, and violation of the Stored Communication Act.  For

11  the reasons discussed below, D'Anna's motions is GRANTED with respect to trade libel and

12  interference with contractual relations, but DENIED as to the Stored Communications Act.

13      **1.  Trade Libel Claim**

14  California courts have explained the doctrine of trade libel as follows:

15      "Trade libel is the publication of matter disparaging the quality of
        another's property, which the publisher should recognize is likely to
16      cause pecuniary loss to the owner. [Citation.] The tort encompasses
        'all false statements concerning the quality of services or product of
17      a business which are intended to cause that business financial harm
        and in fact do so.' [Citation.] [¶] To constitute trade libel, a statement
18      must be false."

19  *City of Costa Mesa v. D'Alessio Invs., LLC*, 214 Cal. App. 4th 358, 376 (2013) (quoting

20  *ComputerXpress, Inc. v. Jackson* 93 Cal. App. 4th 993, 1010 (2001)) (alteration in original).

21      Plaintiffs base this claim on two emails that D'Anna sent after she was fired.  First,

22  D'Anna sent the following email to two individuals at Riggs Distributing on October 17, 2017:

23      Good morning.

24      With some dramatic changes at American Appliance, I would like to
        inform Riggs and my friends at Riggs, Bob and Nikki, that I am no
25      longer part of American Appliance team. It was a great journey for
        me and I came across so many beautiful people that I can look up to
26      and respect. It was a great pleasure working with every single one,
        (Lee, JJ and Elizabeth) and want to thank you for giving me the
27      opportunity to be part of the Subzero, Wolf and Asko family, thank
        You Grant and Bob Riggs for the trust.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

> With the substantial changes and unethical process at American Appliance, morally I can not continue working with the new team. I once believed in this company and the people but time has came where I have to walk away from the company I built.

4

> Again, thank you for your support and encouragement over the past years. I hope our paths will cross again in future endeavors.

5

> Moheba D'Anna

6  Franchini Decl. re D'Anna & Appliance MSJs (dkt. 103) Ex. L.  Riggs had terminated its

7  relationship as a supplier of AAO by that time, and the parties dispute whether there was any

8  discussion or possibility of the relationship resuming.

9       Second, D'Anna sent the following email to an individual named Shantel on October 18,

10  2017:

11

> Hello Shantel,

12

13

> I'm no longer with American Appliance. Here is a company that I trust and can help you out. call Rose and tell them D'Anna sent you and she will definitely help you out. She can be reached at 209-624-3305.

14

15

> D'Anna

16  Franchini Decl. re D'Anna & Appliance MSJs Ex. H.  In her declaration, D'Anna describes

17  Shantel as a sales representative of Bay Area News Group, which AAO used as an advertising

18  outlet.  D'Anna Decl. re D'Anna MSJ (dkt. 89-1) ¶ 4.  The previous email in D'Anna's exchange

19  with Shantel, however, includes references to particular kitchen products only available as a

20  special order, and is at least amenable to an interpretation that Shantel was interested in purchasing

21  those products from AAO.  Franchini Decl. re D'Anna & Appliance MSJs Ex. H.

22       D'Anna argues that she cannot be held liable for her statements that a different company

23  was "a company that [she] trust[s]" and that AAO was "unethical" because those are statements of

24  opinion, relying on a California appellate court's decision in *Hofmann Co. v. E. I. Du Pont De*

25  *Nemours & Co.*, 202 Cal. App. 3d 390, 403 (1988).  *See* D'Anna & Appliance Reply (dkt. 109) at

26  2 (citing *Hofmann*).  The strict rule against imposing liability for statements of opinion as

27  discussed in that case has since been abrogated.  *See Kahn v. Bower*, 232 Cal. App. 3d 1599,

28  1606–07 (1991) (recognizing that *Hofman* has been abrogated by *Milkovich v. Lorain Journal Co.*,

497 U.S 1 (1990)).  Instead, the question is whether D'Anna's statements could be construed as "'implying a provably false factual assertion.'"  *Id.* at 1607 (quoting *Moyer v. Amador Valley Joint Union High Sch. Dist.*, 225 Cal. App. 3d 720, 724 (1990)).  Statements of opinion are still not generally actionable, but "where an expression of opinion implies a false assertion of fact, the opinion can constitute actionable defamation."  *Summit Bank v. Rogers*, 206 Cal. App. 4th 669, 696 (2012); *see also Wong v. Jing*, 189 Cal. App. 4th 1354, 1370 (2010).  Whether the statement could be construed as implying an assertion of fact is a question of law for the Court.  *Summit Bank*, 206 Cal. App. 4th at 696.

D'Anna's statement that a competitor of AAO was "a company that [she] trust[s]" does not support a claim for trade libel, both because it is a statement of opinion that does not clearly imply any disprovable fact, and because there is no evidence that it is false.  Whether the statement could be taken as implying a lack of trust in the new management of AAO is of no consequence— D'Anna was free to place her trust in whichever companies she saw fit, and at least absent any non-disparagement contract, she was free to express her opinions as to which companies she trusted.

The question of whether D'Anna's email to Riggs either includes or implies a false statement of fact is a closer call.  At the very least, the email likely implies that D'Anna left AAO voluntarily based on a difference of opinion, which is not true—there is no dispute that D'Anna was fired.  *See* D'Anna Decl. re D'Anna MSJ ¶ 3.  Describing a party as "unethical" can also support a claim in at least some circumstances.  *See Mamou v. Trendwest Resorts, Inc.*, 165 Cal. App. 4th 686, 728 (2008) ("Even the statements on which Trendwest focuses for this argument— that Mamou lacked integrity, that he was unethical—could be found to convey an actual imputation of fact if they implied the speaker's possession of undisclosed supporting facts.").

The larger issue with D'Anna's email to Riggs personnel is that Plaintiffs have not offered evidence of any harm that resulted from it.  To support a claim for trade libel, a false statement not only must be "intended to cause [a] business financial harm," but also must "in fact do so."  *Costa Mesa*, 214 Cal. App. 4th at 376.  Riggs terminated its dealer agreement with AAO before AAO fired D'Anna and before she sent the email at issue.  *See* Pohl's Decl. re D'Anna MSJ Ex. 2 (letter

23

from Riggs dated October 3, 2017).  As Plaintiffs concede in their opposition brief, their "burden" is to show that "D'Anna's publication played a material part in AAO's loss of a prospective dealer agreement with Riggs," or in other words, a material part in AAO's failure to secure a new agreement after Riggs terminated the agreement that had been in place when Cardinal bought the business.  Opp'n to D'Anna MSJ (dkt. 101) at 5.  The evidence they offer shows at most that Cardinal was attempting to secure a new agreement.  *See* Cardinal Decl. re D'Anna & Appliance MSJs (dkt. 105) ¶ 9 ("As of the time AAO terminated Ms. D'Anna's employment . . . AAO and Riggs were in good-faith discussions regarding the renewal of the Dealer Agreement."); Crawford Decl. re D'Anna & Appliance MSJs Ex. Q (text message conversation dated October 10, 2017 including messages from Cardinal stating, "As of when that letter came in, we can't place any new orders from Riggs.  We're working on getting a new account set up with them, but until that's confirmed, we can't place any new orders - we can only work with old orders that were placed on or [message cuts off at end of page]").[11]

        There is no evidence that such discussions had any chance of success.  To the contrary, Riggs representative Robert Hostetler testified at his deposition that he "felt both [Cardinal] and Moheba [D'Anna] were not being forthcoming" in a meeting with them before Cardinal completed his purchase of AAO.  Pohl's Reply Decl. re D'Anna MSJ Ex. A (Hostetler Dep.) at 93:5–10 (emphasis added); *see also id.* at 94:9–11 ("[B]ut I could tell just from the meeting that -- that neither one of 'em were being forthcoming.").  Hostetler testified that he attempted to steer the conversation to business, including the fact that the Riggs dealer agreement was not transferable and would not remain with AAO if Cardinal bought the company, while "Mr. Cardinal talked about dog showers."  *Id.* at 92:25–94:4.  According to Hostetler, D'Anna's email did not affect his impression of the new ownership of AAO "[b]ecause [Hostetler] had already had

---

[11] Cardinal notes in his declaration that even after the termination of the dealer agreement, AAO was able to purchase goods from Riggs on a cash-in-advance basis, but was unable to do so "after November 2017."  Cardinal Decl. re D'Anna & Appliance MSJs ¶¶ 9–10.  To the extent Cardinal's declaration could be construed as implying that D'Anna's email prompted Riggs to revoke AAO's ability to buy goods cash-in-advance, the record does not support such a chain of causation.  Riggs's October 3, 2017 termination letter expressly stated that AAO would retain the right to purchase goods cash-in-advance only until November 3, 2017.  Pohl's Decl. re D'Anna MSJ Ex. 2.

that meeting with Mr. Cardinal." *Id.* at 112:7–13.  Hostetler summarized the meeting as follows: "It was one of the worst meetings I've ever been in, actually, in 30 years.  It was terrible." *Id.* at 93:8–10.  Riggs later terminated the dealer agreement upon learning that Cardinal had bought AAO.

Hostetler testified that Riggs was not in discussions with AAO about renewing the agreement when D'Anna sent the email at issue. *Id.* at 112:18–20.  After Riggs terminated the dealer agreement upon learning that Cardinal purchased AAO, Hostetler eventually had a meeting with Cardinal's business partner James Franchini (after Franchini visited the Riggs office on three consecutive days seeking such a meeting), which Hostetler also characterized as "terrible," with Franchini becoming "aggressive" and "belligerent" and "saying some really derogatory things" about D'Anna, including "accus[ing] her of being a terrorist." *Id.* at 113:2–114:18, 145:16–146:24, 148:17–22.  Hostetler became uncomfortable and asked Franchini to leave the building, which Franchini initially refused to do. *Id.* at 114:19–21.

Even taking into account Hostetler's testimony that "the conversation [he] had with Jim [Franchini] wasn't that we weren't ever going to sell him goods or open him up as a dealer," *id.* at 145:9–11, there is no evidence in the record from which a reasonable jury could conclude that D'Anna's email was a substantial factor in Plaintiffs' failure to renew AAO's dealer agreement with Riggs.  Because neither D'Anna's email to Shantel nor her email to Riggs supports a claim for trade libel, D'Anna's motion for summary judgment on this claim is GRANTED.

### 2.    Interference with Contractual Relations

The eighth claim of Plaintiffs' complaint, asserted by Kitchen Experts for interference with contractual relations, includes D'Anna as well as Lupo in a heading, but includes allegations only regarding Lupo's conduct, with no other mention of D'Anna.  Compl. ¶¶ 86–91.  D'Anna notes that lack of allegations and asserts that she had no relationship whatsoever with Kitchen Experts. D'Anna MSJ (dkt. 89) at 5–6.  In their opposition brief, "Plaintiffs do not contest D'Anna's motion with respect to [this] cause of action," conceding that the complaint lacks allegations that she interfered with any Kitchen Experts contract, and stating that "D'Anna [sic, presumably intended as 'Kitchen Experts' or 'Plaintiffs'] applies for approval of this Court to dismiss this

25

1   Cause of Action against D'Anna."  Opp'n to D'Anna MSJ at 14 (capitalization altered in the first

2   quotation).  D'Anna's motion is GRANTED as to this claim.

3               **3.      Stored Communications Act Claim**

4          AAO's claim under the Stored Communications Act asserts that D'Anna violated 18

5   U.S.C. §§ 2701, which, in conjunction with 18 U.S.C. § 2707, "provides a cause of action against

6   anyone who 'intentionally accesses without authorization a facility through which an electronic

7   communication service is provided . . . and thereby obtains, alters, or prevents authorized access to

8   a wire or electronic communication while it is in electronic storage.'"  *Theofel v. Farey-Jones*, 359

9   F.3d 1066, 1072 (9th Cir. 2004) (quoting 18 U.S.C. § 2701(a)).  There is no dispute that D'Anna

10  continued to access and use the "aao_outlet@yahoo.com" email address for some time after she

11  was fired.  The parties dispute whether the email address belonged to AAO, in which case

12  D'Anna's use of it was without authorization, or belonged to D'Anna personally, in which case

13  her continued use was legitimate (and AAO's subsequent steps to block D'Anna's access to the

14  account and use the account itself would not be legitimate, although no party has asserted a claim

15  based on that conduct).  *See* D'Anna MSJ at 6; Appliance MSJ (dkt. 91) at 4–6.

16         After AAO fired D'Anna on October 16, 2017, *see* Franchini Decl. re D'Anna &

17  Appliance MSJs ¶ 10, she continued to access the email account "aao_outlet@yahoo.com" and

18  replied to several emails that AAO customers sent to that account.  Some of those replies simply

19  informed the customers that D'Anna was no longer employed by AAO and directed them to other

20  AAO personnel.  *See* D'Anna Decl. re D'Anna MSJ Ex. 1.  In one instance, however D'Anna told

21  a customer who inquired about an order to contact "Rose from AAO" and provided a telephone

22  number, without informing the customer that Rose worked for a competing company that also

23  used the initials AAO—*Adell* Appliance Outlet, not *American* Appliance Outlet.  Franchini Decl.

24  re D'Anna & Appliance MSJs ¶ 14 & Ex. F.  As discussed above in the context of trade libel,

25  D'Anna also emailed an individual named Shantel to state that Rose was with "a company that

26  [D'Anna] trust[s]" and "can help [Shantel] out."  *Id.* Ex. H.  These examples are intended only to

27  illustrate D'Anna use of the account in a manner to which AAO might reasonably object; because

28  the parties' dispute centers on ownership of the account, this order need not recount the full scope

United States District Court
Northern District of California

26

United States District Court
Northern District of California

1  of D'Anna's use of the account after she was fired.  On October 20, 2017, an AAO representative

2  contact D'Anna by text message and requested the password for the account, but D'Anna refused

3  to provide it, stating that it was her personal account and AAO had no right to access it.  D'Anna

4  Decl. re Appliance MSJ (dkt. 91-1) ¶ 6 & Ex. 3.  On October 23, 2017, AAO changed the

5  password, security settings, and associated contact information for the account, denying D'Anna

6  further access.  *See id.* ¶¶ 7–9; Pohls Decl. re Appliance MSJ (dkt. 91-9) Ex. 1 (Responses to

7  Requests for Admission 15–20).

8        D'Anna states in her declaration that she created the email account at issue in 2011, when

9  AAO did not yet exist and D'Anna worked at Adell's Appliance Outlet—a different company run

10  by members of her family that shared the same acronym as AAO—and that although she used the

11  account in part for business purposes, she also used it for personal communications and Adell's

12  Appliance Outlet had no ownership interest in the account.  D'Anna Decl. re Appliance MSJ ¶ 2.

13  D'Anna states that she continued to use the account for both business and personal

14  communications when she was employed by AAO from 2013 through October of 2017, but she

15  never transferred any ownership interest in the account to AAO.  *Id.* ¶ 4.  D'Anna's position that

16  she owned the account is supported by AAO's admissions that the account was created in 2011,

17  that AAO was not formed as a limited liability company until 2013, and that D'Anna used the

18  account in part for personal communication.  Pohls Decl. re Appliance MSJ Ex. 1 (Responses to

19  Requests for Admission 2, 4–6).

20        There is also evidence tending to suggest that the account was in at least de facto use as

21  AAO's general office email account.  In the emails attached to D'Anna's declaration, the name of

22  the account is displayed as "American Appliance."  D'Anna Decl. re Appliance MSJ Ex. 2.

23  Franchini states in a declaration that other employees besides D'Anna had access to the account

24  and AAO had its password, and that he understood the account to be AAO's "primary email

25  address" at the time Cardinal purchased the company.  Franchini Decl. re D'Anna & Appliance

26  MSJs ¶¶ 8–9.  Franchini also attaches two business directories and an advertisement in a magazine

27  from 2014 or 2015 listing the Yahoo address as AAO's contact information.  *Id.* ¶ 13 & Exs. C–

28

E.[12]  Perhaps most significantly, D'Anna and Cardinal had a conversation via text message that, at the very least, could reasonably be interpreted as D'Anna stating that the account at issue was AAO's office email address rather than her own personal email address:

> [Cardinal:] Those are three sections. If you share your email I can send you the PDF if that's easier.
>
> [D'Anna:] aao_outlet@yahoo.com
>
> [Cardinal:] For future reference, is that just you or is that shared with everyone there?
>
> [D'Anna:] That's the office email
>
> [D'Anna:] Danna@aaoaapliance.com [sic]

Cardinal Decl. re D'Anna & Appliance MSJs ¶ 4 & Ex. V.  D'Anna offers a strained interpretation of that conversation as stating that the "aao_outlet" email address was D'Anna's personal address while the latter email address beginning with "Danna" was "shared with everyone there."  D'Anna & Appliance Reply at 6–7; *see also* Crawford Decl. re D'Anna & Appliance MSJs Ex. O (D'Anna Dep.) at 166:6–22 (muddled testimony that could be interpreted as stating the same position).[13] On D'Anna's motion for summary judgment, the Court need not address whether her interpretation of the conversation might be plausible—it is enough that a reasonable jury *could* view the conversation as indicating that the account at issue was "the office email" that was "shared with everyone there."

Weighing that conflicting evidence, a jury could reasonably decide either that the email address belonged to D'Anna personally or that it was AAO's general office email address.  While Defendants are correct that Plaintiffs have not offered direct evidence that D'Anna transferred ownership of the account to AAO—and neither party has addressed any legal standard for how

---

[12] It is not obvious whether the business directories included this email address before AAO fired D'Anna and barred her access to the account.  Regardless, the 2014 or 2015 advertisement provides at least some evidence that AAO used the account as its general email address before those events.

[13] Defendants' reply brief states that D'Anna gave clearer testimony to the same effect on redirect examination, which would be submitted under seal.  D'Anna & Appliance Reply at 8 n.7.  The only exhibits submitted with the reply, under seal or otherwise, were excerpts of the depositions of Robert Hostetler and Grant Riggs.  *See* Pohls Reply Decl. re D'Anna & Appliance MSJs (dkt. 109-1); Sealing Mot. re Reply re D'Anna & Appliance MSJs (dkt. 110).

United States District Court
Northern District of California

such a transfer of ownership would be effected—a jury might infer from the evidence of AAO's general use of the address and D'Anna's characterization of it as a shared office email address (if the jury interpreted her text messages with Cardinal in Plaintiffs' favor) that such a transfer at some point occurred, and decline to credit D'Anna's testimony to the contrary. D'Anna's motion for summary judgment on this claim is DENIED.

### D. Appliance Fantastic Motion

Appliance Fantastic moves for summary judgment on both of the claims against it, for violation of the Stored Communications Act and the UCL. *See generally* Appliance MSJ.

#### 1. Stored Communications Act

AAO's Stored Communications Act claim asserts that Appliance Fantastic is liable because D'Anna acted as its agent at the time she accessed the "aao_outlet@yahoo.com" email account. Compl. ¶¶ 120–26. Appliance Fantastic's first argument with respect to this claim is that no violation occurred because D'Anna owned the account in question. Appliance MSJ at 4–6. For the reasons discussed above in the context of D'Anna's motion, Appliance Fantastic is not entitled to summary judgment on that basis.

Appliance Fantastic also argues that there is no evidence that D'Anna was acting as its agent at the time she accessed the account. *Id.* at 7. Appliance Fantastic relies on D'Anna's declaration that she was not employed by Appliance Fantastic at that time or any time before November 5, 2017, that she exchanged only brief text messages with Lupo asking him to call her on October 20, 2017 (i.e., before AAO changed the password to the account) because she intended to inform him that she had been fired and was looking for a new job, and that the two did not have a conversation until October 24, 2017 (i.e., after AAO change the password and D'Anna ceased to have access to the account). D'Anna Decl. re Appliance MSJ ¶¶ 10–11 & Exs. 5–6.[14]

The evidence on which Plaintiffs rely for their position that D'Anna began acting as Appliance Fantastic's agent before she accessed the account is less direct. D'Anna testified that

---

[14] Plaintiffs object to the screenshots of text messages attached to D'Anna's declaration on the grounds that they were produced by Lupo but not authenticated by him. That objection is overruled. D'Anna was a party to the conversation and may testify to its authenticity, regardless of whether it was produced from her records.

United States District Court
Northern District of California

Lupo reached out to her to see if she was interested in helping with his new company at some point between October 16, 2017 and October 20, 2017, while she still had access to the Yahoo account.  *See* Crawford Decl. Ex. O (D'Anna Dep.) at 252:24–253:19.[15]  D'Anna also testified, however, that she did not respond to that outreach until her brief text message to Lupo on October 20, 2017 asking to talk, and did not think that she spoke to him that day, although she was not sure.  *Id.* at 253:6–24.  D'Anna does not indicate in her deposition testimony that she accepted Lupo's expression of interest in hiring her before AAO changed the password to the Yahoo account.

There is also evidence that could be interpreted as D'Anna beginning outreach to a Thermador distributor on Lupo's behalf before the November 5, 2017 date that she states is the earliest she might have begun working for Lupo.  First, on October 17, 2017—the day after she was fired—D'Anna sent an email to Rich Federico, a sales manager of BSH Home Appliance, reading as follows:

> Hello Rick,
> Pleasure meeting with you. Let me know what day works best for you to meet and go over the Bosch/Thermador/ Gaggenau live showroom. Have a great evening.
> Thank You
> D'Anna

Franchini Decl. re D'Anna & Appliance MSJs Ex. J.  Federico responded about an hour later that it was "[g]reat speaking with you this evening" and asked D'Anna to remind him where she was located.  *Id.*  D'Anna responded, again using the "aao_outlet" Yahoo account:

> American Appliance Pleasanton and AAO Appliance in Manteca. Sold both locations. Now new location will be in Livermore. David Nicholas is our sales representative and our will calls of as last time was over 1 million with a Purcell Murray. David Nichols will have a better ballpark with our numbers. Any question feel free to contact me.

*Id.*  D'Anna, Federico, and another BSH sales representative arranged a meeting for the following

---

[15] Plaintiffs assert in their opposition brief that Lupo first "solicited D'Anna's personal assistance for Appliance Fantastic's business no later than August 23, 2017—within a week of incorporating Appliance Fantastic," but cite no evidence for that assertion.  *See* Opp'n to Appliance MSJ at 6.

day, but Federico had to cancel the meeting and stated in an October 19, 2017 email that the other

representative would follow up with D'Anna to reschedule.  *Id.*

It is not clear from the email exchange above on whose behalf D'Anna was meeting with

the BSH representatives—for example, the parties' briefs do not address who "David Nicholas" or

"David Nichols" is and whether he had any relationship with AAO, Appliance Fantastic, or any

other company.  *See id.*  About two weeks later on November 1, 2017, however, D'Anna and

Lupo exchanged the following text messages:

> [Lupo:] How did your meeting with thermador go? Is there a chance for us?
>
> [D'Anna:] It went great. Ty [presumably, "thank you"] I'll call you tomorrow
>
> [It is not clear whether a portion of the conversation is omitted here between pages.]
>
> [Lupo:] Ok
> So does that mean
> No chance for us?
>
> [D'Anna:] Maybe tomorrow or Friday if I can see the showroom to see where things r at
>
> [Lupo:] Ok
> Yay sounds like there is a chance then
>
> [D'Anna:] Let's meet n get to know how u conduct business and go from there

D'Anna Decl. re Appliance MSJ Ex. 7.  D'Anna and Lupo arranged for a meeting the following

day, and after that meeting Lupo sent D'Anna a text message stating in part, "I can't remember

being this excited[.]  Your [sic] awesome !!!!!"  *Id.*  D'Anna responded:

> Pls send me your email. I have the steals n deals from Thermador. Let me know if ur interested. All new product but discounted

*Id.*  After a conversation about a particular appliance, on November 4th and 5th, Lupo and D'Anna

discussed D'Anna's efforts to obtain permission to "go forward"—apparently referring to working

with Lupo—from members of her family who were also in the appliance business.  *Id.*  The

portion of the conversation included in the record concludes with the following message from

D'Anna:

United States District Court
Northern District of California

1

2         Let's sit down n see exactly what my role be. What your expectations
       are and what #'s we r looking at for the first year

3      *Id.*

4        At her deposition, D'Anna testified that her meeting with a Thermador distributor

5      referenced in Lupo's November 1, 2017 text message related to her "potentially going to be

6      opening up a place of [her] own," and was with Rick Federico, the BSH representative whom she

7      emailed from the "aao_outlet@yahoo.com" account in mid-October.  Crawford Decl. re D'Anna

8      & Appliance MSJs Ex. O (D'Anna Dep.) at 254:23–255:5, 255:21–23.  D'Anna had no

9      explanation for why Lupo referred to "a chance for *us*" if he was referring to a meeting she took

10     for her own purposes.  *Id.* at 255:6–18 (emphasis added).  The conversation could be interpreted as

11     suggesting that D'Anna held the meeting on November 1, 2017 (or perhaps shortly before then) on

12     Lupo and Appliance Fantastic's behalf, even though subsequent messages indicate that she had

13     not finalized a role with them by November 5, 2017.  Combined with D'Anna's unexplained

14     failure to produce all of her text messages with Lupo despite producing messages with other

15     people from the same time period, a jury that found Lupo and D'Anna's testimony not credible

16     could perhaps infer that—contrary to D'Anna's declaration—D'Anna had agreed to meet with

17     Federico on Lupo and Appliance Fantastic's behalf when she emailed Federico in October of 2017

18     from the Yahoo account that Appliance Fantastic claims to own.  The Court therefore declines to

19     grant summary judgment on the Stored Communication Act claim against Appliance Fantastic.

20         **2.**  **Unfair Competition Claim**

21       Appliance Fantastic seeks summary judgment on AAO's unfair competition claim based

22     on the doctrine of unclean hands, arguing that "admissions that AAO made in response to Ms.

23     D'Anna's discovery . . . conclusively establish that AAO engaged in precisely the same conduct

24     upon which it purports to base its claims against Appliance Fantastic."  Appliance MSJ at 8.  That

25     portion of Appliance Fantastic's motion cites no particular admissions, but appears to refer to

26     admissions cited earlier in the motion that AAO accessed the Yahoo email account without asking

27     for D'Anna's permission and changed the password for the account without authority from

28     D'Anna.  *See id.* at 6 (citing Pohls Decl. re Appliance MSJ Ex. 1).  Such conduct would only be

wrongful if D'Anna was the rightful owner of the account and AAO was not—an issue that, as discussed above in the context of the Stored Communication Act, is in dispute and could be resolved in either party's favor.

Moreover, as Plaintiffs note in their opposition brief, California courts "have long held that the equitable defense of unclean hands is not a defense to an unfair trade or business practices claim based on violation of a statute." *Ticconi v. Blue Shield of Cal. Life & Health Ins. Co.*, 160 Cal. App. 4th 528, 543 (2008); *see* Opp'n to Appliance MSJ (dkt. 102) at 9.  Equitable defenses like unclean hands "may be considered when the trial court exercises its discretion to fashion a *remedy* under Business and Professions Code section 17203 [but] may *not* be used to defeat the cause of action under the UCL." *Ticconi*, 160 Cal. App. 4th at 544 (citing *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 179 (2000)) (some emphasis omitted).  Defendants do not address that issue in their reply, instead arguing for the first time that summary judgment is appropriate because the UCL claim is derivative of Plaintiffs' other claims and "the same evidence which establishes that plaintiffs' other claims in this case lack merit therefore requires that Appliance Fantastic also prevail on the [UCL] claim."  D'Anna & Appliance Reply at 10.  Because, as discussed above, AAO may proceed on its Stored Communications Act claim, it may also proceed on its UCL claim.  Appliance Fantastic's motion for summary judgment is DENIED.

### E.   Lupo and Kitchen Fantastic's Motion

Lupo and Kitchen Fantastic move for summary judgment on Plaintiffs' claims against them.  *See* Lupo & Kitchen MSJ (dkt. 96); Kitchen Fantastic Joinder (dkt. 99).  With respect to Lupo, those claims are for fraudulent misrepresentation, negligent misrepresentation, breach of contract, breach of the duty of good faith and fair dealing, trade libel, intentional interference with contractual relations, intentional interference with prospective economic relations, inducing a breach of the duty of loyalty, conversion, violation of the Computer Fraud and Abuse Act, and violation of the Stored Communications Act.  With respect to Kitchen Fantastic, those claims are trade libel, inducing a breach of the duty of loyalty, conversion, violation of the Computer Fraud and Abuse Act, and violation of the Unfair Competition Law.

1            **1.      Claims for Fraudulent and Negligent Misrepresentation**

2            Defendants contend that Lupo cannot be liable for fraudulent or negligent

3    misrepresentation related to the stock purchase agreement ("SPA") because Cardinal cannot prove

4    reliance.  Lupo & Kitchen MSJ at 7–8.  Section 3.17 of the SPA, which Cardinal initialed,

5    describes Cardinal's duty to conduct an investigation to his satisfaction:

6            3.17 **Due Diligence.** The Buyer has or will have inspected and
             performed the requisite due diligence, to the extent the Buyer deems
7            necessary, in its sole and absolute discretion, with respect to every
             element and facet of the Corporation and the Business prior to the
8            Closing. **THE BUYER WOULD NOT AND WILL NOT CLOSE
             THE   TRANSACTION   CONTEMPLATED   BY   THIS
9            AGREEMENT UNLESS THE BUYER IS SATISFIED WITH
             SAID INSPECTION AND DUE DILIGENCE.**

10

11   SPA § 3.17.[16]  Lupo relies on the rule that "a plaintiff 'cannot claim reliance if he makes an

12   independent investigation, which, performed with reasonable diligence, should disclose the true

13   facts.'"  Lupo & Kitchen MSJ at 7 (quoting *Carroll v. Dungey*, 223 Cal. App. 2d 247, 254,

14   (1963)).

15           A more complete statement of the relationship between reliance and diligent investigation

16   is found in a 1987 California appellate decision quoting a treatise: "'If the plaintiff *having access*

17   *to the necessary information* actually makes an independent investigation which the defendant

18   *does not hinder*, he will be charged with knowledge of the facts which reasonable diligence would

19   have disclosed, and he cannot claim reliance upon the representations.'"  *Orient Handel v. U.S.*

20   *Fid. & Guar. Co.*, 192 Cal. App. 3d 684, 694 (1987) (citation omitted; emphasis added); *see also*

21   *ING Bank, FSB v. Ahn*, 758 F. Supp. 2d 936, 944 (N.D. Cal. 2010).  There are questions of fact as

22   to whether Cardinal had access to all necessary information to discover Lupo's purported

23   misrepresentations, and as to whether Lupo hindered Cardinal's ability to conduct an

24   investigation.  *See, e.g.*, Cardinal Decl. re Lupo & Kitchen MSJ (dkt. 112-1) ¶ 10 ("Mr. Lupo

25   explained that all the documents we requested existed [when in fact they did not] and were at the

26   Kitchen Experts office, but that he couldn't get them from Anne Barlow without causing a

27   _____

28   [16] The SPA is included in the record as Exhibit A to Plaintiffs' Complaint.  No party disputes its
     authenticity.

United States District Court
Northern District of California

1    widespread panic within the company that would cause major damage by leading to an exodus of

2    employees.").

3         Defendants also argue in their reply that Cardinal cannot have relied on Lupo's

4    representations outside of the SPA because the SPA itself provided that Lupo did "not make any

5    other express or implied representation or warranty on behalf of the corporation related to the

6    subject matter of this agreement" other than those specifically stated in the SPA.  SPA § 3.10

7    (capitalization and emphasis omitted); Lupo & Kitchen Reply (dkt. 113) at 5–7.  For one thing,

8    Lupo does not address the portion of that provision describing the representations at issue as "on

9    behalf of the company," which could be interpreted as stating only that representations that Lupo

10   made outside of the written SPA were made on his own behalf, not as a representative of Kitchen

11   Experts.  Because Defendants did not raise that provision until their reply, Plaintiffs had no

12   occasion to address its meaning in their opposition brief.

13        Even aside from that, there is evidence from which a jury could conclude that certain

14   representations within the SPA itself were false.  *E.g., compare* SPA § 3.13 ("The Corporation . . .

15   has allowed Buyer to review true, correct and complete copies of all of the Corporation's bank

16   statements [over multiple years.]") *with* Cardinal Decl. re Lupo & Kitchen MSJ ¶ 26 ("[T]here

17   was a secret company account at Bank of America that Mr. Lupo never told use about, and later

18   withdrew money from long after the sale."); *compare* SPA § 3.15 ("Employee Classfication.  The

19   Corporation . . . has been in compliance in all material respects with all applicable state and

20   federal laws and regulations regarding employment and employment practices . . . .") *with*

21   Cardinal Decl. re Lupo & Kitchen MSJ ¶ 25 ("Second, [Kitchen Experts], under Mr. Lupo's

22   ownership, had been committing massive payroll fraud for years.").  Based on Cardinal's

23   declaration that he had those provisions added to assuage his concerns about the limited

24   documentation available to him, a jury could reasonably conclude that he relied on their veracity.

25   Cardinal Decl. re Lupo & Kitchen MSJ ¶ 14.

26        Defendants briefly argue that Cardinal also cannot prevail on his misrepresentation claims

27   because Cardinal and Kitchen Experts expressly agreed to indemnify Lupo and hold him harmless

28   of conduct related to his association with the company.  Lupo & Kitchen MSJ at 8 (citing SPA

United States District Court
Northern District of California

35

United States District Court
Northern District of California

§ 7.2).  As Plaintiffs correctly note, a party cannot rely on a provision of a contract that was procured by fraud.  Opp'n to Lupo & Kitchen MSJ (dkt. 112) at 5; *Filet Menu, Inc. v. C.C.L. & G., Inc.*, 79 Cal. App. 4th 852, 861 (2000) ("[A] contract induced by fraud renders the entire agreement voidable, permitting the aggrieved party to defend a suit on the contract by objecting to its enforcement because procured or induced by fraud.").  There is evidence from which a jury could conclude that the SPA was procured by fraud.  Defendants' motion for summary judgment on Plaintiffs' misrepresentation claims is DENIED.

### 2.  Claims for Breach of Contract and the Duty of Good Faith

#### a.  Anti-Assignment Clause

Defendants argue that they cannot be liable for breach of contract to Kitchen Experts because, after Cardinal purchased the business, he merged it into a new company, "KEC Acquisition Corporation," that later took on essentially the same name as the previous company— "Kitchen Experts of California, Inc.," as compared to the previous "Kitchen Experts of California, Incorporated."  Lupo & Kitchen MSJ at 1–2 (citing Pohls Decl. re Lupo & Kitchen MSJ (dkt. 98) Exs. 1–3).  According to Defendants, any transfer of the original Kitchen Experts' rights under the contract to the new corporation as a result of the merger would violate the anti-assignment clause of the SPA, which reads as follows:

> 10.7 Assignment. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns; provided that no assignment by the Buyer of any rights or obligations may be made without the written consent of the Selling Shareholder except to name a nominee for the purchase hereunder provided said nominee assumes all of the obligations hereunder pursuant to Exhibit 13 hereof. The Seller may in its sole discretion assign any of its rights and obligations under Section 4.7 of this Agreement to one or more of its Affiliates upon written notice to the Buyer. No assignment by any party pursuant to this Section 10.7 shall relieve the assigning party of its obligations hereunder.

SPA § 10.7.

Plaintiffs contend that California courts have not held assignments as a matter of law based on changes in corporate form to violate contractual anti-assignment provisions.  Opp'n to Lupo & Kitchen MSJ at 7–12.  The California Supreme Court has recognized that principle in at least some circumstances since 1947.  *Trubowitch v. Riverbank Canning Co.*, 30 Cal. 2d 335, 345–46

(1947) ("No interest of the seller would be served by preventing the rights under this contract for the sale of standard goods from passing to a copartnership continuing the business of the corporation formed by its sole stockholders, who were entitled to the assets of the corporation upon its dissolution. . . . To require an action to be brought under such circumstances by the dissolved corporation rather than by the copartnership formed by its shareholders, which owns all the assets of the corporation and carries on its business, is to require compliance with a shallow formality that serves no substantial interest of the seller."). *Trubowich* acknowledged "that a provision against assignment in a contract or lease does not preclude a transfer of the rights thereunder by operation of law . . . and that if an assignment results merely from a change in the legal form of ownership of a business, its validity depends upon whether it affects the interests of the parties protected by the nonassignability of the contract." *Id.*

Under section 1107 of the California Corporations Code, the surviving corporation after a merger "shall succeed, without other transfer, to all the rights and property of each of the disappearing corporations and shall be subject to all the debts and liabilities of each in the same manner as if the surviving corporation had itself incurred them." Cal. Corp. Code § 1107(a). The statute tends to suggest that the transfer of rights occurs "by operation of law," and thus does not violate the anti-assignment clause. *See Trubowitch*, 30 Cal. 2d at 345. Alternatively, if the merger is considered "a change in the legal form of ownership of a business," the question would be whether it "whether it affects the interests of the parties protected by the nonassignability of the contract." *Id.* at 346; *see also SQL Sols., Inc. v. Oracle Corp.*, No. C-91-1079 MHP, 1991 WL 626458, at *4 (N.D. Cal. Dec. 18, 1991).

Defendants have offered no argument or evidence of any adverse effect on them as a result of the merger, which Cardinal states that he undertook to cure certain defects in corporate governance that occurred while Lupo owned the business. *See* Cardinal Decl. re Lupo & Kitchen MSJ ¶ 33. Under similar circumstances, Judge Alsup denied a motion for summary judgment based on anti-assignment provision where the moving party did "not provide any analysis of facts or law regarding whether the 'acquisition' . . . affected the interests protected by the nonassignability provision, or even what those interests might be." *Openwave Sys. Inc. v. Myriad*

1  *France S.A.S.*, No. C 10-02805 WHA, 2011 WL 1832999, at *5 (N.D. Cal. May 13, 2011).

2  Defendants also note Cardinal's transfer of his stock in Kitchen Experts to a new holding

3  corporation known as Good Development, and his later transfer of his stock in Good Development

4  to Franchini.  The Ninth Circuit has held that where a corporation is a party to an anti-assignment

5  provision, a transfer of the corporation's stock to a new owner—as opposed to a transfer of the

6  corporation's *rights* to a different entity—does not violate the provision.  *U.S. Cellular Inv. Co. v.*

7  *GTE Mobilnet, Inc.*, 281 F.3d 929, 935 (9th Cir. 2002).

8  Rather than addressing any of the authority discussed above and in Plaintiffs' opposition

9  brief, Defendants' reply argues for the first time that Plaintiffs violated a separate section of the

10  SPA, which required Cardinal to provide Lupo with three days' notice prior to the merger

11  contemplated at the time of the sale, because Cardinal did not in fact provide any such notice.

12  Lupo & Kitchen Reply at 2–3 (citing SPA § 2.2; Lupo Decl. re Lupo & Kitchen MSJ (dkt. 97) ¶ 2

13  (stating that Lupo was unaware of the change in corporate form until his deposition in June of

14  2019)).  That provision appears in a section of the SPA addressing Lupo's security interest in

15  Kitchen Experts from the time of the sale until full payment of the purchase price.  SPA § 2.2.

16  There is no indication that the parties intended it to have any relation to the anti-assignment

17  provision, which occurs fourteen pages later in a separate section of the SPA.  Defendants have

18  also identified no evidence of prejudice as a result of that purported breach.  Whatever remedy

19  Lupo may have for the purported breach of section 2.2, if any, it is not to negate the transfer of

20  rights under the SPA by operation of law to the surviving post-merger corporation under section

21  1107 of the Corporations Code.

22  Defendants have not shown that any change in corporate form or ownership violated the

23  SPA's anti-assignement provision under California law.  Their motion for summary judgment on

24  that basis is DENIED.

25  b.      Cardinal's Transfer of Stock

26  Defendants also argue that Cardinal cannot show damages because he transferred his

27  ownership interest within months after purchasing the corporation, and thus could only recover for

28  damages that occurred between May 25, 2017 and June 15, 2017.  Lupo & Kitchen MSJ at 5–7.

United States District Court
Northern District of California

38

Defendants base that date on when Cardinal transferred his shares in Kitchen Experts to the corporation that he created and also owned for the purpose of effecting a merger and curing purported defects in past corporate governance.  Cardinal did not transfer his ultimate ownership of Kitchen Experts (using that term to refer to both the pre- and post-merger versions of the company) until 2019, when he gave 49% of the new holding company Good Development to Franchini on or immediately after March 8, 2019, and days later sold his remaining 51% of the holding company to Franchini "in return for assumption of the company's debts to [Cardinal], which at the time was roughly $2.14 million (most of which was from KE)."  Cardinal Decl. re Lupo & Kitchen MSJ ¶¶ 43–44.

Cardinal's declaration and the SPA indicate that Cardinal paid $2 million to purchase Kitchen Experts from Lupo, SPA § 2.1, subsequently loaned an amount to Kitchen Experts sufficient to constitute "most of" Good Development's $2.14 million debt (for a total investment in Kitchen Experts likely somewhere between $3 million and $4 million), and then sold his ownership interest in Good Development (which also included other businesses besides Kitchen Experts) in exchange for Franchini's assumption of the company's $2.1 million debt.  Cardinal Decl. re Lupo & Kitchen MSJ ¶ 44.  If a jury agreed with Plaintiffs' positions regarding Lupo and Kitchen Fantastic's purported misconduct, the jury might reasonably attribute some portion of the significant difference in value reflected by those purchase, investment, and sale amounts to such misconduct, either at the time of sale resulting from Lupo's purported misrepresentations inducing Cardinal to pay a higher price than he otherwise would have, or subsequent to the sale resulting from other conduct.  Defendants are not entitled to summary judgment based on a failure by Cardinal to show damages.

To the extent that Defendants motion could be read as suggesting that Cardinal cannot show a breach of contract because Lupo's relevant obligations under the SPA were limited to indemnifying Cardinal for misrepresentations stated in the SPA, *see* Lupo & Kitchen MSJ at 5–6, there is evidence—as discussed above in the context of the misrepresentation claims—from which a jury could reasonably determine that certain representations in the SPA were false, and that such representations affected the value of the company.

United States District Court
Northern District of California

Defendants' motion for summary judgment is DENIED with respect to Plaintiffs' claims for breach of contract, as well as for breach of the duty of good faith and fair dealing, for which Defendants rely on the same arguments.  *See* Lupo & Kitchen MSJ at 4, 6–7.

### 3. Claim for Trade Libel

Defendants argue that Lupo is entitled to summary judgment on Plaintiffs' claims for trade libel because Kitchen Experts' responses to interrogatories failed to identify any evidence of false statements by Lupo or of any "prospective user of [Kitchen Expert's] business . . . who was induced to avoid [Kitchen Experts] because of a false statement attributed to Mr. Lupo."  Lupo & Kitchen MSJ at 8 (citing Pohls Decl. re Lupo & Kitchen MSJ Exs. 7–8).  Plaintiffs contend that summary judgment is not appropriate because they identified certain purportedly false statements in their interrogatory responses, and because Lupo has "refuse[d] to turn over information regarding his communications with prospective [Kitchen Experts] customers."  Opp'n to Lupo & Kitchen MSJ at 22–23.

Plaintiffs also object to Defendants' reliance on Plaintiffs' interrogatory responses as hearsay.  *Id.* at 22 n.9.  But *Defendants'* use of Plaintiffs' responses "falls under the hearsay exception for statements of an opposing party."  *Held v. Northshore Sch. Dist.*, No. C13-1548 MJP, 2014 WL 6451297, at *5 (W.D. Wash. Nov. 17, 2014) (citing Fed. R. Evid. 802(d)(2)).  A party's *own* interrogatory responses, on the other hand, are hearsay—Plaintiffs cannot rely on their interrogatory responses as a substitute for evidence of false statements that Lupo made to any of Kitchen Experts' actual or potential customers, or anyone else with whom it might have had a business relationship, such as customers or suppliers.  *AT & T Corp. v. Dataway Inc.*, 577 F. Supp. 2d 1099, 1109 (N.D. Cal. 2008).

The Court is also not inclined to deny summary judgment based on Lupo's purported failure to produce communications with potential Kitchen Experts customers.  *Celotex*, on which Plaintiffs rely, acknowledged Rule 56(f) of the Federal Rules of Civil Procedure, which "which allows a summary judgment motion to be denied, or the hearing on the motion to be continued, if the nonmoving party has not had an opportunity to make full discovery."  477 U.S. at 326. Plaintiffs had such an opportunity here.  Discovery closed before Lupo and Kitchen Experts filed

their motion for summary judgment, Plaintiffs filed their opposition brief more than a month after Lupo's long-delayed deposition, and Plaintiffs did not file a motion to compel Lupo to produce evidence of communications with potential customers.  Even Plaintiffs' belated motion for sanctions does not cite any failure of Lupo to produce such evidence as grounds for relief. Plaintiffs had their opportunity.  Defendants' motion for summary judgment is GRANTED as to the claim against Lupo for trade libel.

Although Defendants' briefs omitted any argument that Plaintiffs lack evidence of false statements or harm caused by Kitchen Fantastic, the Court raised that issue at the hearing and Plaintiffs did not indicate that they had any such evidence.  Summary judgment is therefore also GRANTED with respect to the trade libel claim against Kitchen Fantastic.

### 4.    Claims for Intentional Interference with Contractual Relations and Economic Relations

Defendants argue that Lupo is entitled to summary judgment on Plaintiffs' claims for interference with contractual relations and prospective economic relations because, in the context of employment and in the absence of a contract, such a claim is barred under section 16600 of the California Business and Professions Code as a restraint of trade.  Lupo & Kitchen MSJ at 4–5 (also citing *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 255 (1968)); *see also* Notice of Lupo & Kitchen MSJ at 3 ¶ 8.  According to Defendants, Lupo was not subject to any contract that would disrupt the operation of that rule because the anti-assignment provision bars the current version of Kitchen Experts from invoking its predecessor's rights.  As discussed above, the Court rejects the underlying argument regarding the anti-assignment provision, and holds that the new Kitchen Experts is entitled to assert the rights of the company that Lupo sold.  The motion is therefore DENIED as to this claim.  The Court need not reach Plaintiffs' alternative argument that Lupo's particular familiarity with Kitchen Experts's business is sufficient to support the claim even without a contract.

### 5.    Claim for Inducing a Breach of the Duty of Loyalty

Defendants argue that Lupo and Kitchen Fantastic are entitled to summary judgment on Plaintiffs claim for inducing a breach of Daza and Phelton's duty of loyalty to Kitchen Experts

because Plaintiffs have not shown any fiduciary duty.  Lupo & Kitchen MSJ at 9; *see also* Lupo &

Kitchen Reply at 8 ("Neither Mr. Lupo nor Kitchen Fantastic, Inc. Can Be Liable for Inducing

Conduct that Was Not Tortious").  For the reasons discussed above in the context of Phelton's

motion, the Court holds that California law recognizes a tort claim for any employee's breach of

the duty of loyalty to an employer, distinct from a claim for breach of fiduciary duty.  Defendants'

motion is therefore DENIED as to this claim.

> **6.    Claims for Conversion and Violation of the Computer Fraud and
> Abuse Act**

Defendants assert in their notice of motion that they are entitled to summary judgment on

Kitchen Expert's claims for conversion and violation of the Computer Fraud and Abuse Act

"because the Kitchen Experts of the Stock Purchase Agreement is no longer in existence and John

Lupo and Kitchen fantastic [sic] have no contractual relationship with the existing entity."  Notice

of Lupo & Kitchen MSJ at 3 ¶¶ 10–11.  Defendants do not address those claims again in either

their motion or their reply brief, except for a footnote in the motion reading as follows:

> To the extent they are dependent on a contractual relationship that did
> not exist, the ninth claim for relief (for intentional interference with
> prospective economic relations), twelfth claim for relief (for
> conversion) and thirteenth claim for relief (for computer fraud) all
> also must fail.

Lupo & Kitchen MSJ at 4 n.3.  Defendants have not explained why a contractual relationship

would be necessary to the tort of conversion or to a statutory claim for unauthorized access under

the Computer Fraud and Abuse Act.  *See, e.g.*, *LVRC Holdings LCC v. Brekka*, 581 F.3d 1127,

1132 (9th Cir. 2009) (discussing the elements of a claim under the Computer Fraud and Abuse

Act); *Welco Elecs., Inc. v. Mora*, 223 Cal. App. 4th 202 (2014) (discussing the elements of a claim

for conversion under California law).  Defendants thus have not met their initial burden to show

the absence of genuine dispute as to any element of those claims, and their motion is DENIED

with respect to those claims.[17]

---

[17] To the extent Defendants intended, without explanation, that this argument rely on the anti-
assignment argument discussed above in the context of Plaintiffs' breach of contract claims, it
fails because Defendants have not shown that the changes in corporate form or stock ownership
violated that provision of the contract.  Such an argument would also fail because any rights that

United States District Court
Northern District of California

### 7.        Claim for Violation of the Stored Communications Act

Defendants' notice of motion briefly asserts that Lupo is entitled to judgment on Plaintiffs' claim for relief under the Stored Communications Act because Lupo did not access AAO's stored communications.  Notice of Lupo & Kitchen Fantastic MSJ at 3 ¶ 12.  Neither party's briefs address that claim in any way.  The Stored Communications Act claim asserted in the complaint does not allege that Lupo himself accessed AAO's communications, but rather than D'Anna acted as Lupo's agent when she accessed the "aao_outlet@yahoo.com" account after she was fired.  Compl. ¶ 122.  For the reasons discussed above in the context of Appliance Fantastic's motion, Lupo is not entitled to summary judgment on that claim.

### 8.        Claim for Violation of the Unfair Competition Law

Defendants argue in their motion only that Kitchen Fantastic is entitled to judgment on Plaintiffs' UCL claim because it is derivative of Plaintiffs' other claims, on which Defendants also contend they are entitled to judgment.  Lupo & Kitchen MSJ at 9–10.  As discussed above, the Court declines to grant judgment on any of the other claims against Kitchen Fantastic—for trade libel, inducing a breach of the duty of loyalty, and violation of the Computer Fraud and Abuse Act.  The Court therefore also DENIES Defendants' motion with respect to the UCL claim.[18]

### F.    Andrea Michael's Motion

Lupo's wife Andrea Michael moves for summary judgment on the only claim against her, for aiding and abetting Lupo's purported fraud.  Liability for aiding and abetting applies where a "person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a

---

Kitchen Expert had to sue for conversion or violation of the Computer Fraud and Abuse Act were not rights *under the contract*, and thus did not fall within the scope of the anti-assignment provision to begin with.

[18] In a footnote, Lupo also briefly contends that he is entitled to summary judgment on a counterclaim for breach of contract.  Lupo & Kitchen MSJ at 5 n.5.  That request is DENIED.  *See United States v. Strong*, 489 F.3d 1055, 1060 n.4 (9th Cir. 2007) ("The summary mention of an issue in a footnote, without reasoning in support of the appellant's argument, is insufficient to raise the issue on appeal." (quoting *Hilao v. Estate of Marcos*, 103 F.3d 767, 889 n.4 (9th Cir. 1996)).

1   breach of duty to the third person." *Berger v. Varum*, 35 Cal. App. 5th 1013, 1025 (2019)

2   (citation and internal quotation marks omitted).

3     Michael states in her declaration that she did not participate in negotiations regarding the

4   SPA or Lupo's efforts to sell Kitchen Experts, that she had no role related to Kitchen Experts's

5   books and records, that she made no representations regarding the sale, and that she met Cardinal

6   for the first time when she signed a spousal consent form at the closing of the transaction.  *See*

7   *generally* Michael Decl. (dkt. 85).  There is evidence from which a jury might conclude otherwise.

8   Mail for Kitchen Express was delivered to her home.  Crawford Decl. re Phelton & Michael MSJs

9   (dkt. 87) Ex. B at 22:14–16.  Michael sometimes signed checks on behalf of Kitchen Express.  *Id*

10  at 20:16–22:6.  Michael made numerous personal purchases using Kitchen Express checks,

11  sometimes based on consultations with her husband Lupo.  *E.g.*, *id.* at 41:7–42:15.  Michael

12  frequently called Kitchen Experts operations manager Anne Barlow with questions regarding

13  "certain payments, finances, and expenses," and gave Barlow the impression "that she was

14  familiar with the financial condition and affairs of Kitchen Experts."  Barlow Decl. re Michael

15  MSJ (dkt. 88-1) ¶ 4.

16    During the process of finalizing the sale, Thomas Del Beccaro—an attorney whom

17  Cardinal had initially believed represented Lupo—stated that he represented Michael and was

18  serving as her representative, that Michael did not approve of the $1 million sale price to which

19  Lupo and Cardinal had previously agreed, and that her approval was necessary for the sale to go

20  forward.  Cardinal Decl. re Michael MSJ (dkt. 88-5) ¶¶ 2–3.[19]  Michael later expressed opinions

21  on the sale of the company that had been central to her and her husband's lives.  *Id.* ¶¶ 4, 7.

22    If  a jury declined to credit Michael's testimony regarding her lack of knowledge

23  involvement, it might conclude from the evidence of her involvement with Kitchen Experts and

24  the sale that she knew of at least some of Lupo's purported misrepresentations, and that she

25  knowingly helped Lupo defraud Cardinal by insisting on a higher sale price.[20]  Michael's motion

26

27  [19] Defendants object to Cardinal's recounting of Del Beccaro's statements as hearsay.  Statements
    by an agent of a party opponent are not hearsay.  Fed. R. Evid. 801(d)(2)(D).

28  [20] The Court also notes that Michael did not search for text messages in response to Plaintiffs'
    requests for production of communications, and thus may not have produced all communications

United States District Court
Northern District of California

for summary judgment is therefore DENIED.

The Court does not reach Plaintiffs' argument that Michael's signing of the spousal consent form representing that she had read the SPA was itself fraudulent in light of her testimony that she did not read the SPA.

## VI.    CONCLUSION

For the reasons discussed above, the motions are GRANTED in part and DENIED in part. The motion for sanctions is DENIED except as to limited attorneys' fees, and the parties shall follow the procedure set forth above to determine the amount of fees.  Defendants' motions for summary judgment are GRANTED with respect to: (1) all of Plaintiffs' claims for trade libel; and (2) the claim against D'Anna for interference with contractual relations.  The motions for summary judgment are otherwise DENIED.

**IT IS SO ORDERED.**

Dated: September 17, 2019

_____

JOSEPH C. SPERO
Chief Magistrate Judge

_____

responsive to Plaintiffs' document requests.  *Id.* at 147:17–148:8.